**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

```
------------------------------------------------------------ x
In re:                                     :
                                           :        Chapter 11
HO WAN KWOK, et al.,¹                       :
                                           :
                        Debtors.           :        Case No. 22-50073 (JAM)
                                           :        (Jointly Administered)
------------------------------------------------------------ x
LUC A. DESPINS, CHAPTER 11                  :
TRUSTEE,                                    :
                        Plaintiff,         :
v.                                         :        Adv. Proceeding No. 24-05249
                                           :
ACA CAPITAL GROUP LIMITED, et al.,          :
                        Defendants.        :
------------------------------------------------------------ x
```

**NOTICE REGARDING COURT'S MAY 28, 2026 ORDER**

Luc. A. Despins, in his capacity as chapter 11 trustee (the "Trustee") appointed in the chapter 11 case of Ho Wan Kwok (the "Debtor"), and plaintiff in the above-captioned adversary proceeding (this "Adversary Proceeding"), hereby submits this notice concerning the Court's May 28, 2026 Order (ECF No. 236).

1.      On May 14, 2026, the Trustee moved to compel discovery (ECF No. 216) as to defendants ACA Capital Group Ltd. ("ACA Capital"), Hamilton Opportunity Fund SPC ("Hamilton Opportunity"), Hamilton Capital Holding Limited ("Hamilton Capital"), Hamilton Investment Management Limited ("Hamilton Investment"), Himalaya International Clearing Limited ("Himalaya Clearing"), Himalaya Currency Clearing Pty. Ltd. ("Himalaya Currency"),

---

¹ The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

Himalaya International Financial Group Limited ("Himalaya Financial"), Himalaya International Payments Limited ("Himalaya Payments"), Himalaya International Reserves Limited ("Himalaya Reserves", and, together with Himalaya Clearing, Himalaya Currency, Himalaya Financial, and Himalaya Payments, the "Himalaya Entities"), Celestial Tide Limited ("Celestial Tide"), G Fashion, G Fashion Hold Co A Limited ("G Fashion A"), G Fashion Hold Co B Limited ("G Fashion B"), G Fashion International Limited ("G Fashion International"), G Fashion Media Group Inc. ("G Fashion Media"), GF IP LLC ("GF IP"), GF Italy LLC ("GF Italy"), GFNY Inc. ("GFNY"), Major Lead International Limited ("Major Lead"), and William Je (collectively, the "Defendants" and those Defendants other than William Je, the "Entity Defendants") due to, among other things, the Defendants' failure to produce any documents for more than two weeks after the April 30 production deadline.

2.      On May 18, 2026, the Defendants produced approximately 7,936 documents, the overwhelming majority of which came from just two defendants: GF Italy (approximately 2,939 documents) and GFNY (approximately 4,000 documents).  Most of the eighteen remaining Defendants produced fewer than 50 documents each, and the Defendants' aggregate production included hardly any communications involving William Je or those of the Defendants' other agents and representatives.  As detailed at the May 28, 2026 hearing, the productions of the eight Defendants scheduled for trial this summer (Hamilton Opportunity, ACA Capital, the Himalaya Entities, and William Je, together the "Summer Trial Defendants"), were particularly lacking.  The Summer Trial Defendants collectively produced only approximately 690 documents, of which only 92 were emails; only 18 of these emails involved William Je, and nearly half of all of the 92 emails produced to the Trustee were either communications between Aaron Mitchell and a real estate

agent, relating to the Debtor's acquisition of the Mahwah Mansion, or communications about COVID sanitation products. *See* ECF No. 236, pp. 17:6-18:9.[2]

3. On May 28, 2026, in response to the gross deficiencies in the Defendants' responses to the Trustee's requests for the production of documents (the "Requests"), the Court ordered the Defendants to provide the Trustee with written verifications detailing (1) the search terms that the Defendants applied in response to the Trustee's Requests; (2) the sources against which these search terms were applied; (3) the email accounts of William Je and the other Defendants; (4) the status of these email accounts, including whether they are still operational (and if not, when and how they stopped operating) as well as whether they are subject to automatic deletion (and if so, on what schedule); (5) a list of the devices that the Defendants used, including identifying what was searched; (6) a list of messaging platforms, including WhatsApp or Signal, that the Defendants used, including identifying what was searched; (7) whether any Defendants have custody, possession, or control over documents created in connection with the employment by ACA Capital of certain individuals identified in ACA Capital's document production; and (8) whether William Je owns or has access to documents located at the properties that he disclosed in his interrogatory responses (collectively, the "Document Search Information"). *See* Ex. 1, at 69:3-71:9.

4. The Court ordered the foregoing information, as well as amended and revised verifications of the Defendants' interrogatory responses, to be served on the Trustee by 10 a.m. on June 4, 2026 (the "May 28 Discovery Order"). *Id.,* at 68:12-16.

5. On June 2, 2026, counsel for the Trustee sent an email to Defendants' counsel reminding him of his obligations under the Court's May 28 Discovery Order. A copy of this email is attached hereto as **Exhibit 2**.

---

[2]   A copy of the May 28, 2026 hearing transcript is attached hereto as **Exhibit 1**.

6.      Notwithstanding the Trustee's June 2 reminder, the Defendants made no effort to comply with the Court's May 28 Discovery Order, failing to provide *any of the Document Search Information* or *any of the amended interrogatory verifications* by the deadline of 10:00 a.m. on June 4, 2026.  As of the time of this filing, the Defendants have still provided none of the information required by the Court's order.

7.      As a result of their unexcused failure to comply with the Court's order and their discovery obligations more generally, the Defendants should be subject to immediate sanctions under Rule 37(b)(2)(A) and 37(c) of the Federal Rules of Civil Procedure, as made applicable here under Rule 7037 of the Federal Rules of Bankruptcy Procedure.  The Trustee respectfully submits that, pursuant to Rules 37(b)(2)(A)(ii) and 37(c), the Defendants should be precluded from offering any evidence, including testimony at trial, relating to the subjects of the Trustee's Requests for Production, including but not limited to (i) Mr. Je's alleged ownership of the Entity Defendants; (ii) the operations, management, and decision-making of the Entity Defendants; (iii) transfers of assets to or from the Entity Defendants; (iv) Mr. Je's and the Entity Defendants' relationships with the Debtor and other individuals, including the Debtor's assistants and family members; and (v) customers of the Entity Defendants and services allegedly provided to such customers.[3]

8.      The Trustee reserves his right to seek similar or additional relief related to the categories of evidence described herein, including by filing a separate motion for sanctions if necessary or a motion *in limine*, and this notice is without prejudice or limitation to any further relief the Trustee may seek at or before trial in this adversary proceeding.

---

[3]   For ease of reference, the Trustee attaches as **Exhibit 3** his Requests for Production served on Defendant ACA Capital, which cover substantially the same categories of documents as the Requests for Production served on the other Defendants.  For the avoidance of doubt, the Defendants should be precluded from offering evidence related to *any* of the requested categories of documents, not only the foregoing categories.

Dated:   June 4, 2026             LUC A. DESPINS,
        New Haven, Connecticut    CHAPTER 11 TRUSTEE

By: /s/ *Kari A. Mitchell*
    Patrick R. Linsey (ct29437)
    Kari A. Mitchell (ct31578)
    NEUBERT, PEPE & MONTEITH, P.C.
    195 Church Street, 13th Floor
    New Haven, Connecticut 06510
    (203) 781-2884
    plinsey@npmlaw.com
    kmitchell@npmlaw.com

    Nicholas A. Bassett (admitted *pro hac vice*)
    PAUL HASTINGS LLP
    2050 M Street NW
    Washington, D.C., 20036
    (202) 551-1902
    nicholasbassett@paulhastings.com

    *Counsel for the Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

------------------------------------------------------------ x
In re:                                                      :
                                                           :       Chapter 11
HO WAN KWOK, *et al.*,[4]                                    :
                                                           :       Case No. 22-50073 (JAM)
                             Debtors.                       :       (Jointly Administered)
------------------------------------------------------------ x
LUC A. DESPINS, CHAPTER 11                                  :
TRUSTEE,                                                    :
                             Plaintiff,                     :
v.                                                          :       Adv. Proceeding No. 24-05249
                                                           :
ACA CAPITAL GROUP LIMITED, *et al.*,                        :
                             Defendants.                    :
------------------------------------------------------------ x

## CERTIFICATE OF SERVICE

The foregoing notice was filed on the date hereof using the Court's case management/electronic case files ("CM/ECF") system on the public docket in the above-captioned adversary proceeding (the "Adversary Proceeding"). Notice of the version filed on the public docket was sent by email immediately upon filing to all appearing parties in this Adversary Proceeding by operation of the CM/ECF system.

Dated:     June 4, 2026
           New Haven, Connecticut

                              By: /s/ *Kari A. Mitchell*
                                  Kari A. Mitchell (ct31578)
                                  NEUBERT, PEPE & MONTEITH, P.C.
                                  195 Church Street, 13th Floor
                                  New Haven, Connecticut 06510
                                  (203) 781-2884 kmitchell@npmlaw.com

---

[4] The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION


IN RE:                              .  Chapter 11
                                    .  Case No. 22-50073 (JAM)
HO WAN KWOK AND GENEVER             .
HOLDINGS CORPORATION AND            .  (Jointly Administered)
GENEVER HOLDINGS, LLC,              .
                                    .
          Debtors.                  .
                                    .
. . . . . . . . . . . . . . . . .   .
                                    .
LUC A. DESPINS,                     .  Adversary Proceeding
CHAPTER 11 TRUSTEE,                 .  No. 25-05249 (JAM)
                                    .
          Plaintiff,                .
                                    .
     v.                             .
                                    .
ACA CAPITAL                         .  Brien McMahon Federal Building
GROUP LTD., *et al.*,               .  915 Lafayette Boulevard
                                    .  Bridgeport, Connecticut 06604
          Defendant.                .
                                    .  Thursday, May 28, 2026
. . . . . . . . . . . . . . . . .   .  10:58 a.m.


                TRANSCRIPT OF HYBRID ZOOM HEARING
           BEFORE THE HONORABLE JULIE A. MANNING
                UNITED STATES BANKRUPTCY JUDGE


Audio Operator:           Electronically recorded

Transcription Company:    Reliable
                          The Nemours Building
                          1007 N. Orange Street, Suite 110
                          Wilmington, Delaware 19801
                          Telephone: (302)654-8080
                          Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES OF COUNSEL

**Luc A. Despins, Esquire**
Paul Hastings LLP
200 Park Avenue
New York, NY 10166

**Nicholas A. Bassett, Esquire**
Paul Hastings, LLP
2050 M Street NW
Washington, DC 20036

**Patrick R. Linsey, Esquire**
Neubert, Pepe & Monteith, P.C.
195 Church Street
13th Floor
New Haven, CT 06510

**Michael T. Conway, Esquire**
Lazare Potter Giacovas & Moyle LLP
747 Third Ave., 16th Floor
Fifth Floor
New York, NY 10017

**Jeffrey M. Sklarz, Esquire**
Green & Sklarz LLC
One Audubon Street
3rd Floor
New Haven, CT 06511

3

                                  INDEX

MOTIONS:                                                    PAGE

Matter
No. 216    #216; Motion to Compel                             6

           Court's Ruling:                                   65

Matter
No. 225    #225; Motion to Compel                            71

           Court's Ruling:                                   89


Transcriptionists' Certificate                              101

(Proceedings commence at 10:58 a.m.)

THE CLERK:  Adversary number 24-05249, Luc A. Despins, Chapter 11 Trustee v. ACA Capital Group, Ltd., et al.

THE COURT:  Good morning.  If we could have appearances for the record, please.

MR. DESPINS:  Good morning, Luc Despins, Chapter 11 Trustee.

And I want to thank the Court for adjusting the schedule to suit my conflicting hearing in the BVI.  Thank you.

MR. BASSETT:  Good morning, Your Honor.  Nick Bassett from Paul Hastings, counsel to the Chapter 11 Trustee.

MR. LINSEY:  Good morning, Your Honor.  Patrick Linsey of Neubert, Pepe & Monteith for the Chapter 11 Trustee.

THE COURT:  All I see is --

MR. CONWAY:  Good morning, Your Honor.  Michael --

THE COURT:  All I see is clouds, Mr. Linsey.  Are you outside?

MR. LINSEY:  I apologize, Your Honor.  I had a personal family obligation this morning that ran late, so I am at a highway rest stop.

THE COURT:  Well, maybe you should sit in your

car.

MR. LINSEY:  I thought this would look better.  I don't know.

THE COURT:  I'm not sure it does.

MR. LINSEY:  Fair.

(Laughter)

MR. LINSEY:  Fair.

THE COURT:  Okay.

MR. LINSEY:  Attorney Bassett will be speaking, and I'll be turning my camera off, if that's acceptable to the Court.

THE COURT:  That's fine.  Thank you.

MR. CONWAY:  Good morning, Your Honor.  Michael Conway.  I am here representing ACA Capital Group, Celestial Tide, G Fashion, G Fashion International Limited, GF IP, GF Italy, GFNY, Hamilton Capital Holding, Hamilton Investment Management Limited, Hamilton Opportunity Fund, Himalaya Currency Clearing, Himalaya International Clearing, Himalaya International Finance Group, Himalaya International Payments, Himalaya International Reserves, Major Lead, and William Je.

THE COURT:  Good morning.

MR. CONWAY:  Good morning.

THE COURT:  Are there other people on this remote call that wish to -- this remote hearing?  I think I see other people.  I'm not sure why, but --

MR. SKLARZ:  Your Honor, this is --

THE COURT:  Okay.

MR. SKLARZ:  This is Jeff -- this is Jeff Sklarz. We're just observing the proceedings.  I don't intend to participate.  And Colton Bailey is a lead intern in our office -- I'm sorry -- a summer associate in our office this summer, again, just observing proceedings.

THE COURT:  Okay.  Thank you.

MR. CHARMOY:  Scott Charmoy, and I'm also here to observe proceedings.

THE COURT:  Okay.  thank you.

All right, Trustee Despins.  This is a continued hearing on a motion to compel and an initial hearing on a second motion that has some aspects of compelling to it, as well, so please proceed.

MR. DESPINS:  Mr. Bassett will take the lead, Your Honor.

MR. BASSETT:  Good morning, Your Honor.  Again, Nick Bassett from Paul Hastings on behalf of the Chapter 11 Trustee.

So I'll start with the continued hearing on the trustee's motion to compel compliance with discovery obligations by Attorney Conway's clients.

Your Honor, we obviously last addressed this issue at the hearing on April 19th.  The way that hearing concluded

was with an instruction by the Court that the defendants were to provide information, specific information, by last Friday, April 22nd, concerning the manner in which they searched for documents responsive to the committee's document requests.

In particular, the types of information we discussed at the hearing would be:  The names of all custodians; sources of documents, including electronic devices, email accounts, et cetera, and the search terms that were used.

Importantly, it came up during the course of the hearing that this was not an obligation to provide information occasioned by an interrogatory served by the trustee, but rather, consistent with the defendants' obligations under Rule 26, to conduct a complete and thorough search for documents in response to the trustee's discovery requests.

I also want to point out that, although the defendants had indicated at the April 19 hearing that somehow they had never heard of the trustee's request for this information prior to the hearing on April 19th, that is not true for two reasons:

One, we had raised it on a meet-and-confer call that we had the prior week.

And secondly -- and we filed, Your Honor, this morning, some additional materials at ECF 228 that are

relevant to the hearing today, that I'll reference in due course.

But on March 4th, 2026 -- this is one of the documents we filed -- the trustee proactively sent an email to all defendants prior to their deadline to produce documents, setting forth all the different types of information that the trustee would want to have in order to facilitate an orderly meet-and-confer process, including the types of information that I discussed about document collection, sources, search terms, things like that.  That was on March 4th, so, you know, three -- two and a half months ago at this point, almost three.  We never got a response to that from the defendants.

Last Friday, Your Honor, on April [sic] 22nd, instead of providing the information that was discussed at the April 19th hearing, the defendants simply served -- and we filed these at ECF 228 under seal because they were marked confidential.  The defendants served for each entity and for William Je amended interrogatory responses where they simply answered one of the trustee's interrogatories, in which the trustee had asked for the locations at which the defendants had stored documents.

And the reason we had asked that particular interrogatory, Your Honor, was not to supplant the defendants' obligations under Rule 26, but because we wanted

to understand if there were other persons or locations or entities that may be in possession of documents belonging to the defendants in case we needed to issue third-party subpoenas to those entities.  It was absolutely not an indication that that's all the information the defendants would need to provide in order to comply with their document production obligations.

Those interrogatory responses, Your Honor, don't come close to satisfying the defendants' obligations and are not consistent with what was discussed at the April 19th hearing.

Just to give the Court a flavor, the interrogatory responses for ACA, for all the Himalaya entities, and for Hamilton are, as far as I can tell, identical.  And the Court can see this in what we filed.  For whatever reason, I'm not sure why, they were marked highly confidential, so I won't get into it in too much detail.  But it basically just lists an address at which the documents were stored, says that there were digital records that were transferred.

And by the way, for each of these entities, for ACA, for the Himalaya entities, and Hamilton, apparently, according to these interrogatory responses, all of the documents for those entities were stored at Hamilton because the response is identical, and it just refers to Hamilton as the party who held the documents.

THE COURT:  Which Hamilton entity are you talking about, Mr. Bassett?

MR. BASSETT:  Yeah, in -- it says all records -- the documents were kept by -- for each of the entities, it says the documents were kept by its main contractor, Hamilton Capital Holding Limited, which is now in administration.

THE COURT:  Say -- I'm sorry.  Please slow down a little bit and tell me again.

MR. BASSETT:  Sure.

THE COURT:  Hamilton Marketing did you say?

MR. BASSETT:  No.  Hamilton Capital Holding Limited is purportedly the entity that maintained records for ACA, for the Hamilton entity defendants and for all the Himalaya entity defendants.

And then the interrogatory response goes on to say that, you know, for all -- each of the defendants, once again, it's identical -- that, you know, digital records were available -- here's no description of what those digital records consist of -- that they were maintained on some online platform named Huddle.

THE COURT:  Named what?

MR. BASSETT:  Eventually --

THE COURT:  Slow down.

MR. BASSETT:  Huddle, H -- yes, Your Honor. Huddle, H-u-d-d-l-e.

THE COURT:  And are they saying they're --

MR. BASSETT:  And again --

THE COURT:  -- no longer there?  Is that what you're telling me?

Well, they say, when the assets were -- it says:

"When the assets were frozen and the ability to pay was removed, Huddle blocked access to these digital records."

THE COURT:  When what assets were frozen?

MR. BASSETT:  It's not clear, Your Honor.

Again, we filed these amended interrogatory responses at ECF 228 --

THE COURT:  When did you file --

MR. BASSETT:  -- so the Court can see --

THE COURT:  You filed those when?

MR. BASSETT:  We filed it this morning, Your Honor, in advance of the hearing.

THE COURT:  Well, apparently, less than an hour ago, so I have, obviously, not seen that.

MR. BASSETT:  Understood, Your Honor.  I'm just pointing it out for reference that the --

THE COURT:  The other thing I would note, I think you just made a mistake when you said dates.  The last hearing on this was not April 19th, but May 19th.  I -- at least --

MR. BASSETT:  I'm sorry, Your Honor.

THE COURT:  Right?  I mean, that's what my records indicate.

MR. BASSETT:  Yes, Your Honor.

THE COURT:  So I want to make sure the record is accurate.

MR. BASSETT:  You're absolutely correct.  I had the wrong month.

THE COURT:  That's fine.  That's not a problem.  I just want to make sure I'm -- I am where I think I am.  Okay?  All right.

MR. BASSETT:  Under --

THE COURT:  So keep going.

MR. BASSETT:  Understood.

THE COURT:  I'm sorry.  I -- just, when you use names and things of that nature, I just need you to slow down so I can write them down, and I might need you to spell them, so that they're clear for the record.  All right?

MR. BASSETT:  Understood, Your Honor.

And so, look, these interrogatory responses conclude by saying that:

"Temporary access to the records was obtained and the records were downloaded as best as possible."

That's all in the passive voice.  It doesn't say obtained by whom, downloaded by whom.

THE COURT:  When they were sought --

MR. BASSETT:  And then it says --

THE COURT:  -- and when they were obtained.

MR. BASSETT:  Correct.  It doesn't say what consisted of the records, it doesn't say whose -- you know, what types of documents were within those digital records, who the individual custodians were who would have documents, whether there were emails stored as part of those digital records, whether there were text messages, instant messages, whether there were -- there was repository of, you know, Word and Excel files, anything like that, No visibility into the content.

And then the interrogatory response concludes by saying:

"The resulting digital copy is currently maintained by William Je, who assisted with the collection of documents responsive to the trustee's request for production."

THE COURT:  So hold on.

MR. BASSETT:  That's it.

THE COURT:  Say that again, Attorney Bassett, please, that -- what you just said.  The records are -- whatever sentence you just read, would you read it again, please?

MR. BASSETT:  Sure.  Let me read the last two

sentences for you, so you have the full context.

"Temporary access was obtained and the records were downloaded as best was possible.  The resulting digital copy is currently maintained by William Je, who assisted with the collection of documents responsive to the trustee's request for production."

That's it.  So we have no information as to how the document search and collection process was conducted.

Again, we have no visibility into who were the various custodians.  Was William Je the only person who ever created documents on behalf of these entities?  If so, you know, what devices did Mr. Je use?  Did he have computers? Did he have iPhones or other smart phones?  Did he have tablets?

Did he use email accounts?  If so, what were those email addresses?  Are the email addresses and accounts accessible to Mr. Je, such that they can be searched and documents provided?  What about other messaging accounts such as WhatsApp, which we know Mr. Je and others used?  We don't have answers to any of those questions.

Now what I anticipate Mr. Conway may say is that William Je was really the only person -- and I understand this from our meet-and-confer; we talked again yesterday -- is really the only person who would have documents.

But Your Honor, within the limited documents that

the defendants did produce -- and I want to give the Court a quick overview of those in a minute -- but for ACA, for example, they produced a document purporting to show the various officers and managers of ACA, and there's at least seven or eight people on that list:  A chief information officer, a chief financial officer, someone involved in legal compliance, a chief operating officer, a chief administration officer, and a chief investment officer, and a head of IT. We have no clue whether those persons' documents were searched; if so, how.  And for everyone, we have no visibility into, you know, what search terms were employed, et cetera.

And Your Honor, just a couple of other points why it is so important for us to have transparency and access to the information that I've identified, in terms of how these documents have been collected.

First -- and this is sort of, I think, a bit of stating the obvious.  But you know, there has been a history of issues with discovery in this Chapter 11 case, from the beginning, with individuals associated with the debtor failing to comply with their discovery obligations on numerous occasions.

For Mr. Je, the criminal court -- I mean, the Court obviously has heard a lot about Mr. Je's past proceedings.  But just as one example, in the criminal trial

against the debtor -- this is a finding by Judge Torres of the Southern District of New York -- she found that Mr. Je was, quote:

"-- chiefly responsible for laundering the proceeds of the charged fraud schemes" --

Which implicated him as a co-conspirator of the debtor.

Your Honor, under circumstances such as these, it is simply not sufficient for counsel to forward a discovery request to a client and say hey, give me what your response is.  I'm not saying that's all that Mr. Conway did.  But we need to understand exactly what was done because it would not be acceptable if Mr. Je was left to simply collect documents on his own.

And Your Honor, the documents that were produced further call into question the sufficiency of the production and necessitate the additional information that we are requesting.

Your Honor, we served nearly 50 document requests on each of the alter ego defendants represented by Mr. Conway.

We sought all documents and communications regarding the formation of the entity, its corporate governance, its funding, its capitalization.

We sought all communications with Mr. Je regarding

the operations, management, or decision-making of the company.

We sought financial statements, tax returns, communications with clients and customers, all documents and communications related to asset transfers.

Your Honor -- and I'm going to focus on the entities that are going to trial this summer.  Again, it's the Hamilton entities, Himalaya entities, and ACA.  Across those entities -- and by the way, the time period on our request was up to ten -- or at least ten years, in terms of what we requested, going back to 2016 or earlier.

We received a total, a grand total across all those entities, of 690 documents.  That was 92 emails and 3 text messages.

William Je himself produced a grand total of 30 documents, including 13 emails, 8 of which I'm told were related to the purchase of COVID sanitation products.  Mr. Je produced 1 WhatsApp message.

ACA Capital produced a grand total of 30 documents, including zero emails.

Himalaya International Clearing produced a grand total of 35 emails and 2 text messages.

Himalaya International Financial Group produced a total of 27 documents, including 1 email.

Himalaya International Payments produced a grand

total of 6 documents, including zero emails.

Himalaya International Reserves produced 21 documents, including 1 email.

Himalaya Currency Clearing produced 8 documents, including 1 email.

And finally, Hamilton Opportunity Fund produced a total of 255 documents and 41 emails; of those emails, most involved communications between Aaron Mitchell and a real estate agent for the Mahwah Mansion, as I understand it.

Your Honor, in light of the circumstances, in light of the facial incompleteness of the defendants' production, we absolutely need more information than that which has been provided.  The law requires it.  We provided Attorney Conway with case law, and we could provide it to the Court, examples of situations where courts have compelled the disclosure of search terms, of, you know, custodians, of devices, of all the parameters that an opposing party used to collect documents.  We need that information here, Your Honor, in order to assure ourselves and to assure the Court that the defendants' document production is complete.

And I will say, if we don't get that information and if the production that we've received is the full extent of the documents that the client -- or that the defendants say that they possess that are responsive to our discovery requests, I would suggest that and will suggest at the

appropriate time that that is further evidence of their alter ego nature, Your Honor.

But with that, I'm happy to answer any questions the Court may have.  But that's sort of the update on where we are since the hearing on May 19th, Your Honor.

THE COURT:  Well, again, I haven't looked at anything that was filed this morning, so I don't know exactly what you're talking about, except I just opened two documents; I haven't looked at them.

MR. BASSETT:  And --

THE COURT:  But --

MR. BASSETT:  And Your Honor, just -- so all we filed -- all we filed this morning was just -- because the Court had instructed Attorney Conway to provide information by last Friday, he had served the amended interrogatory responses on the trustee.  We thought it would be helpful to provide those to the Court, so the Court had an idea of what was provided last Friday.

And then we also attached a copy of the email we sent to Attorney Conway identifying, in our view, the remaining deficiencies and what he had provided.

And then we also attached the email that we had sent to all defendants on March -- in March of this year that I referenced in my remarks earlier.  That's the substance and totality of what we produced --

THE COURT:  Well, there's --

MR. BASSETT:  -- or what we filed --

THE COURT:  -- a sealed --

MR. BASSETT:  -- on the docket.

THE COURT:  -- document that was also filed.

MR. BASSETT:  I think that would be all of the interrogatory -- amended interrogatory responses which Attorney Conway had marked confidential.

THE COURT:  So you're asking the Court to grant your motion.  You're saying that Attorney Conway still has not produced the documents you've requested in your discovery requests, and, therefore, you would like the Court to grant your motion to compel.

MR. BASSETT:  And instruct the defendants to provide the information that we've requested concerning the manner in which documents were searched for and collected.

THE COURT:  By what date?

MR. BASSETT:  Well, Your Honor, in light of the schedule that we're under, I think it would have to be by -- I would say no later than next Wednesday, June 3rd.

THE COURT:  Okay.  Attorney Conway.

MR. CONWAY:  Thank you, Your Honor.

I want to start by saying that I was not served with a copy of whatever was filed under seal, so I didn't -- I'll take Mr. Bassett's word for the fact that it's just my

amended interrogatory responses.

And I will point out that, when I went back to try and figure out how to provide the information requested at the May 19th hearing, the only interrogatories -- the only requests that came close to this was the one that I responded with an amended response to.  It wasn't meant to be, necessarily, limited to former locations of documents, but that was as close as I could get to a request for the information, so that's what I used as my vehicle for providing the information.  I'm not sure why that would be objectionable.

But the -- let's start with the -- this email that apparently was sent from their litigation -- or their document email that was sent out to everybody.  As I pointed out to them yesterday -- we had a meet-and-confer last night -- that was the first time I had seen it.  But we went through it one by one, the things that they wanted.  I pointed out that we had either given that to them or they didn't -- they were inapplicable.

The one thing that Mr. Bassett said that he wanted were the various search terms used, which I indicated I would get to him.  I pointed out that, with the G Club entities, it wasn't really relevant because they just simply got all the documents and produced them without holding anything back, so there was no reason to opine what was relevant; they just

gave him everything.

But the -- what I'll call the "William Je entities" did run search terms.  And as I pointed out to Mr. Bassett last night, I've got a massive amount of documents which appear to be privileged, not necessarily responsive or relevant -- or really not necessarily relevant. In fact, the relevant documents that were responsive were produced to the extent that they weren't privileged.

This is a case where they're trying to prove that the debtor was the alter ego of all these entities, and there are no documents to support that.  The documents relating to how these entities were formed, including attorney invoices relating to that, were produced.

The -- and in the conversation I said well, look, you would think that there would be one document --

THE COURT:  Let me just --

MR. CONWAY:  -- in the --

THE COURT:  -- stop you right there, Attorney Conway.  You just said they're trying to prove the debtor is the alter ego, that's what you said.  Those were your words. It's just the opposite.  They're trying to prove that the entity is the alter ego of the debtor.  So I'm not sure why you would say that.  Did you mean to say that?

MR. CONWAY:  Well, I'll take your definition, Your Honor.

THE COURT:  It's not my definition.

MR. CONWAY:  I don't think it's --

THE COURT:  Stop.  Stop, stop.

MR. CONWAY:  Yeah, it would --

THE COURT:  Stop.  Stop.  It's not my definition. It's the allegations in the complaint, Attorney Conway.  The allegations --

MR. CONWAY:  Okay.

THE COURT:  -- in the complaint are that the entities are the alter egos of the debtor.  Those are the allegations.  So we need to make sure we have the record clear.

And when you say what's relevant and what's not relevant, ultimately, you don't get to make that determination.  That's what discovery is about.  Whether it's relevant or not will be decided when the evidence is submitted to the Court and a proper objection is raised and decided on.  So you don't get to decide what's relevant or not, number one.

Number two, I don't understand why you said what you said.  So I need you to --

MR. CONWAY:  Well, which part would you like me to explain?

THE COURT:  I'd like you to explain everything you just said that doesn't make sense to me.  You just said that

they -- they're try -- they have to prove that the debtor is the alter ego of the entity; say, for example, ACA Capital. That's exactly opposite of what's pled in the complaint.  So I want to understand why you said that.

MR. CONWAY:  Okay.  Well, Your Honor, I'd rather we didn't waste time on something like this because I will take the opposite statement and throw it back out at you that they have to prove that ACA is the alter ego of the debtor. Although I will point out that this is the exact opposite of the way it normally works in an alter ego proceeding.

THE COURT:  I --

MR. CONWAY:  But --

THE COURT:  Mr. Conway, you --

MR. CONWAY:  Yes?

THE COURT:  You didn't answer my question.

MR. CONWAY:  Yeah, I don't want to waste time on this.

THE COURT:  Answer my question.

MR. CONWAY:  Which is your question now?

THE COURT:  Do I have to read back your comments and my question, Mr. Conway?  It's not what is my question now.  And I think you need to step back a little bit here.

MR. CONWAY:  Well, I was trying --

THE COURT:  These are --

MR. CONWAY:  -- to say to you, Your Honor, that

I'm accepting what you said and I'm trying to rephrase what I said.

THE COURT:  Okay.  Then please --

MR. CONWAY:  I'm not sure --

THE COURT:  --rephrase it.

MR. CONWAY:  -- if it's efficient -- I did, I said that the complaint requires them to prove that -- and we'll talk -- say -- start with ACA -- that ACA is the alter ego of the debtor.  I'm assuming that that's okay for me to say.

And if that's the case, then they have to show some evidence.  Yesterday, Mr. Bassett acknowledged that they don't have a single document that supports that Mr. Kwok was involved in the formation or ownership of any of these entities.

MR. BASSETT:  That is not true.

THE COURT:  I would be surprised to --

MR. CONWAY:  That's exactly --

THE COURT:  -- hear that --

MR. CONWAY:  -- what was said.

THE COURT:  -- Mr. Conway.  I'd be very surprised.

MR. CONWAY:  Well, that's what you told me last night.

MR. BASSETT:  Not true.

MR. CONWAY:  That's what you told me last night.  I asked him --

THE COURT:  That's a waste --

MR. CONWAY:  -- what he --

THE COURT:  -- of time, actually --

MR. CONWAY:  -- what he --

THE COURT:  -- so let's get on with the issues.

What is Hamilton Capital Holdings Limited that was actually, according to these responses, from what I've heard, the entity maintaining the documents for all of these corporate entities?  What is Hamilton Capital Holdings Limited?

MR. CONWAY:  It's a management company that was acting as manager for all of these entities.

THE COURT:  Okay.

MR. CONWAY:  Located in the U.K., currently in administration, in the process of getting all this material. I was informed, for the first time, by the administrator that they sold the assets of the entity to another entity, which I've disclosed to Mr. Bassett and provided him with the transfer documents to that entity.

THE COURT:  And they destroyed --

MR. CONWAY:  The --

THE COURT:  -- the records that they had?  Where are the records?

MR. CONWAY:  I have no -- I don't know that they destroyed them.  I just know they sold them.

THE COURT:  Well, didn't you ask?

MR. CONWAY:  Yeah, and I did ask.  And the answer was everything was turned over to the purchasing entity.

THE COURT:  Including the records that the person in England who was charged with what, liquidating an entity that was a holding company for only documents?  What would there -- what would there be to liquidate?

MR. CONWAY:  It's an administrator.  I'm not -- I don't know why he would be liquidating anything.  All I know is that he said that not -- without knowing -- and I did ask, Your Honor -- and I showed frustration the way Mr. Bassett might have shown frustration -- what do you mean the documents -- the assets were sold, why have I not heard this before.  And the answer was I don't know, they were.  And he didn't have any answer for me.

THE COURT:  Well, are --

MR. CONWAY:  But that said, we went ahead and found documents elsewhere that were maintained on the same digital record for Hamilton Capital and produced those.

But we did produce everything responsive.  As I told Mr. Bassett, we have thousands of documents that I'm going through and creating a privilege log for.  And that I'm trying to have to him by the end of the weekend.

THE COURT:  All right.

MR. CONWAY:  So it's not as --

THE COURT:  Let me ask you --

MR. CONWAY:  -- if we didn't --

THE COURT:  Let me ask you another question then. So Hamilton Capital Holding Limited, you filed an appearance on their behalf.

MR. CONWAY:  I did.

THE COURT:  And you had no idea that they were in liquidation proceedings?

MR. CONWAY:  No.  I was engaged by the administrator to make an appearance.  And then, when I brought up the fact that this discovery process was going on, I got stonewalled with -- I finally was told well, there's no -- that the money that they have in their accounts was frozen pursuant to agreement with Mr. Despins, and they're not doing any work.

THE COURT:  What agreement with Mr. Despins?  I don't know anything about any agreement.

But stop for a second.  You just said you were engaged by the Administrator of Hamilton Capital Holding Limited?  Someone in England?

MR. CONWAY:  I was -- yeah.

THE COURT:  And asked you --

MR. CONWAY:  I was asked by --

THE COURT:  Retained you to be counsel to Hamilton Capital Holding Limited?

MR. CONWAY:  Yes.

THE COURT:  And who is that person?

MR. CONWAY:  Ian Goodhew, I believe is his name.

THE COURT:  Could you please spell it for the record?

MR. CONWAY:  If my memory serves correct, Ian is spelled the normal way, I-a-n.  And the last name, if my memory serves, that's G-o-o-w -- I'm sorry -- G-o-o-d-h-e-w.

THE COURT:  And that person, Mr. Goodhew, is appointed by a court, or is this a liquidation or whatever it is that happens outside of court?

MR. CONWAY:  It's a high court administration.  As I understand it, there have been proceedings for the last couple of years that Mr. Despins has participated in to a certain degree.

THE COURT:  Involving Hamilton Capital Holding Limited in England?

MR. CONWAY:  That's right.

THE COURT:  So --

MR. DESPINS:  And Your Honor, I can shed some light on that if you want.

THE COURT:  Hold on one second, please.

MR. DESPINS:  Briefly.

THE COURT:  Just hold on.

So then, after -- my understanding of what I've

been told is that Hamilton Capital Holdings Limited -- which is an administrator of what, documents?  Was then sold.  And there was a digital record of all of those documents that Mr. Je has.  Is that accurate, Mr. Conway?

MR. CONWAY:  I don't think that's accurate.  I don't think that the digital records were ever in the possession of Hamilton as administrator.  I think what they got rid of were all the paper documents that were stored.

They were storing documents for all of the entities.  And why they sold it -- I didn't even know they sold it until recently, Your Honor.  And I must say that my frustration has gotten me to the point that I -- you know, I want to be relieved as counsel because they -- you know, they -- their purported response or -- you know, was well, we don't have any information before the appointment, so we're not going to -- we're not going to assist.

THE COURT:  Well, what about Mr. Je?  You represent Mr. Je, so you must be taking directions from Mr. Je directly.

MR. CONWAY:  Mr. Je formed Hamilton Capital Holdings, is the D.O. [sic] of Hamilton Capital Holdings and, because of that, had digital records for Hamilton Capital Holdings.

THE COURT:  Okay.  And where --

MR. CONWAY:  So for --

THE COURT:  -- are those records?

MR. CONWAY:  The same place that all the relevant records -- all the records are --

THE COURT:  Well, no.

MR. CONWAY:  -- stored.

THE COURT:  You just said they only had paper records, not digital records.

MR. CONWAY:  And I'm referring now to the only records we have, which is a digital copy of records that were pulled down from Huddle.  Everything that was digital was stored on Huddle, and it was pulled down --

THE COURT:  So --

MR. CONWAY:  -- from Huddle.

THE COURT:  -- did Mr. Je provide you with a digital copy of the records he has regarding these alleged alter egos?

MR. CONWAY:  He provided me with a copy of the responsive documents.

THE COURT:  hat he believes to be the responsive documents.

MR. CONWAY:  Well, Your Honor, it wasn't that simple.  I mean, I'm not going to get into the attorney/client --

THE COURT:  Well, no.

MR. CONWAY:  -- confidentiality --

THE COURT:  Let's stop you --

MR. CONWAY:  Well, let --

THE COURT:  -- right there --

MR. CONWAY:  -- me finish --

THE COURT:  -- Mr. Conway.

MR. CONWAY:  -- my sentence, please.

THE COURT:  No, let me --

MR. CONWAY:  No, I --

THE COURT:  -- just stop --

MR. CONWAY:  I want to --

THE COURT:  -- you right --

MR. CONWAY:  I want to answer your question, if I could.

You know, as the attorney, I worked through these requests and the search with my client and went through and said okay, what about this, have you searched this, have you searched that, you know, show me what's going on here, show me what's going on there.  It wasn't a process where I just sent over some document requests to Mr. Je and said, have at it.

THE COURT:  So you had --

MR. CONWAY:  We're in --

THE COURT:  -- conversations --

MR. CONWAY:  -- a process --

THE COURT:  -- and meetings with Mr. Je about all

these requests for production, and you specifically spoke to Mr. Je.

MR. CONWAY:  Yes, and then formulated discovery search terms, which I wasn't provided by the trustee's counsel.  I got -- and we put those together by taking all the information that they requested in their requests.  And then, actually, I asked for things that I thought would be relevant that weren't requested, that, from what I understood of the cases, would be relevant in any event.

THE COURT:  So Mr. Je is the -- what is he, the officer of Hamilton?  He told me -- you just told me he formed Hamilton Capital Holding Limited.  That's what you told me, right?

MR. CONWAY:  Right.  I don't think he has any oversight abilities anymore because it's an administration, even though he was the D.O.  He was helping me because I couldn't get help from the administrator.

THE COURT:  Okay.  But you still haven't answered the question of whether Mr. Je has turned over all the documents he has with regard to all of these entities that the trustee has sought -- from which the trustee has sought discovery.

MR. CONWAY:  He -- well, let me answer that two ways:

One, he has not turned over the -- all the records

that were in possession for all entities, for all business purposes.  But he has turned over all the information that -- related to the requests.

THE COURT:  And your -- you believe that to be true?  You've reviewed every document that he has turned over, and you believe that those are all the documents that he has that are responsive to these requests.

MR. CONWAY:  I believe that to be true.  I, like I said, haven't reviewed every one of them yet because there are thousands I have yet to review that appear to be privileged.  But you know, to the extent that, you know, I see something in there that's not privileged, after my review this weekend, I will certainly produce it.  But I believe that everything that was responsive was produced, other than privileged documents.

THE COURT:  And why would --

MR. CONWAY:  And --

THE COURT:  -- there be a privileged document?

MR. CONWAY:  Well, Your Honor, there's the -- as you're well aware, several years ago, all of these entities became subject to litigation in the criminal court or investigations with the SEC or investigations with whatever entity, and there are attorney/client conversations relating to all of those investigations.  Those are not -- they're not relevant to the issues in these cases, which is --

THE COURT:  Well, we don't --

MR. CONWAY:  -- on the issue --

THE COURT:  -- know that, Attorney Conway.  We don't know that they're not relevant.  You're making a statement --

MR. CONWAY:  Well --

THE COURT:  -- without any evidence to support what you're saying.  We don't know that -- you just said you haven't even reviewed the documents.  So how do you know they're not relevant?

MR. CONWAY:  Well, Your Honor, I can assume that you would agree with me that not every document that's ever been created is relevant, that there are going to be documents --

THE COURT:  Well, regardless --

MR. CONWAY:  -- that are not --

THE COURT:  -- of that --

MR. CONWAY:  -- relevant.

THE COURT:  That doesn't matter because the scope of discovery is broad, Attorney Conway, as you well know.  And whether or not something's relevant, you can object to trial.  That's the whole point, so --

MR. CONWAY:  Well, Your Honor, you know, I'm confused because when this was raised at our conference a couple of months ago, you specifically said, you know, just

because you ask for it doesn't mean you get it.

THE COURT:  I understand what --

MR. CONWAY:  And if it's not --

THE COURT:  -- I said --

MR. CONWAY:  If it's not --

THE COURT:  -- Attorney Conway.

MR. CONWAY:  -- relevant --

THE COURT:  And you said --

MR. CONWAY:  -- it's not --

THE COURT:  -- a lot of things I could pull out, too.  Okay?  But right, now we're talking in the context of a motion to compel.

MR. CONWAY:  Okay.

THE COURT:  And you're telling me that you haven't reviewed all of the documents that have been produced, but you believe your client that he's produced every document that's responsive to the document requests.

And I'm looking now at what was apparently one of the responses -- although I haven't looked at the entire document in fairness, Attorney Conway.  But there appears to be some purported verification by attorney -- by Mr. Je.  That's not a verification.  It doesn't cite to the statute, the United States Statute, and it wasn't -- and it would have to do at least that, or it would have to be signed under penalty of the perjury in the presence of a witness who saw

him sign the document.  So it -- neither -- so the verification I'm looking at is not a verification.

MR. CONWAY:  Noted.

THE COURT:  Thank you.

THE COURT:  So with regard to Huddle, however that all worked, why aren't you -- why can't Mr. Je give the trustee access to Huddle and all the documents on that website?  What's the problem with that?

MR. CONWAY:  That was shut down years ago, Your Honor.

THE COURT:  So the claim is that, even if there were documents, they've either been sold to some entity, destroyed, or they don't exist anymore.

MR. CONWAY:  I don't know that that's true, Your Honor.  I think that we're -- you know, we've reviewed the documents that existed for these entities that were pulled down from Huddle.  There are certain --

THE COURT:  Well, how could you --

MR. CONWAY:  -- things like --

THE COURT:  -- pull it down from Huddle if Huddle hasn't existed for years?

MR. CONWAY:  Well, as we pointed out in our responses, after they shut it down, we paid an amount of money to get temporary access to pull down the information that was there.  And because it was pulled down by an

employee that was -- is no longer with us, all I can tell you is that we believe that all the records were pulled down.

THE COURT:  What do you mean --

MR. CONWAY:  And I don't --

THE COURT:  -- an employee who's no longer with you?  So somebody, in the last month and a half, who was an employee of what entity, who's no longer an employee, but pulled down documents to try to be responsive to discovery?

MR. CONWAY:  Not in the last month and a half, in the last several years.  This was -- this happened a couple of years ago when the entities' assets were frozen by the Government.  The -- there are no employees of any of these companies.  You know, Mr. Je is the last man standing.  So, you know, it's unfortunate, but that's what happens when, you know, the Government shuts everything down.

So, Your Honor, in terms -- in an effort to be as helpful as possible, I discussed with Mr. Bassett going to third parties to try and find documents, like the law firms that assisted in the formation of all these entities, you know, getting them to provide their records.

The -- you know, Mr. Je has agreed that he can go on WhatsApp and get whatever information WhatsApp has. He's -- you know, he's doing his best to get all of his WhatsApp -- he did search his WhatsApp for anything that -- related to these entities and conversations with Mr. Kwok,

found nothing.

But after conversations with Mr. Bassett last night, I told him I want all -- you know, any conversations you had, no matter what the subject was, and that's coming.

THE COURT:  You mean only --

MR. CONWAY:  So, you know --

THE COURT:  -- with regard to Mr. Kwok?  That's what you just said, that he's only going to look for conversations he had with Mr. Kwok?

MR. CONWAY:  This is on WhatsApp --

THE COURT:  I understand.

MR. CONWAY:  -- conversations with --

THE COURT:  I completely heard you.  And so I'm asking you:  Are you saying he's only going to look for conversations he had with Mr. Kwok?

MR. CONWAY:  I don't think that's necessarily true because I know that that there are other people on the conversations.  But the fact is he searched every name that the trustee asked him to search.  So I -- there are no conversations with anybody else that the trustee asked him --

THE COURT:  So --

MR. CONWAY:  -- to search.

THE COURT:  -- let me ask a question then.  So, Attorney Bassett, did you ask Mr. Je and mister -- through Mr. Conway to search WhatsApp to see if he had a conversation

with Scott Barnett?

MR. BASSETT:  Your Honor, I'd have to look to see if our request covered specifically communications with Scott Barnett, I imagine that they did, but they were incredibly broad.  I mean, it would have covered any communications that Mr. Je had with respect to the operations, management, or control over these entities.

Basically, Your Honor, our -- you know, one of -- as you can imagine, one of the things we intend to demonstrate was that Mr. Je wasn't really ultimately directing the operations of these entities.  And so it's anything related to these entities, period, including all communications with Mr. Kwok and his family members and associates.

I'd have to look at my discovery requests.  I am nearly positive that somebody like Scott Barnett would have been among the Kwok-associated individuals as to whom we requested, you know, relevant communications.  But the requests are very, very broad.

And what I am hearing from Attorney Conway is that, you know, he and his client have sort of made their own relevance determination.  But as the Court pointed out, that's not the way it works.  They're required to produce the documents that we've sought, and then the Court will decide whether they're relevant to trial.

MR. DESPINS:  And Your Honor --

THE COURT:  I mean, I --

MR. DESPINS:  -- if I may address --

THE COURT:  Just one thing --

MR. DESPINS:  I'm sorry.

THE COURT:  -- before you say anything, Trustee Despins.

I agree with one comment that Attorney Conway made, which is you can't ask for things -- you can't ask for -- there are -- you know, if you said, you have to show me every document that existed for the last 25 years, I would say I think that's a problem.

But that, Mr. Conway, isn't what I've seen has been asked for.  So if you have issues with regard to what their relevance is with -- on their request, then you need to bring them to the Court's attention, so that there can be a ruling.  Otherwise, you have to give them over and deal with your relevance issue at trial.  It is -- that's how discovery works.

I agree that I said -- but you know, you can take that out of context to work for you in the situation that you think it might work -- that you can't get everything you ask for.  I agree with you.  That's a very general statement.

Now we have to get specific.  And the problem is you're still not getting specific.  The problem is you're

saying well, I talked to him, he said that these are relevant, I believe they're relevant, even though I haven't looked at them all, and so that's what we're doing.  And you don't want me to grant the motion to compel because you're saying you've done everything you can do, but you still have to --

MR. CONWAY:  Yes --

THE COURT:  -- produce a privilege log.  You still have to go back and look at WhatsApp, but then you've told him only to look at conversations with Mr. Kwok.  That makes no sense to me.

MR. CONWAY:  I didn't say that, Your Honor.  I said the opposite.  I said he searched every name that was requested.

And I can tell you that Scott Barnett, while not being one of the names that was on the list, I can tell you that, because of the Torres case, that there were no conversations between Mr. Je and Mr. Barnett.  But I'll ask him to go back and do it again.

THE COURT:  I was just --

MR. CONWAY:  That's not really --

THE COURT:  -- using him --

MR. CONWAY:  -- a problem.

THE COURT:  -- as an example, by the way.  I wasn't pointing out Mr. Barnett for any other reason than

just an example.

MR. CONWAY:  That's fine, Your Honor.

And I guess the -- with respect to relevance, you know, my concern about relevance, as I pointed out in court the other day, is not, you know, this document that exists for this company is not relevant because it doesn't have anything to do with formation.  It's -- as I pointed out, the relevance that we were concerned with is more of an identity issue; that the owners of the customer accounts for the exchange are not relevant to a claim of who owns the exchange.

And the idea that you can put them in danger by making public that they're part of an exchange that is then now dragged through the mud as an anti-CCP exchange puts them at risk, and it violates the personal information --

THE COURT:  Well, then --

MR. CONWAY:  -- rules that --

THE COURT:  -- why don't you --

MR. CONWAY:  -- apply --

THE COURT:  -- create those information in a privilege log, Mr. Conway?  And then the Court can rule whether or not it should be privileged.  It doesn't mean --

MR. CONWAY:  Well --

THE COURT:  -- you don't produce it.

MR. CONWAY:  And Your Honor, I've already produced

everything with the names redacted, and I pointed out --

THE COURT:  Okay.

MR. CONWAY:  -- that the names --

THE COURT:  So then --

MR. CONWAY:  -- themselves --

THE COURT:  Then --

MR. CONWAY:  -- are not --

THE COURT:  Then you don't have an issue.  Let's move on to the real issues.  You've already --

MR. CONWAY:  And Your Honor --

THE COURT:  -- produced it.

MR. CONWAY:  -- I was -- and I was trying to just finish my thought, which was the client has also agreed that things like that could be, if you felt that it was necessary, I produced you in camera for review.  But there's no way to put these people's lives in jeopardy by producing them --

THE COURT:  No one is suggesting that people's lives should be put in jeopardy, Mr. Conway.  Okay?  No one is suggesting that.  There is -- this is discovery under Rule 26, it has to be responded to.  If it's not responded to, then the trustee or any other party can do what they've done, is seek a motion to compel.  If the information hasn't been produced, then the motion to compel can be granted.

Now, as I just said, I just looked at -- and it's one part of an extensive document.  But this verification of

Mr. Je is not a verification, and so you need to fix that or not, but it's --

MR. CONWAY:  We can fix that.

THE COURT:  It's not a verification --

MR. CONWAY:  We can fix that.

THE COURT:  -- under United States Code, the Federal Rules of Civil Procedure, or any other applicable law governing discovery in this case, in this adversary proceeding.

MR. CONWAY:  We can take care of that, Your Honor.

THE COURT:  So what are we --

MR. CONWAY:  So --

THE COURT:  What are we supposed to do from here?

MR. CONWAY:  Well, Your Honor, I guess my response is that we've complied.  The things that are -- we consider not relevant, as I pointed out, are things like customer names, not random documents.  Those are being produced, even though we don't believe they're relevant.

But the privilege log still needs to be completed. As I told Mr. Bassett, I would work through the weekend to get that done for him, and hopefully get it to him on Monday.

So I'm not sure what else there is to do other than -- you know, if they want to argue that our privilege -- our claim of privilege is inappropriate, you know, we can revisit that, but --

THE COURT:  Well, I -- have you submitted a verification on behalf of every one of the entities that Mr. Bassett or the trustee's counsel has sought discovery from, or is it just Mr. Je?

MR. CONWAY:  No, every entity.

THE COURT:  And is it the same kind of --

MR. CONWAY:  But they're all going to --

THE COURT:  -- verification?

MR. CONWAY:  -- have the same -- they're going to all have the same defect, which we'll fix.

THE COURT:  Okay.  And those people -- is there -- are there people other than Mr. Je that has signed on behalf of these entities?

MR. CONWAY:  On behalf of the G Fashion Entities, yes.

THE COURT:  And is the name -- does Mr. Bassett know the name, the person's name?  I haven't read --

MR. CONWAY:  I --

THE COURT:  I don't see it yet, so I don't know.

MR. CONWAY:  I can assume he knows.  But the names are on -- most are Andrea Volpe.  Okay.  And there were a couple that were signed by Leanne Li.

THE COURT:  Are those people available for depositions?

MR. CONWAY:  I don't know -- I can't speak for

Leanne Li, she's not in --

THE COURT:  Well, you're --

MR. CONWAY:  -- the country.

THE COURT:  They're your clients --

MR. CONWAY:  And Andrea Volpe --

THE COURT:  -- so you need to figure that out. They're your clients.  So there --

MR. CONWAY:  Okay.

THE COURT:  There has to be a Rule 30(b)(6) representative available for a deposition, if the --

MR. CONWAY:  Well, that --

THE COURT:  -- trustee --

MR. CONWAY:  -- hasn't come --

THE COURT:  -- is seeking --

MR. CONWAY:  -- up yet.

THE COURT:  -- that deposition.

MR. CONWAY:  They haven't -- that hasn't come up yet because they're not subject to the initial trials, so they haven't served -- they haven't requested that yet, but I can certainly look into that.  You know, Andrea Volpe is, I think, living in New York, so that wouldn't be a problem.

MR. DESPINS:  Your Honor, may I shed --

THE COURT:  Yes.

MR. DESPINS:  -- some light on the Hamilton UK?

THE COURT:  Yes.

MR. DESPINS:  So, just to refresh your recollection, probably a year and a half ago, a year ago, we discovered that the Kwok folks had started the equivalent of the assignment for benefit of creditors in England, meaning appointing their own people to liquidate Hamilton, and they had gold.  You may -- that may refresh your recollection. There was gold that they were holding, and they were proposing to sell it.  So we went to Kwok U.K. --

THE COURT:  They had gold, G-o-l-d?

MR. DESPINS:  Yes.

THE COURT:  Okay.  Go ahead.

MR. DESPINS:  And that they were proposing to sell and distribute to their creditors -- I'm saying "creditors" in quotes because it was like the assignment for debtor's creditors; they're all friendly Kwok people that were the creditors.  Of course, we were not on that list.

And so we went to court.  The Judge basically agreed with us that -- he said look, you -- Hamilton, you've appeared before Judge Manning disputing the alter ego, so we're going to let that proceeding go forward, which it is right now, and in the meantime, Administrator, you're not allowed to distribute a penny to any of these creditors until there's a final order on -- by -- of the Bankruptcy Court regarding the alter ego issue.

And so now they're saying well --

THE COURT:  Do I have that --

MR. DESPINS:  -- basically, they --

THE COURT:  -- anywhere in the record of this case, attorney -- Trustee Despins, what you just told me? Because I don't think I do.  I --

MR. DESPINS:  Yeah.  No, we -- in one of these updates, I'm sure --

THE COURT:  Yeah.

MR. DESPINS:  -- we talked about --

THE COURT:  But an update --

MR. DESPINS:  -- the gold and --

THE COURT:  -- is different -- than you're telling me right now there's some order from an English Court that stops --

MR. DESPINS:  Yes.

THE COURT:  -- the administrator -- I don't think I've ever seen that.

MR. DESPINS:  I thought it was summarized in one of these updates.  I will find out --

THE COURT:  I'm not talking --

MR. DESPINS:  -- and I will --

THE COURT:  -- about summary.  I'm talking about I want to see the order --

MR. DESPINS:  Okay.

THE COURT:  -- right?

THE COURT:  Okay.  But -- we will provide that to Your Honor.

But the point I'm making is this, is that the administrators can't have it both ways.  They can't have this case go on and say well, we're not producing documents, we sold them or we can't -- we don't have ex to them -- access to them.  You know, if they're going to do that, there is a consequence to that, which is that the Court can draw some negative inferences from that.

But the -- it's really they're aware -- they chose to instruct Mr. Conaway to be their counsel.  So they're subject to these procedures here and they cannot dodge, basically, production by saying oh, I don't have money or I don't want to have access to documents or I just sold the entire company to somebody else last week without telling anyone, so I just want to make sure you knew that.

But I'm -- I will get the Court a copy of that order.  But basically I thought -- anyway, I shouldn't speculate.  But let me file that with the Court.  We'll do that.

THE COURT:  Well, I think it's relevant, isn't it?  I mean, if you're --

MR. DESPINS:  Yeah.

THE COURT:  Mr. Conaway is telling me, on the one hand -- well, maybe he's not.  See, this is the problem.  I

don't have a record to completely understand what you're all telling me.

But I think what I heard, I believe what I heard was that Hamilton Capital Holding Limited, who is the entity who was essentially holding all the documents of all these entities, was put into some kind of proceeding to liquidate in England.  Is that the proceeding, Trustee Despins, that you're talking about?  Where they were going to sell the gold and the Court said no, you can't do that now because you got to wait for the Bankruptcy Court to determine whether or not this is the alter ego of Mr. Kwok?

MR. DESPINS:  I am a hundred percent sure it's a Hamilton entity.  Now is it that Hamilton entity?  I need to go and check that.

THE COURT:  Okay.

MR. DESPINS:  But I --

THE COURT:  Well, that's what I need to know, right?

MR. DESPINS:  Yes.

THE COURT:  Because if that's relevant.

MR. CONWAY:  And Your Honor, I can confirm it is.  I can confirm it is.  And I -- and to the extent that Mr. Despins is referring to this order, I can tell you that that order also does exist.  It was a stipulation between the parties that was so ordered by the Court, not a forcible

order, but the stipulation was --

THE COURT:  Well, I don't know that that's true, Attorney Conway.

MR. CONWAY:  I --

THE COURT:  I could --

MR. CONWAY:  But --

THE COURT:  I've had case -- I've had matters in this case where the parties have stipulated and I've so ordered because I told them that I was going to do X, Y, or Z if they didn't stipulate.  So I'm not sure that's true.

MR. DESPINS:  That's exactly what happened.  And that's exactly --

MR. CONWAY:  Well, I'm telling you --

MR. DESPINS:  -- what happened.

MR. CONWAY:  I'm telling you that that's what the document says and that's what the administrator says.  Whether there's some --

THE COURT:  Well, maybe --

MR. CONWAY:  -- machination --

THE COURT:  -- we'll need to have --

MR. CONWAY:  -- in this thing --

THE COURT:  -- the administrator --

MR. CONWAY:  -- that's not relevant --

THE COURT:  -- come over and talk to us.

MR. CONWAY:  All I'm trying to do is say to you

that what Mr. Despins is telling you is true.  I'm not trying to argue with him, I'm not trying to argue with you.  I'm trying to help you because you said you didn't have a record there.

THE COURT:  I understand, but --

MR. CONWAY:  So I'm trying --

THE COURT:  I understand.  I'm not sure that couching it as a stipulation to try to infer that the parties agreed to stop this consensually is helpful, if that's not true.

MR. CONWAY:  Okay.  Well, I wouldn't lie to you, Your Honor.  It was a motion by Mr. Despins to stop the sale of the gold, which was resolved by the stipulated order.

THE COURT:  Right.

MR. DESPINS:  No, but what happened is exactly what Judge Manning said, which is the Judge said if you had not agreed to it, I would have imposed it.  That's something basically from his comments before there was a break in court to agree to this.  It was clear that he was going to stop the proceeding, so --

THE COURT:  In any event, I'd like to see the order.  It would --

MR. DESPINS:  Yes, Your Honor.

THE COURT:  I think it sheds a little light on what's going on with these different entities here and the

upcoming trial on the twenty-sixth count of the complaint that's going to be -- on ACA Capital, that's going to be held on July 8th, and then the next trial on July 22nd with regard to the Himalaya entity, the Himalaya exchange entities. That's all relevant to me.  I need to understand these issues.

There have been, obviously, many findings of many courts, both civil and criminal, throughout the world with regard to these issues.  And I would like to make sure that all of the evidence that's come forth is -- I am not -- I want to be aware when some other decision has already been made that impacts these claims.  And there have been, apparently, quite a few.

So with regard to the motion to compel Attorney Bassett, Attorney Conway is saying he needs the weekend to put together a privilege log.

He also said he's going to rectify the verifications.

He also said that the -- some of the entities -- which I -- again, I haven't reviewed them all because it was filed within an hour before this hearing, or less than an hour -- are signed by individuals that Mr. Conway says are in the United States, including someone in New York.

Okay.  So what am I doing?  I need to -- we -- this either has to be resolved or I have to rule by the end

of next week because the trial date is July 8th.  It's that simple.

And I'm also going to set a date today of when the list of witnesses and exhibits are going to be filed with regard to the July 8th trial because the pretrial order did not do that.  But I can enter a docket -- I will have a docket entry made on the docket of the case that the -- all the lists -- the list of witnesses and exhibits I'm going to require to be filed by June 30, which is a Tuesday.

And all the exhibits are going to be in PDF format and they're going to be numbered, no letters.  So it can be Plaintiff's 1 and Defendant's 1 or Despins 1 and ACA 1.  Whatever you want to do, fine with me, but it's numbers, no letters.  And they all need to be in separate PDFs.  And they need to -- the list of witnesses and exhibits needs to be docketed along with the exhibits.

Now I think you can talk with the Clerk of the Court if you want to docket the actual document list of exhibits separate from the exhibits as a different -- I think you can probably do that.  I'm not really sure.  You can talk to the Clerk of the Court about that prior to June 30.

But that's where we are.  And so, if this issue isn't resolved by next Friday -- which is June 5th -- then I'll have to rule and we'll go from there.

I mean, the issue with regard to the documents and

the testimony of different witnesses at -- in different proceedings, that -- those -- if this -- if the discovery is not completed and that the discovery responses are not made appropriately and/or verified, and/or there's information that comes forward that was not produced that should have been produced, then the Court will rule accordingly.  It's not like something that hasn't happened before.

If the discovery is not completed and  that the discovery responses are not made appropriately and/or verified and/or there's information that comes forward that was not produced, that should have been produced, then the Court will rule accordingly.  It's not like something that hasn't happened before.  And there can be inferences drawn. There can be sanctions imposed.  You know, you all know that, so I'm not telling you anything you don't know.  I would hope that these issues would be resolved and if not, then I'll rule on the motion and that's where we're going to go, because this trial is proceeding on July 8th.

So, Attorney Bassett and Attorney Conway, what I'd like you to do -- maybe I could possibly -- or I could maybe do it Friday morning, have a conference, another virtual conference; although, I don't think I'll physically be in the courtroom to tell me where things stand.  But I'm talking about a five-minute conference.  I'm not going through, you know, you gotta -- the privilege log has to be produced.

The -- you have to have verifications from everyone that they produced everything.  You have to show what -- it doesn't sound -- or it sounds to me that -- and I could be wrong, so you can correct me -- that the questions about where the documents were obtained still have not been fully answered.  And I think that that has to be in writing, Attorney Conway, and it has to be verified.  And if it's not, then it's not, but --

MR. BASSETT:  Your Honor, I -- I apologize.

THE COURT:  Go ahead.

MR. BASSETT:  No, Your Honor, I was going to make the same suggestion.  I think it is imperative that it be clear what Attorney Conway is required to provide, so I'll just go down a list of some items.  He has mentioned that he worked with his client to develop search terms to run across the document.  If those search terms were, in fact, developed and used, I don't know why they have not already been provided to us.  Those should have been provided last week if they were, in fact, run and then we can see, are those search terms reasonably calculated to identify documents responsive to our discovery requests.

In addition to the terms themselves, Your Honor, we need to understand the sources against which those terms were applied.  We understand, based on documents we've seen in this case, that Mr. Je has add at least four different

email addresses.  Are those accounts still accessible to him?
Are there other accounts that are accessible to him; if so,
what are those account records --

THE COURT:  When you say, "acceptable," do you
mean accessible?

MR. BASSETT:  Accessible.

THE COURT:  What do you mean?  Are they still
operating accounts, email accounts; is that what you're
saying?

MR. BASSETT:  Are they still -- are they --
exactly, Your Honor, that's what I mean.

THE COURT:  Okay.

MR. BASSETT:  Are they still operating accounts --

THE COURT:  And if they're not, when were -- when
did they stop operating and why.

MR. BASSETT:  Exactly.

And for each account, Your Honor, are there any
automatic deletions for spoliation issues?  Because if
William Je were to say, I had a Gmail account.  I have access
to that account, or I have a Gmail account.  I have access to
that account, and I ran these search terms against it and I
got zero hits; well, that doesn't tell us the whole story.
Because if he says, well, just so you know, that Gmail
account had a grand total of four emails over six years,
because I'm in the habit just deleting emails regularly, then

that's something that we need to understand.

And we need that information for each source document.  And it's not just accounts; it is also devices.  Does Mr. Je have an iPhone or a tablet or a computer that he has used to conduct business related to any of the alter-ego entities; if so, were those devices imaged and searched?  What were the search terms that were applied?

The same goes for any other accounts that he may have used to send or receive messages.  WhatsApp is an application that we know he had used.  We've heard about Signal as an application that people associated with Mr. Kwok have used in the past.  How about iMessages that people have sent using their iPhones?  Those messages are typically either stored on the device themselves or through an iCloud account.  With those documents accessible and have they been searched?

And then, Your Honor, it's not just William Je.  As I said, with respect to ACA, for example, we have -- part of the production was a list of seven or eight different employees of ACA.  What about their documents, are they available?  Have they been searched?  Where are they located?  We have none of that information and that goes for all of the defendants.

So, one other thing I wanted to just point out to make sure the record is complete, Your Honor, is that William

Je, himself, also submitted amended interrogatory responses last Friday.  And his amended interrogatory responses are different from the other ones.  His response says that he has -- that his documents are located at five different locations, that he's only talking about addresses, not devices or email accounts or anything like that.

He lists -- and this all filed at -- under seal at ECF 228 -- but he lists an address in the British Virgin Islands.  He lists two addresses in Hong Kong.  And then he lists two addresses in London.  We don't have any idea whether he's -- well, we don't know if those are properties that belong to Mr. Je.  We don't know if they're properties that belong to somebody else.  We don't know if Mr. Je has access to those properties and the documents located therein. Our understanding is that he has been residing or staying in one location, so as to avoid apprehension by authorities, so I suspect he probably has not gotten documents from all of those locations.  But that's something that we need an answer to.

And, again, Your Honor, I just want to stress, you know, there's a lot of discussion about, well, you can't ask for everything and some of these requests are too broad and irrelevant.  Again, just to reiterate what we're talking about here, so far we've gotten 30 documents, total, from ACA Capital.  Zero emails.  Thirteen emails from Mr. Je.

THE COURT:  All right.  Slow down.

MR. BASSETT:  I mean, we have gotten --

THE COURT:  Slow down, Attorney Bassett.  I cannot keep up, okay.

MR. BASSETT:  Sure.

THE COURT:  So, so far, you've gotten 30 documents from ACA Capital; is that what you're telling me?

MR. BASSETT:  Sorry.  Thirty -- and Attorney Conway produced the documents and folders for each of the defendants, as I understand it.  For Mr. Je, he produced 30 total documents, including 13 total emails and one was that message.

THE COURT:  So they're -- they both -- both of these entities have the same number of documents produced:  30?

MR. BASSETT:  William Je, himself, produced 30, Your Honor, and ACA Capital, itself, happened to also produce 30 total documents.

THE COURT:  That's highly unusual that it would be the same number.

MR. BASSETT:  ACA Capital, Your Honor, produced zero emails.

THE COURT:  Yeah, I got that.  Okay.

MR. BASSETT:  And I can go down the list. Himalaya International Clearing --

THE COURT:  Well, that's what I want you to do, but I want you to do it slowly.

Himalaya what?

MR. BASSETT:  Ab --

THE COURT:  Which Himalaya?

MR. BASSETT:  Absolutely, Your Honor.

Himalaya International Clearing, 313 total documents.  Thirty-five of those are emails and I'm told there are two text messages.

THE COURT:  All right.  Hold on, please.

MR. BASSETT:  Some of the documents --

THE COURT:  Hold on, please.

MR. BASSETT:  Sure.

(Pause)

THE COURT:  Just give me a moment, please.

(Pause)

THE COURT:  Enter -- Himalaya International Clearing, is that what you said?

MR. BASSETT:  Yes, Your Honor.

THE COURT:  All right.  Do you have Himalaya International Financial Group?

MR. BASSETT:  Yes, Your Honor.

Himalaya International Financial Group produced 27 total documents --

THE COURT:  All right.  Hold on --

MR. BASSETT:  -- including one --

THE COURT:  -- please.  Hold on.

(Pause)

THE COURT:  Twenty-seven total documents.

Go ahead.

MR. BASSETT:  Including one email.

THE COURT:  One email.

Okay.  And what else, including?  That's part of the 27?

MR. BASSETT:  Himalaya --

THE COURT:  Okay.  So that's the --

MR. BASSETT:  Himalaya --

THE COURT:  -- that the Second Circuit referred to in the H- -- HK USA affirmation of Judge Dooley's affirmation of summary judgment as HK obtaining the 37 million from a British Virgin Islands entity called "Himalaya International Financial," which as later litigation revealed, Kwok controlled.  That's what the Second Circuit has said about Himalaya International Financial Group.

And you only have 27 total documents and one of those -- an email of -- one email.  When's the email from?

MR. BASSETT:  It is an email from Mercantile Bank to William Je.

THE COURT:  What, regarding the $37 million?

MR. BASSETT:  I -- Your Honor, I don't have the --

I don't have that information handy at the moment.

THE COURT:  Does anybody have it handy?

Mr. Conway?  That's your client.

MR. CONWAY:  No, Your Honor.  But I don't have that information handy.

THE COURT:  Okay.  Well, the Second Circuit --

MR. CONWAY:  It makes sense, though.

THE COURT:  -- obviously had information in an appendix to make that statement, that there was evidence that Mr. Kwok controlled Himalaya International Financial Group.

MR. CONWAY:  I think they're relying on your findings, Your Honor.

THE COURT:  I don't think they're relying on anything.  They don't rely on anything the Bankruptcy Court does.  They make their own findings on appeal.  So that's what they found.  That's what the Second Circuit stated in their decision.

So -- all right.  Keep going, Mr. Bassett.

MR. BASSETT:  The next entity, Your Honor, is Himalaya International Payments.  That entity produced six documents, including zero emails.

The next entity is Himalaya International Reserves.  That entity produced 21 documents, including one email.

THE COURT:  Okay.

MR. BASSETT:   The next entity is Himalaya Currency Clearing.   That entity produced eight documents, including one email.

The next entity is Hamilton Opportunity Fund. Hamilton Opportunity Fund produced 255 documents and 41 of those documents consist of emails that I was told that most of those emails are communications between Mr. Aaron Mitchell and a real estate agent, I believe, In relation to the Mahwah Mansion.

Your Honor, there, obviously, are other defendants, including G Fashion and other -- and its related affiliates and the other defendants represented by Attorney Conway, who are scheduled for trial later this year.   In preparing for today's hearing, I have had my team focus on aggregating this information for the entities going to trial this summer --

THE COURT:   Well, I think that makes some sense --

MR. BASSETT:   -- given the exigency.

THE COURT:   -- honestly, Mr. Bassett, at this point.   I'm not saying that I'm going to rule that you can't seek the information, with regard to other clients and entities, but if we're trying to focus, which we are, on the three upcoming trials, then I think it makes sense to do what you did.

Here's what I'm going to require you both to do.

By Thursday -- and you can -- I'll give you till -- you know, you can do it at 11:59 p.m. if you want, because I'm not going to look at it until Friday, but I'm going -- I need a list of everything you claim either has been produced, not produced, and the total amount of documents that have been produced.

And Mr. Conway, your privilege log, you've rep -- you have represented on the record you're going to get that to Mr. Bassett by Monday, correct, which is what?  Is Monday, June 1st, I think?

MR. CONWAY:  Sounds right.

THE COURT:  Yes, thank you.

So, is that correct, Mr. Conway, you're going to get the privilege log, fully completed, to Mr. Bassett by June 1st?

MR. CONWAY:  Yes, my representation was I was going to work all weekend and hopefully have it to him by Monday.

THE COURT:  Well, I'm ordering you to have it to him by Monday, okay.  That's what I'm -- I'm ordering that on the record.  You need to have the privilege log to him by Monday, June 1st.

And then I'm going to order both of you to -- if there isn't a resolution, then I will give you till 11:59 p.m. on June 4th to file your respective positions

on what has been produced and what has not been produced, then I will rule accordingly on the motion to compel.

MR. CONWAY:  And, Your Honor, just to -- because I didn't want to sound like I was equivocating, but I think the request from counsel was that I get it by the second.  I was going to try to get it by the 1st to make things go faster. I wasn't trying to sound wishy-washy.  I just -- was trying to get it before the date that they told me to get it to them by.

THE COURT:  Mr. Bassett?

MR. BASSETT:  Not entirely sure what Attorney Conway is asking.  If it's okay to get a privilege log --

THE COURT:  He's saying you agreed to June -- this is what he's saying.  You agreed to June 2nd, so Judge, give me June 2nd.  He's saying -- Mr. Conway's saying to me, Judge, Mr. Bassett agreed that I could produce the privilege log by June 2nd, so give me till June 2nd.

Are you agreeing or not agreeing to June 2nd, Mr. Bassett?

MR. BASSETT:  That's fine, Your Honor.

THE COURT:  All right.  7:00 p.m. on June 2nd, Mr. Conway, that's your latest time to get it to Mr. Bassett, and I am so-ordering that on the record.

MR. CONWAY:  Understood, Your Honor.

THE COURT:  And I am also so-ordering on the

record that if there is not a resolution, then the parties must file their respective statements about what is -- what discovery is outstanding, with specific lists like we did now, Mr. Bassett, okay, with specific lists for each entity that hasn't complied by 11:59 on June 4th.

MR. Conway, you need to change all -- or amend and revise those verifications appropriately or those are not deemed -- those will not be deemed to be verifications, and I could grant the motion to compel solely on the basis that those are not verifications.

MR. CONWAY:  Understood, Your Honor.

THE COURT:  And that has to be done well -- that has to be done before 11:59 p.m. on June 4th.  It has to be done by -- I'll give you till 10:00 a.m. on June 4th on the verifications; again, I'm so-ordering this.  I'm not entering a separate order.

MR. BASSETT:  Your Honor, if I may, one point of clarification?

THE COURT:  Yes.

MR. BASSETT:  As part of the discussions that we've been ordered to have by next Thursday and the filings, thereafter, is the Court requiring the defendants to provide the information that we had -- that I had been discussing earlier concerning search terms --

THE COURT:  Yes, absolutely.

MR. BASSETT:  -- the (indiscernible) that get (indiscernible) --

THE COURT:  I'll tell you exactly what I'm requiring:  the search terms used that were created and used should be provided to the plaintiff counsel; the sources against which the search terms were used and applied need to be provided to counsel, all in writing; the email accounts of Mr. Je and the other entities, whether they are -- what they are, whether they are still operating, if they're not operating, when did they stop operating, and why and who stopped them from operating, the actual defendant, or some other third party?  And do any and all of those accounts have automatic deletion in them, and if they do, I need to know -- we need to know, yes, they do, and the automatic deletion is 24 hours, 48 hours, 3 hours, whatever the situation is. Also need to have in writing, the devices that the defendants used, including Mr. Je:  iPhones, iPads, computers.  A list of those.  They all have to be included and there has to be a verification that they were searched or not searched and that these search terms were not applied to those devices.

Then we also have the question about WhatsApp and Signal and any other iPhone messaging; those need to be verified that they were searched with the search terms and there either are documents or there are not documents.

Also, with regard to the employees of ACA Capital,

in particular, I believe you said, Attorney Bassett, there were seven or eight employees of ACA, but you have no information about those employees; is that correct?

MR. BASSETT:  Correct.  And that's according to one of the 30 documents that ACA produced, is a document that states at the top -- the following -- this is a typo:  "The following were the management staff of ACA."  And then it lists one, two, three, four, five, six, seven, eight employees and one, two, three, four -- four directors.

THE COURT:  Okay.  So you're looking for their names, addresses, how long they were in those positions?

MR. BASSETT:  We have their names, but I think what we are entitled to understand is, for purposes of our document requests, yeah, do any of the defendants have custody, possession, or control over documents that these individuals generated in connection with their employment by ACA.

THE COURT:  I think that's fair.  So you'll need to respond to that, Attorney Conway.

Then, with regard to Mr. Je's apparent amended interrogatory responses, he lists five or six locations, at which he says there are documents.  He has to respond, Attorney Conway, as to whether he has -- who owns those properties, if he knows, and if he has access to the documents that he claims are at those properties and if he

doesn't, why not?

MR. CONWAY:  And, Your Honor, I believe that was a holdover from the original response asking for historical places where documents have been stored.

THE COURT:  Well, then, you need to clarify --

MR. CONWAY:  I don't think those were --

THE COURT:  -- that, Attorney Conway, because apparently, it's not clear.

MR. CONWAY:  Okay.

THE COURT:  All right.  Is there anything else we need to deal with on this motion to compel; meaning, the motion to compel, that this is the continued hearing on, where we had our initial hearing last Tuesday, May 19th, ECF Number 216?

MR. BASSETT:  I don't think so, Your Honor.

THE COURT:  Okay.  Then let's move on to the second motion, which is obviously related to the first motion, which is the deposition of Mr. Je.

So, Mr. Conway, what's the problem with Mr. Je being available for a deposition?

MR. CONWAY:  It's not a problem with him being available; as a matter of fact, I received a request from the defense counsel for his deposition on June 19th, which he's agreed to sit for.  He also agreed with the Trustee that he would be deposed on that date, as well as the 18th, so that

the Trustee can get more time in.

But the problem here is we're dealing with -- well, I need to answer this and point out two things, Your Honor.  The second one we've sort of discussed, but the first one is we're talking about a, essentially a third-party witness.  He's listed as a defendant in this case, but he's not a party to any --

THE COURT:  Well, he's not a third-party witness if he's the officer, director, manager, or creator, or whatever the corporate status he has of any one of these entities.  So he's not a third-party witness.

MR. CONWAY:  Okay.  Your Honor, he's an individual who's being -- he doesn't have any claims against him in this case and he's not in the United States.

THE COURT:  The corporation can't act through anyone but an individual, Mr. Conway, and you've already asked him for all this information about all the corporations, so he's obviously acting on behalf of the corporation in some way, shape, or form.  So I don't -- I don't -- I think that argument is not persuasive.

The issue about --

MR. DESPINS:  Your Honor, he's a defendant.

THE COURT:  -- being outside the United States, what's the issue?  You don't want to produce him in person?  You want to have him on a video, still?  Is that still what

you're arguing?

MR. CONWAY:  That's right, Your Honor.  He can't get to the items.  He's agreed to sit in a room with nobody in it, no documents.  He's got -- he'll have the camera on him with his back to the door so you can confirm nobody can come in.

THE COURT:  Well, who's going to control all that if there's nobody with him and there's no documents?  How's he going to -- who's going to record him?  How's he going to get on the Zoom?

MR. CONWAY:  The same way that every deposition is done these days, Your Honor, including everyone that's been noticed so far in this case.  The Zoom operator can be located anywhere in the world and the recording -- the videorecording can be done from anywhere in the world.

The video of his facial expressions will be much easier to tell if you think he's lying than if you have a momentarily glimpse of it on the stand.  So there's no issue --

THE COURT:  Well, I don't agree with that -- but that can be your position -- but I don't agree with that last statement you said.

MR. CONWAY:  And I understand from your prior comments that you don't agree with that, Your Honor, but I think that that's a very important point that you watch him

testify 10 times and make a decision of whether you think he's lying on video.

But the issue here is he's going to give his testimony and if the Trustee feels that there's a problem, the Trustee can bring it to your attention at that point in time.  There's no point in time to say, Well, Mr. Je's going to be a problem because he's Mr. Je.

He's going to sit for deposition.  He's going to give his testimony.  He's not going to come to the United States for the reasons we've already discussed.  He's subject to indictment.  He can't even get a visa to come to the United States, because, one, you know, visas aren't easy to get these days to begin with, but if he were to walk into a U.S. consulate then, basically, he's going to be put into custody, and nobody is going to get a deposition.  So --

THE COURT:  Well, that -- your point about the visa may be valid, but your second point, according to case law cited by the Trustee, is not, that you can't -- you use, as the reason for not being able to be at a deposition, that you're subject to an indictment.

MR. CONWAY:  The point that I just made was that if he's arrested, nobody gets a deposition.

THE COURT:  Well, I don't know about that.  They might be getting depositions of people in jail already in this case, so I'm not sure that's true, but I understand your

point.

I'm just saying, they've cited -- the Trustee has cited case law that says that a Court should not take into consideration, with regard to a witness who is to be deposed, whether or not that witness is the subject of any criminal proceedings or a possible indictment.  So I understand --

MR. CONWAY:  I think with --

THE COURT:  -- what you're saying, but according to case law cited by the Trustee, that's not a consideration for the Court.

MR. CONWAY:  I think it's definitely a consideration, that the Court has the ability to factor in that one way or another in the total scheme of things.  And it's not a bar to a deposition in the case law cited by the Trustee.

So the issue, really, here is, Your Honor, that, you know, under 45(c), this wouldn't be appropriate in any event.  We haven't received any sort of subpoena from the Trustee, but were there one, it would -- you know, it would be subject to being quashed.

THE COURT:  Well, are you going --

MR. CONWAY:  We're trying to do this voluntarily --

THE COURT:  -- to accept service of a subpoena?

MR. CONWAY:  Your Honor, I'm going to accept

service of a subpoena for a Zoom deposition, not for a subpoena where he's being ordered to come to the United States, because he can't.  And that's -- it's not a question, Your Honor, you know, of anybody, you know, being -- thumbing their nose at the process.  He's trying to be as helpful as he can.  He is still subject to indictment, and he could just say, Well, I'll plead the Fifth.

He's not doing that.  He wants to give the information that the Trustee wants, that the other defense counsel wants.  You know, he's willing to sit for a deposition, by he can't do what he can't do.  He can't come to the United States.

So right now, we've got a situation where somebody is trying to provide whatever testimony he can provide and not be obstructive.  And all we're asking, Your Honor, is that we do this the same way we're doing every other deposition in this case, which is a Zoom deposition where all the attorneys can, from the comfort of their own office, they ask questions if they want to.

THE COURT:  Well, when you say, "all the attorneys," I don't -- you know, this isn't a situation where it'll be all -- I don't know who you mean.  Because it's only going to be attorneys involved in these proceedings that are on for trial, just like we discussed last week, with regard to the depositions of Mr. Kwok and Ms. Wang.

MR. CONWAY:  Well, I guess, Your Honor, the answer to that is there are a lot of attorneys anyway, but I would say that --

THE COURT:  There aren't that many.

MR. CONWAY:  -- you know, if there are any issues -- if there are any issues that overlap with the other matters, the charge they'll be handling down the road, I'm sure there are counsel that might think they're entitled to ask questions.  I haven't heard that yet, Your Honor, and would be speculating.

All I'm saying is that the attorney who do want to participate --

THE COURT:  Well, it's not an issue of wanting to participate.  It's an issue of whether they're allowed to participate, given what is on for trial.

Mr. Conway, you and others know we spent over a year -- more than a year -- trying to come up with how this was going to work.  No one could come up with a plan.  This is the plan.  This is how it works.

Whether someone wants to be there and ask questions is different from whether they're entitled to be there.

MR. CONWAY:  And, again, Your Honor, I'm suggesting that the people who are entitled to be there, can be there and ask questions in this -- the way it's being

proposed right now.

THE COURT:  Attorney Bassett, what's your position on what Attorney Conway just said, including his position that all other depositions are being conducted via Zoom?

MR. BASSETT:  My response, Your Honor, is that this is not all of the depositions.  First of all, we've had no objection and it's not true that all of the depositions are being conducted by Zoom.  We're conducting one deposition in Washington, D.C. next Tuesday.  We are going to offer defendants the ability to participate remotely, should they wish, but the deponent is going to be here in my office.

But, regardless, Your Honor, no one has ever objected to any of the other depositions occurring remotely. We're generally doing it that way to save estate resources, so people don't have to travel all over the place for these depositions.

Mr. Je is uniquely situated for a number of reasons.  First, he, himself -- and I don't know why there seems to be some confusion on this point on behalf of Attorney Conway -- but he, himself, is a defendant against whom relief is sought in the omnibus alter-ego adversary proceeding.  He is the nominal owner of all of these entities, the entities that are being tried this summer. He's the ultimate, nominal owner.  As such, we have named him as a defendant, because we are trying to, effectively, divest

him of his nominal ownership of these companies.

So, not only is he the representative of these companies, he, himself, is a named defendant.  That means we don't even need to subpoena him; we simply serve him with a deposition notice on Attorney Conway, his appearing counsel, in this litigation.

In addition, Your Honor, based on the meet-and-confers that we've had with Attorney Conway, including yesterday, we understand that Mr. Je is going to be the designated corporate representative for every single entity defendant that is being tried this summer, which is why this is going to be --

THE COURT:  Regardless of the people who signed the interrogatories in a request for production of documents?

MR. BASSETT:  I don't have the list in front of me of whether for any of the entities that are being tried this summer, who signed all those.  Regardless of who signed them, that is what we were told by Attorney Conway, that Mr. Je would be the 30(b)(6) representative for all of the entities.

What does that mean?  It means that his deposition is of -- he's heightened importance.  We're talking about not just one day -- probably at least two days, if not more, to cover all the ground that we need to cover.

Is a deposition remote -- is a remote deposition adequate in this situation?  Your Honor, I think the answer

is absolutely not.  The case law we cited talks about the importance of party depositions, especially key party witness depositions occurring in person so that adversaries can confront one another in the flesh and understand credibility cues, et cetera, in real time.

The case law is clear that where there have been accusations of improprieties in discovery and other reasons to question a party's or a witness' trustworthiness, that an in-person deposition is even more important.

Here, Your Honor -- and not to belabor the point -- Mr. Je has been charged by U.S. authorities with obstruction of justice.  He's been charged with fraud.  A criminal court judge has issued findings concerning his involvement in a conspiracy for which the debtor was convicted.  There are all kinds of reasons for us to question the trustworthiness of this individual and, therefore, can necessitate that his deposition occur in person.

And when I say, "in person," Your Honor, I do mean in the United States.  We cited the case law, which Your Honor alluded to.  The fact that an individual is subject to arrest in the United States or is under indictment is not reason for that individual to avoid having to come to the U.S. for a deposition.  We are concerned that even if there were an in-person deposition to occur abroad, (A), that would be extraordinarily costly, given the need for myself and

others to travel for that deposition, but also in terms of the -- making sure the witness is subject to the U.S. laws under penalty of perjury.  Your Honor, I think it's incredibly important for a deposition to occur in the United States, where there is no question that he is subject to all the consequences for not offering truthful testimony, and so, you know, for all those reasons, Your Honor.

I think your question started with, Well, what about the other depositions in this case taking place remotely?  Those are by consent.  This is not those other witnesses for a multitude of reasons.

THE COURT:  Well, let's suppose I grant your motion, Attorney Bassett, and Mr. Je doesn't come to the United States.  What then?

MR. BASSETT:  Then I think the consequence has to be that he is precluded from offering testimony in this matter on his own behalf and on behalf of the entities that he purports to represent, and the Court can draw negative inferences against him and the other defendants as a result of that failure to provide testimony.  And I think that's what would happen, Your Honor.

THE COURT:  Okay.  Anything further, Mr. Conway?

MR. CONWAY:  Your Honor, I think it's been fairly beaten to death, other than, I want to reiterate, you know, if he wanted to, we couldn't get a visa for him to come here,

in any event.  But the depositions, as far as I can tell, will take place.  It's just a question of whether the secondary deposition in the United States that you may have to rule on, also take place.

So, it just doesn't make any sense to me to say, Well, you know, we don't know what he might do that is offensive to us or to the laws, but we want him here just in case.  He's going to do a deposition and if somebody at the deposition says, Well, wait a minute, you can't sit -- you can't do whatever it is that you just did; it can be brought to your attention.

But there's just no -- it can't -- it's functionally impossible for him to get here under the circumstances, so the arguments really should end there.

MR. DESPINS:  Your Honor, I would add that even if you bought that argument that he doesn't have to come here, he's not agreeing to be in a room with somebody else.  He has to be alone in this cave and lobbying all these answers without any consequences.  That's just -- I'm sorry, it's just not acceptable.  I cannot happen that way.

We believe he needs to come to the U.S., but even if he didn't agree with that, the concept that he can be alone, allegedly alone -- I mean, let's not beat around the bush.  He's a fraudster.  He was charged and he's a fugitive from justice.  To allow him to be in a room on his own,

allegedly on his own, without -- we don't see exactly what -- who's feeding him the answers and all that.  It's just -- it's a nonstarter, but -- sorry to interject, but I thought I needed to.  Thank you.

THE COURT:  So, Attorney Conway, your agreement is that you will produce him on June 18 and 19, but he has to be in a room alone.  No one else can be with him?

MR. CONWAY:  That's right, Your Honor.  He'll show that there's nobody else in the room --

THE COURT:  Why is that?  Tell me why.  I need to have an understanding of why he needs to be alone in a room.

MR. CONWAY:  Well, for one thing, Your Honor, it's not acceptable to him to have anybody that might bring the forces of a foreign police power upon him by him showing up, for instance, at a Paul Hastings office around the world.  He is not willing to do that for the same reason he can't come to the United States.

But that said, Your Honor, he's pointed out that he'll do exactly what needs to be done to avoid the problems that Mr. Despins just pointed -- just suggested.  He's going to make sure that the camera shows nobody else is in the room and make sure that nobody can come in the room.

THE COURT:  I don't know how he could possibly do that.  That's what I asked the question about at the beginning, without knowing about what you both have just

argued.  I don't know how he can possibly state with any certainty that there's nobody else in the room and that nobody comes in and out and that he's got the camera on himself.  No one can do that.  I can't do that.

MR. CONWAY:  It's easy to do it.

THE COURT:  No, you can't.

MR. CONWAY:  It's -- I do that every time --

THE COURT:  Someone could walk into your office right now, Mr. Conway --

MR. CONWAY:  -- when I'm taking a deposition.

THE COURT:  -- and I'd have no idea they were there.

MR. CONWAY:  I would --

THE COURT:  Yeah, I don't even know if that's your -- is that your office?  Is that your background or is that your office?  I don't even know.

MR. CONWAY:  No, Your Honor, if you -- if you please let me finish, you know, it's fairly simple in this day and age to take your camera and show the entire room.  I make witnesses do that when I feel like Mr. Bassett does, that I don't trust the other side.  I, then, you know, have agreed that he will keep the camera with his back to the door so that you can see nobody comes in during the course of the deposition.  Simple, easy, done.  You can confirm that there's nobody in the room and feeding him answers, as

85

Mr. Despins is talking about.

THE COURT:  Okay.  But you didn't answer my question.

MR. CONWAY:  I'm sorry, was this about the 18th -- 19th?  What was the question again?

THE COURT:  No, the question is:  How could you -- you can't provide with any certainty that there isn't anybody else in the room.

Right now, is that your actual -- are you sitting in a room with a table behind you or is that your background?

MR. CONWAY:  I've got -- I can --

THE COURT:  Just answer my question --

MR. CONWAY:  -- I can tell you I have 10 people in the room.  It's irrelevant.

THE COURT:  -- Attorney Conway.  That's not a hard question.  That -- you're not sitting in a room with a table behind you.

MR. CONWAY:  It's just a background.

THE COURT:  Right.

MR. CONWAY:  It's just a visual background.

THE COURT:  So what would stop Mr. Je or any other witness that was in a room by themselves with a background, what would stop them?

MR. CONWAY:  Your Honor, I'm sorry, but the technology is simple.  You've got cameras.  Cameras show you

what's going on.  You can tell when somebody is moving a camera around a room, who's there and who's not there.

I'm not sure --

THE COURT:  Mr. Conway, I'm not -- I'm not here to rule on or opine on technology, okay.  I'm here to have a trial and make sure that the Rules of Discovery are being completely followed.

So your argument is that you will only produce him if he's only alone.  Okay.  I understand.

Mr. Bassett disagrees with that, so I'll have to rule on that.

MR. CONWAY:  Okay, Your Honor.

THE COURT:  Is there anything further, with regard to the motions to compel -- well the second one is called a motion to compel, but it's seeking an order directing Mr. Je to appear for a deposition in person in the United States.

MR. BASSETT:  No, nothing further from the Trustee, Your Honor.

MR. CONWAY:  And nothing further here, Your Honor.

THE COURT:  Okay.  Then I will look at the motion that came on last week and was set for an expedited hearing today, for which, Mr. Conway, you didn't file an objection and there was an objection deadline set.  You didn't file anything.  You've only made your objection noted on the record.

But as I stated, the Trustee has filed documents and has case cites that says -- that say that it's not appropriate for the Court to consider the issues that seem to be your major issues, which is that you're afraid that someone is going to arrest your client.  So that --

MR. CONWAY:  There are other issues before that, Your Honor, including prior -- what you pointed out is the more important one, that it's physically impossible for him to get to the United States without a visa.  You can't get a visa right now --

THE COURT:  Well, aside from the visa, you're still not explaining to me why somebody else -- you haven't satisfactorily explained to me why someone else can't be in the room with him.  And if your whole explanation is because he's afraid he's going to get arrested, the case law says I can't consider that.

MR. CONWAY:  Your Honor, to the extent that he is not able to get a visa, that's only because of the pending indictment, and so I think one flows from the other.

THE COURT:  And I don't want to get into the visa issue.  I mean, look, the issue is this.  I don't understand why someone can't be in the room with your client, wherever he's going to be, for this deposition.  You can both enter into a protective order that whoever it is that is going to be in the room with your client, Mr. Conway, can't disclose

it.  I mean, there's -- you can -- you know, you don't need a judge to figure that out.  I mean, that's what your obligations are under the rules, the Federal Rules of Civil Procedure.

If the -- and it's not the issue -- you keep saying you're concerned -- it makes no sense.  The visa issue has nothing to do with whether somebody could be in the same room with him, nothing.  They're not related.  They're two different issues.

So, the only that it could possibly be that you -- that your client is not agreeing to have someone else in the room with him is because he's afraid he's going to get arrested.  You've already said that.  If it happens at the offices of Paul Hastings, that somebody is going to walk into Paul Hastings international office and arrest him, then deal with it through a protective order.

If you're really -- if you're -- if you -- and I'm not saying you are saying anything to the contrary, Mr. Conway -- but if the representations that have been made that your client wants to cooperate and provide information, then that's the way he's going to have to do it, if it's not going to happen in the U.S. -- in the United States.  He can't be in a room by himself.  There's no deposition that I know of where a person is in a room by themselves in a foreign country or in the United States.

MR. CONWAY:  Well, I'm not sure -- Your Honor, I'm not sure it's appropriate to argue about other depositions, but I'll tell you that it happens 90 percent of the time in depositions I take.

THE COURT:  There's nobody there?  There's not a reporter?  There's not another person?  There's not somebody else sitting in the room with them?

MR. CONWAY:  That's exactly right, Your Honor.

THE COURT:  Well, good luck with that.  We'll see what a court thinks about that, as far as evidence is concerned.  I mean -- you know, so anyway.

Anything else?

MR. CONWAY:  No, Your Honor.  I guess Mr. Bassett and I will continue to meet and confer on these issues. We've been trying to meet and confer, subject to what you decide on this issue today.  We've still being meeting-and-conferring on how to make it all work when it, you know, with these depositions (indiscernible) before.

THE COURT:  All right.  Everybody knows what the -- my ruling is on the initial motion to compel.

And on the second motion to compel, which we just discussed about Mr. Je's deposition, I've heard from the parties; I've looked at the only pleadings that have been filed -- that were filed by Mr. Bassett -- well, I'm not sure if it was by Mr. Bassett -- but counsel for the Trustee.  I

will consider those and I will rule accordingly.

As I stated, I will also enter a docket entry that the list of witnesses and exhibits have to be filed on or before June 30 with all the instructions that -- in the manner that the Court ordered on the record during a hearing held on May 28th, 2026.

Okay?

MR. CONWAY:  And, you know, we've already started discussing that, internally, between Mr. Bassett and I, knowing that you were going to do that.

MR. BASSETT:  That's correct, Your Honor.

In particular, we started discussing the authenticity issue that I think Your Honor had asked us to confer about, following the close of discovery.  We thought it made sense to get out ahead of that, so we're already trying to, you know, get to a resolution where we don't have to bother the Court with authenticity issues at trial.

THE COURT:  Okay.  Thank you.

Now, aside from the adversary proceedings, we have case issues.  So, Mr. Conway, you're welcome to stay, but you don't have to, but I have some questions of the Trustee on some outstanding matters that I'm going to ask him.  So, it's up to you, you can stay or you can go, whatever, you know, works for you.

MR. CONWAY:  I appreciate it, Your Honor.

I might stay just to see what they are, but I have to get to the doctor's office anyway, so I appreciate it.

THE COURT:  Okay.  The only issue that really is pressing is an order that was submitted by the trustee's counsel prior to the entry of all of the pretrial orders that are now in effect.  The pretrial -- on April 22nd, the Court entered six pretrial orders.  The original pretrial -- granted, in part, the trustee's motion to amend the avoidance action as an omnibus alter-ego pretrial order.  That was the first order, which then referenced the five separate orders would enter, and they have entered.  And they -- the first three set up the first three trials and the last two are the extensions of discovery and trial dates in the remaining claims that are not being tried in the omnibus alter-ego action and the other avoidance actions.

So, Trustee Despins, Attorney Bassett, whomever, you filed -- you submitted an order about staying adversary proceedings, which I told you some time ago when we had a hearing before these pretrial orders were entered by the Court, that I didn't quite understand.  I mean, I understand it, but I don't understand why you want to do it.  And I think it's a little confusing.  It talks about dropping and adding people.  I'm not really sure that I agree that it should enter.

I'm not asking you to respond today, but we have

other hearings on June 9th.  I need to understand why, if at all, at this point in time, the order that was submitted about staying certain adversary proceedings -- not proceedings -- claims in adversary proceedings and removing and severing and adding and dropping and all of that should even happen anymore.  I'm not sure that it should.

So, again, I'm not asking you to respond today, but I want to be -- you to be prepared to discuss that on June 9th when we have several hearings on several matters in the case and in adversary proceedings.

MR. DESPINS:  These are "alter ego versus alter ego" adversary proceedings, I believe, right, that's the topic?

THE COURT:  It's not just that one.  It's not just -- it's --

MR. DESPINS:  No, there's more --

THE COURT:  -- there are other issues.

MR. DESPINS:  -- there are others that were caught in -- yes.  Yes.  Yes.

Actually, one of Mr. Conway's clients was, I believe, involved.  Maybe Mister -- the security guy -- I forget.

MR. CONWAY:  Scott Barnett.

MR. DESPINS:  Bench warrant, yes.

MR. CONWAY:  The trustee and I did already agree

to something that was submitted to you on that one.

MR. DESPINS:  Yeah, but -- okay.  No, we will cover that on June 9th, Your Honor.

THE COURT:  Well, and may be what we do -- is that just in one adversary proceeding, then?

MR. DESPINS:  That was one, but we needed to move him out of that adversary proceeding --

THE COURT:  Yeah, we have to talk about it, because --

MR. DESPINS:  Fine.

THE COURT:  -- there's a lot of issues as to why that may cause more confusion than it's worth, but maybe you'll convince me otherwise on June 9th.

MR. DESPINS:  Understood, Your Honor.

THE COURT:  Okay.  All right.

Is there anything else that we need to discuss today?

MR. DESPINS:  Yes.  I'm sure you would really love to talk about this -- I'm being facetious -- two issues.  The first one is the BVI cost order.  The reason why I needed to move the hearing to -- or asked for the hearing to be moved to 10:45 is that we asked for an extension of time to comply with that order, and the judge granted it, but said it's -- you have until June 4th.  And it's my final -- that's the final extension you're going to get.  So I wanted to make

sure Your Honor knew that.

THE COURT:  Well, what does that mean?

MR. DESPINS:  And --

THE COURT:  Meaning that if you don't -- what do you have to do by June 4th:  pay or not pay?

MR. DESPINS:  Exactly.

THE COURT:  Well, the Committee submitted an order where you don't pay.

MR. DESPINS:  I understand, Your Honor, and so it'd be, basically, you have to decide whether you'll adopt that order or not.

But the point the judge made is, look, these are your issues you have to deal with.  From my point of view -- this is the judge in the BVI speaking -- you're personally liable for those fees and for these costs and, therefore, I'm indifferent as to what the Bankruptcy Court does or does not do.  So that's where we are with that issue.

THE COURT:  And the Committee's aware of that?

MR. DESPINS:  Well, no, because it just happened.

THE COURT:  Okay.  Yeah, well, you should make them aware --

MR. DESPINS:  I think --

THE COURT:  -- because they --

MR. DESPINS:  Yes, I --

THE COURT:  -- I -- we gave them until May 22nd to

submit additional legal --

MR. DESPINS:  They did.

THE COURT:  -- and there's -- they couldn't find anything, okay.  They filed something where they said they couldn't find any additional and they wanted me to enter the order that they submitted.

MR. DESPINS:  That's correct, Your Honor.

THE COURT:  Okay.

MR. DESPINS:  But I've not been -- I've not had a chance to tell them about this yet, because it just happened before this hearing, but I will.

The second --

THE COURT:  Well, I need to know --

MR. DESPINS:  Sorry, Your Honor.

THE COURT:  -- their position is going to change. Do they still want me to enter that order, given what just occurred in the BVI?  And if they do, I just need to understand that.

MR. DESPINS:  I won't speak for them, but I suspect --

THE COURT:  Because it sounds to me --

MR. DESPINS:  -- that they will.

THE COURT:  -- it sounds to me, Trustee Despins -- and maybe I'm wrong -- but it sounds to me that the BVI Court said what the concerns I raised were in this court, which is

any order of this court isn't going to be enforced or taken into consideration with regard to the finding that's already been made in the BVI.  And your counsel from London and the BVI agreed with that.

So I want to make sure the Committee wants me to enter that order, given that you just had a hearing where the -- whatever the judge -- and I apologize, I obviously don't know what the judge's name is -- but whatever the judge said seems to support what your counsel said, which is it doesn't matter.

MR. DESPINS:  Yes, Your Honor.  But -- yeah, that was during the sealed portion of the hearing.

But, yes, I'll convey that to the Committee, and I assume them convey, somehow, to Your Honor what their point of view is.

The second issue, Your Honor -- and I don't want to make a big issue of this -- is the issue of (indiscernible) the monthly payment.  I said I would bring it back today.

You really don't need to deal with that, except -- and let me tell you what my concern was -- you raised the -- this issue of maybe changing the system.  And in the meantime, a bunch of law firms -- not Paul Hastings or Neubert Pepe -- but others, international and also Pullman & Comley, submitted their monthly and they're saying, I need to

get paid.  I need to get paid.  Not in that way, Your Honor, but my point is I didn't want to do that because it could be a bad look for me, given that you raised the issue and then we get a bunch of people paid before you rule.  That's not a good look.

So that's why I'm raising this again as to what you intend to do, Your Honor.  You're probably not ready to discuss it, but the question is, what do I do with these payments that are due, according to the existing procedure that they are due to be paid --

THE COURT:  Well, the procedure's not changed yet --

MR. DESPINS:  -- I put a hold on them.

THE COURT:  -- so you have to do what you think the procedure says.

MR. DESPINS:  Okay.

THE COURT:  But I will schedule for the 9th, I'll ask the courtroom deputy, we'll set a status conference on the existing order, which I can't remember what it's called, but something like "omnibus procedures for payment of professionals," or something, right?

MR. DESPINS:  Correct.  Yes, Your Honor.

THE COURT:  So we'll set a status conference on that for the 9th, as well.

MR. DESPINS:  Okay, Your Honor.  Thank you.

I just wanted to make sure that you knew that I was going to pay these people because I -- you know, I didn't want you to think that I just slipped those through before you changed the rules.

THE COURT:  I understand.  I understand.

MR. DESPINS:  Okay.  That's all I have, Your Honor.

THE COURT:  Okay.  All right.

Then I don't have anything further, I think.  I just want to make sure.

Oh, yes, I do, and I should have said this, I guess, when -- didn't you say somebody sent some email yesterday about changing times for responses in an adversary in a default judgment?

MR. LINSEY:  I did, Your Honor.  I submitted a proposed agreement where the Court had adjourned a hearing for several weeks that postponed --

THE COURT:  Well, I didn't adjourn it for several weeks.  People weren't available and then the Court wasn't available, so the Court put it on the next available date.

MR. LINSEY:  Understood.

At the request of the defendant, it was pushed back several weeks, and if I did the wrong thing, I apologize, Your Honor.  I could have filed a motion request, like, a contempt motion --

THE COURT:  No, I don't want you to do that, but the hearing is now when?  When is the hearing, June 23rd?

MR. LINSEY:  Yeah, that's correct, Your Honor.

(Pause)

THE COURT:  I want the replies due -- I don't know why there's a two-week period between opposition to pending motion on June 5th and then a reply due on June 18th.  I think the reply can be filed on June 16th.  I'm not -- I don't -- I'm not putting myself in a position where I have to read 17 things right before the hearing on June 23rd.

So, you can change it as long -- whose reply?  Is that your reply?

MR. LINSEY:  There are -- it's one of these default situations where there's dueling motions.  There's a motion for default judgment and a motion to set aside the clerk's default, which were both filed on the same day.  So the deadlines apply to the defendant's --

THE COURT:  So the replies are June 16.  I'm not going to June 18.  I need time.  If I'm going to be, in any way, prepared for the hearing, I need time to review the documents, okay?

MR. LINSEY:  Understood, Your Honor.

THE COURT:  So you need to inform -- what are the other counsel that are involved in that?

MR. LINSEY:  It's Attorney Conway, Your Honor.

I'll let him know.

THE COURT:  All right.  Will you just let him know?

MR. LINSEY:  Will do.

THE COURT:  Or I suppose the courtroom deputy can -- did you send an email with Attorney Conway on it, I mean, CCed?

MR. LINSEY:  I did, Your Honor; I CCed him.

THE COURT:  All right.  So, then, the courtroom deputy will send back an email later today or tomorrow, stating that it's -- your request to extend the oppositions to the pending motions by June 5th is fine, but that the replies have to be filed by June 16, okay.

MR. LINSEY:  Thank you, Your Honor.

THE COURT:  And then you -- Attorney Conway will know because he's on that email.  I should have thought of that while he was still here, but I didn't.

Okay.  Anything further?

MR. DESPINS:  No, Your Honor.  Thank you.

THE COURT:  All right.  Thank you all.

Those are the last matters on today's calendar, so court is adjourned.

(Proceedings concluded at 1:03 p.m.)

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.


/s/ William J. Garling                    May 29, 2026

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable


/s/ Coleen Rand                           May 29, 2026

Coleen Rand, CET-341

Certified Court Transcriptionist

For Reliable

# EXHIBIT 2

| From: | Michael Conway |
| --- | --- |
| To: | Bassett, Nicholas |
| Cc: | Despins, Luc A.; Patrick Linsey; Farmer, Will C. |
| Subject: | [EXT] RE: Je Deposition |
| Date: | Tuesday, June 2, 2026 5:25:55 PM |

**-- External Email --**

 Report Suspicious 

Working on that information. Hope to have that done tomorrow.

As for the confidentiality agreement, as suggested by Judge Manning, we expect a simmple agreement that the location will not be disclosed and that the identities of who to expect will be provided in advance so there is no mistake as to who will be in the room. Obviously the agreement comes first, or there is no sense having an agreement.

I can confirm that subject to the confidentiality agreement, he has agreed.

Mike


Michael T. Conway
Partner
Lazare Potter Glazer & Moyle LLP
747 Third Ave, 16th Floor
New York, New York  10017
Cell: (917) 242-1597
Office Direct Dial (212) 784-2404
Office Fax: (212) 888-0919

This communication, including attachments, is confidential, may be subject to legal privileges, and is intended for the sole use of the addressee. Any use, duplication, disclosure or dissemination of this communication, other than by the addressee, is prohibited. If you have received this communication in error, please notify the sender immediately and delete or destroy this communication and all copies.

-----Original Message-----
From: Bassett, Nicholas <nicholasbassett@paulhastings.com>
Sent: Tuesday, June 2, 2026 6:27 PM
To: Michael Conway <mconway@lpgmlaw.com>
Cc: Despins, Luc A. <lucdespins@paulhastings.com>; Patrick Linsey <plinsey@npmlaw.com>; Farmer, Will C. <willfarmer@paulhastings.com>
Subject: Re: Je Deposition

[WARNING] This email is from an EXTERNAL sender. Do not click on links or

attachments unless you expect them from the sender and know the content is safe.

We will get back to you on the privilege log.   Do you have an ETA on the other information that Judge Manning instructed the defendants to produce regarding search and collection efforts?  I assume you have a copy of the transcript so you can refer to her specific instructions, but if not let me know and I can forward.

On the deposition, what specifically do you have in mind in terms of a confidentiality agreement?   Obviously, we and the Court need to know where the deposition is occurring.   And we need to know your proposed location now so we can see if we agree with that location.  In other words, we need the proposed location before our Thursday meet and confer deadline, as we will have to sort through a variety of location-specific issues, such as how we are going to administer the oath, arrange for a court reporter, travel issues etc., to see if the location works.

I assume based on what you are saying that you have spoken to Je and confirmed that he is willing to sit for a deposition that we attend in person? Please confirm.

_____
From: Michael Conway <mconway@lpgmlaw.com>
Sent: Tuesday, June 2, 2026 6:07:52 PM
To: Bassett, Nicholas <nicholasbassett@paulhastings.com>
Cc: Despins, Luc A. <lucdespins@paulhastings.com>; Patrick Linsey <plinsey@npmlaw.com>; Farmer, Will C. <willfarmer@paulhastings.com>
Subject: [EXT] RE: Je Deposition

How are we looking on the issue of a confidentiality agreement on location? This was Judge Manning's idea, so I assume you are okay with it, but let me know so we can move forward on that issue. Also, after spending a good amount of time

How are we looking on the issue of a confidentiality agreement on location? This was Judge Manning's idea, so I assume you are okay with it, but let me know so we can move forward on that issue.

Also, after spending a good amount of time going over almost 4,000 additional documents for privilege, I decided that Luc likely holds the privilege at this point with respect to all but 7 documents (all emails relating to the same subject). See privilege log attached.

I will get you the new production as soon as (1) my computer allows me to download it - the size is giving me a problem - and (2) you provide a link for upload.

Best,

Mike

[cid:image002.jpg@01DCF2BA.39204FD0]

Michael T. Conway
<https://urldefense.com/v3/__https://www.lpgmlaw.com/person/michael-t-conway__;!!AzbtxItlYFH3yJIM!bG4KJnn_zDR7ORPSAiyJZNWycXPUXAeJIceXkk2Uv V0aPGLRiFVnYX5DA6IcVmgNaOt80nOWqNYN9jX1QSTTb3Exsw$>

Partner<https://urldefense.com/v3/__https://www.lpgmlaw.com/person/michael-t-conway__;!!AzbtxItlYFH3yJIM!bG4KJnn_zDR7ORPSAiyJZNWycXPUXAeJIceXkk2Uv V0aPGLRiFVnYX5DA6IcVmgNaOt80nOWqNYN9jX1QSTTb3Exsw$>

Lazare Potter Glazer & Moyle
LLP<https://urldefense.com/v3/__https://www.lpgmlaw.com/person/michael-t-conway__;!!AzbtxItlYFH3yJIM!bG4KJnn_zDR7ORPSAiyJZNWycXPUXAeJIceXkk2Uv V0aPGLRiFVnYX5DA6IcVmgNaOt80nOWqNYN9jX1QSTTb3Exsw$>

747 Third Ave, 16th Floor

New York, New York  10017

Cell: (917) 242-1597

Office Direct Dial (212) 784-2404

Office Fax: (212) 888-0919

This communication, including attachments, is confidential, may be subject to legal privileges, and is intended for the sole use of the addressee. Any use, duplication, disclosure or dissemination of this communication, other than by the addressee, is

prohibited. If you have received this communication in error, please notify the sender immediately and delete or destroy this communication and all copies.

From: Michael Conway <mconway@lpgmlaw.com>
Sent: Monday, June 1, 2026 9:13 PM
To: Bassett, Nicholas <nicholasbassett@paulhastings.com>
Cc: Despins, Luc A. <lucdespins@paulhastings.com>; Patrick Linsey <plinsey@npmlaw.com>; Farmer, Will C. <willfarmer@paulhastings.com>
Subject: Re: Je Deposition

I should hear back by morning. I envision a protective order as suggested by Judge Manning that addresses confidentiality of location and identity of PH personnel.

Get Outlook for iOS<https://urldefense.com/v3/__https://aka.ms/o0ukef__;!!AzbtxItlYFH3yJIM!bG4KJnn_zDR7ORPSAiyJZNWycXPUXAeJlceXkk2UvV0aPGLRiFVnYX5DA6IcVmgNaOt80nOWqNYN9jX1QSQ9vgqxkQ$>

_____

From:Bassett, Nicholas <nicholasbassett@paulhastings.com<mailto:nicholasbassett@paulhastings.com>>
Sent: Monday, June 1, 2026 11:49:55 AM
To: Michael Conway <mconway@lpgmlaw.com<mailto:mconway@lpgmlaw.com>>
Cc: Despins, Luc A. <lucdespins@paulhastings.com<mailto:lucdespins@paulhastings.com>>; Patrick Linsey <plinsey@npmlaw.com<mailto:plinsey@npmlaw.com>>; Farmer, Will C. <willfarmer@paulhastings.com<mailto:willfarmer@paulhastings.com>>
Subject: Je Deposition

[WARNING] This email is from an EXTERNAL sender. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Mike, let us know when you are available to meet and confer as required by Judge Manning's order (attached).

_____

[cid:image003.png@01DCF2BA.39204FD0]<http://www.paulhastings.com/ >

Nick Bassett | Partner | Financial Restructuring Group Paul Hastings LLP | 2050 M Street NW, Washington, DC 20036 | Direct: +1.202.551.1902 | Main: +1.202.551.1700 | Fax: +1.202.551.0402 | nicholasbassett@paulhastings.com<mailto:nicholasbassett@paulhastings.com> | http://www.paulhastings.com <http://www.paulhastings.com/ >

***********************************************************************************
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.
If you reply to this message, Paul Hastings may collect personal information including your name, business name and other contact details, and IP address. For more information about Paul Hastings' information collection, privacy and security principles please click HERE<https://www.paulhastings.com/global-privacy-statement >. If you have any questions, please contact Privacy@paulhastings.com<mailto:privacy@paulhastings.com>.

# EXHIBIT 3

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

------------------------------------------------------------------------x
                                                    :
In re:                                              :    Chapter 11
                                                    :
HO WAN KWOK, *et al.*,[1]                           :    Case No. 22-50073 (JAM)
                                                    :
                            Debtors.                :    (Jointly Administered)
                                                    :
                                                    :
------------------------------------------------------:
                                                    :
LUC A. DESPINS, CHAPTER 11                           :
TRUSTEE,                                             :
                                                    :    Adv. Proceeding No. 24-05249
                            Plaintiff,              :
                                                    :
v.                                                  :
                                                    :    February 24, 2026
                                                    :
ACA CAPITAL GROUP LTD., CELESTIAL TIDE              :
LIMITED, G CLUB INTERNATIONAL LIMITED,              :
G CLUB OPERATIONS LLC, G FASHION (CA),              :
G FASHION HOLD CO A LIMITED, G FASHION              :
HOLD CO B LIMITED, G FASHION INTERNATIONAL          :
LIMITED, GFASHION MEDIA GROUP INC.,                 :
GF IP, LLC, GF ITALY, LLC, GFNY, INC., HAMILTON     :
CAPITAL HOLDING LIMITED, HAMILTON                   :
INVESTMENT MANAGEMENT LIMITED, HAMILTON             :
OPPORTUNITY FUND SPC, HIMALAYA CURRENCY             :
CLEARING PTY LTD., HIMALAYA INTERNATIONAL           :
CLEARING LIMITED, HIMALAYA INTERNATIONAL            :
FINANCIAL GROUP LIMITED, HIMALAYA                   :
INTERNATIONAL PAYMENTS LIMITED, HIMALAYA            :
INTERNATIONAL RESERVES LIMITED, MAJOR              :
LEAD INTERNATIONAL LIMITED, MEI GUO, RULE          :
OF LAW FOUNDATION III, INC., RULE OF LAW            :
SOCIETY IV, INC., AND WILLIAM JE,                   :
                                                    :
                            Defendants.             :
------------------------------------------------------------------------x

---

[1]   The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

## CHAPTER 11 TRUSTEE'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO ACA CAPITAL GROUP LTD.

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, as made applicable by Rules 7026 and 7034 of the Federal Rules of Bankruptcy Procedure, Local Civil Rule 26 of the Local Rules for the District of Connecticut, as made applicable by Local Bankruptcy Rule 7026-1 of the Local Rules of Bankruptcy Procedure for the District of Connecticut, and the Court's *Order: (A) Granting Chapter 11 Trustee's Motion for Order for Entry of Pretrial Order; and (B) Entering Omnibus Alter Ego Actions Pretrial Order* [Adv. Proc. Docket No. 197], Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") for the estate of Ho Wan Kwok (the "Debtor"), individual debtor in the above-captioned jointly administered cases (collectively, the "Chapter 11 Cases"), through his undersigned counsel, hereby requests that ACA Capital Group Ltd. produce the documents and other items requested herein (the "Requests," and each, a "Request").  Production of documents responsive to the Requests shall be made electronically or at the offices of Paul Hastings LLP, Attn: Douglass E. Barron, 200 Park Avenue, New York, New York 10166.  Production shall occur on a rolling basis and be completed by no later than **March 26, 2026**.  These requests are without waiver of the Trustee's rights to serve further discovery requests based on the information that may be disclosed in response to these Requests or otherwise, and the Trustee expressly reserves all such rights.

### INSTRUCTIONS

1.      Unless stated otherwise or unless the context dictates otherwise, these Requests will cover the following time period: from January 1, 2010 to the present.

2.      Each Request must be responded to separately and specifically.  Each Request shall be answered fully unless it is in good faith objected to, in which event the reason for Your objection shall be stated in detail, as set forth below.  If an objection pertains only to a portion of

2

a Request, or a word, phrase or clause contained within it, You are required to state Your objection to that portion only and to respond to the remainder of the Requests.

3.      Electronically stored information must be produced in accordance with the following instructions:

a.  <u>Images.</u>  Black and white images must be 300 DPI Group IV single-page TIFF files. Color images must be produced in JPEG format.  File names cannot contain embedded spaces or special characters (including the comma). Folder names cannot contain embedded spaces or special characters (including the comma). All TIFF image files must have a unique file name, i.e. Bates number. Images must be endorsed with sequential Bates numbers in the lower right corner of each image.  The number of TIFF files per folder should not exceed 1000 files. Excel spreadsheets should have a placeholder image named by the Bates number of the file.

b.  <u>Image Load File</u>
   a.  Concordance® Data File. The data file (.DAT) contains all of the fielded information that will be loaded into the Concordance® database. The first line of the .DAT file must be a header row identifying the field names. The .DAT file must use the following Concordance® default delimiters: Comma ASCII character (020) Quote þ ASCII character (254). Date fields should be provided in the format: mm/dd/yyyy.  Date and time fields must be two separate fields. If documents includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments. An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media. The text file must be named after the FIRSTBATES.  Do not include the text in the .DAT file. For Documents with native files, a LINK field must be included to provide the file path and name of the native file. The native file must be named after the FIRSTBATES.
   b.  Concordance Image® OR Opticon Cross-Reference File. The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format: ImageID, VolumeLabel, ImageFilePath, DocumentBreak, FolderBreak, BoxBreak, PageCoun.

c.  <u>Document Text.</u> Text must be produced as separate text files, not as fields within the .DAT file.  The full path to the text file (OCRPATH) should be included in the .DAT file. It is recommended document level ANSI text files, named per the FIRSTBATES/Image Key.  Extracted text files must be in a separate folder, and the number of text files per folder should not exceed 1,000 files. There should

3

be no special characters (including commas in the folder names). Text files must be provided on a document level.

d. <u>Native Production for Certain File Types.</u>  File types that reasonably require viewing in their native format for a full understanding of their content and meaning must be produced in native format.  These include, but are not limited to, spreadsheets, spreadsheet-like files (Microsoft Excel, comma separated values, tab separated values, etc.), Microsoft PowerPoint or other special presentation files, database files, and audio/visual files.  Provide an image of a Bates numbered slip sheet indicating the presence of a native file, and include the path to the native as a field in the .dat file.  Name the produced native file with the Bates number corresponding to the slip sheet for the file.  Group native files within incrementally named "NATIVE" directories, separate from images directories.

e. <u>De-duplication.</u> Produce a single copy of each electronic document for which exact duplicates exist. For email messages, consolidate duplicates based on MD5 hash generated from the BCC, Body, CC, From, IntMsgID, To, and Attach properties. For email attachments and standalone electronic files, consolidate duplicates based on MD5 hash of the entire file.

f. <u>Metadata.</u> Produce extracted metadata for each document in the form of a Concordance compliant load file (.dat). The first line of the .DAT file must be a header row identifying the field names. The .DAT file must use the following Concordance default delimiters: Comma, ASCII character (020) Quote þ ASCII character                                                              (254).
Date fields should be provided in the format: mm/dd/yyyy.  Date and time fields must be two separate fields.  Required metadata listed below:

| Field Name | Sample Data | Description |
| --- | --- | --- |
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email **The LASTBATES field should be populated for single page |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| CUSTODIAN | Smith, John | Email: Mailbox where the email resided Native: Name of the individual or department from whose files the document originated |
| FROM | John Smith | Email: Sender Native: Author(s) of document **semi-colon should be used to separate multiple entries |

4

| TO | Coffman, Janice; LeeW [mailto: LeeW@MSN.com] | Recipient(s) **semi-colon should be used to separate multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s) **semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s) **semi-colon should be used to separate multiple entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email Native: Title of document (if available) |
| FILE_NAME | BoardMeetingMinutes.docx | Native: Name of the original native file, including extension |
| DATE_SENT | 10/12/2010 | Email: Date the email was sent Native: (empty) |
| TIME_SENT/ TIME_ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized |
| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion. |
| LINK | D:\001\ EDC0000001.msg | Hyperlink to the email or native file document **The linked file must be named per the FIRSTBATES number |
| FILE_EXTEN | MSG | The file type extension representing the Email or |
| AUTHOR | John Smith | Email: (empty) Native: Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty) Native: Date the document was created |
| TIME_CREATED | 10:25 AM | Email: (empty) Native: Time the document was created **This data must be a separate field and cannot be combined with the DATE_CREATED field |
| DATE_MOD | 10/12/2010 | Email: (empty) Native: Date the document was last modified |
| TIME_MOD | 07:00 PM | Email: (empty) Native: Time the document was last modified **This data must be a separate field and cannot be combined with the DATE_MOD field |
| DATE_ACCESSD | 10/12/2010 | Email: (empty) Native: Date the document was last accessed |
| TIME_ACCESSD | 07:00 PM | Email: (empty) Native: Time the document was last accessed **This data must be a separate field and cannot be combined with the DATE_ACCESSD field |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |

5

| PGCOUNT | 1 | Number of pages in native file document/email |
|---|---|---|
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty)<br>Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name.<br>Native: (empty) |
| INTMSGID | <000805c2c71b$75977050$ cb8306d1@MSN> | Email: Unique Message ID Native: (empty) |
| MD5HASH | d131dd02c5e6eec4693d9a0 698aff95c 2fcab58712467eab4004583e b8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

4.      Each Request operates and should be construed independently and, unless otherwise indicated, no Request limits the scope of any other Request.

5.      All Documents are to be produced as kept in the usual course of business or are to be organized and labeled to correspond with the categories in these Requests.

6.      Each Request contained herein extends to all Documents: (a) in Your possession, custody, or control; or (b) in the possession, custody, or control of anyone acting on Your behalf, including Your counsel or other representatives and advisors.  Each Document shall be produced in its entirety.

7.      If You are requested to produce a Document that is no longer in Your possession, custody, or control, then Your response must (a) describe in detail the nature of the document and its contents; (b) identify the person(s) who prepared or authored the Document (and, if applicable, the Person(s) to whom the Document was sent); (c) identify the date on which the document was prepared or created; (d) state whether such Document (i) is missing or lost, (ii) has been destroyed, (iii) has been transferred, voluntarily or involuntarily, to others, or (iv) was otherwise disposed of; (e) state the reason for, and the facts and circumstances surrounding, such disposition; (f) identify the Persons who authorized such disposition; (g) identify the date or

approximate date of such disposition; (h) state when the Document was most recently in Your possession, custody or control; and (i) identify the Person, if any, presently in possession, custody, or control of such Document.

8.      If You are requested to produce a Document that has been destroyed, then Your response must state, in addition to the information required by the preceding Instruction: (a) the reason for the Document's destruction; (b) the identity of the Person who destroyed the Document; and (c) the identity of the Person who directed that the Document be destroyed.

9.      If You claim that a requested Document is privileged or attorney work-product, then Your response must: (a) state (i) a description of the Document adequate to support Your contention that the Document is privileged, (ii) the title of the Document, (iii) the date of the Document, (iv) the author of the Document, (v) the addressee of the Document, (vi) the identity of each Person who received or saw the original or any draft, copy, or reproduction of the Document, (vii) whether the Document itself, or any information contained or referred to in the Document is in the possession, custody, or control of any other Persons, and if so, the identity of such Persons, as well as a statement addressing how the information came into their possession, (viii) the claim of privilege under which the Document is withheld, and (ix) all of the circumstances upon which You will rely to support such claim of privilege; and (b) produce a privilege log containing all of the information requested in Part (a) of this Instruction for each Document withheld on the basis of a claim of privilege.  If a portion of an otherwise responsive Document contains information subject to a claim of privilege, only that portion of the Document subject to the claim of privilege shall be deleted or redacted from the Document following the instructions above, and the rest shall be produced.

10.     The Requests are continuing in nature.  You are hereby instructed to (a) supplement or correct any responses later learned to be incomplete or incorrect immediately upon learning that a prior response was incomplete or incorrect; and (b) produce any additional Documents that are called for under the Requests.

11.     Each Request contained herein extends to all instant messages, chats, text messages, telephonic notes, or notes transmitted internally or with third parties by phone or computer, including but not limited to through WhatsApp, Signal, and Telegram, all of which must be searched in connection with the Requests.

12.     These Requests shall not be construed as a waiver or abridgment of, and are not intended to waive, any argument, defense, or objection to any discovery request by the Trustee, nor shall they be construed as an admission of any fact.

13.     In relation to an individual, "to identify" includes giving, to the extent known, the person's full name, current location, present or last known mailing address, email address, and telephone number, if you know such individual to be represented by counsel, the name and email address of such individual's counsel, and when referring to a natural person, additionally, the present or last known place of employment.  Once an individual has been identified in accordance with this subparagraph, only the name of that individual need be listed in response to subsequent discovery requesting the identification of that individual.

## RULES OF CONSTRUCTION

14.     The use of a verb in any tense shall be construed as the use of the verb in all other tenses, as necessary to bring within the scope of each Request all Documents, Communications, materials and information that might otherwise be considered outside its scope.

8

15.     The terms "each" and "any" shall be deemed to include and encompass the words "every" and "all."

16.     The terms "and" and "or" when used herein shall be construed conjunctively or disjunctively as necessary to make these Document Requests inclusive rather than exclusive.

**DEFINITIONS**

The definitions supplied by D. Conn. L. Civ. R. 26(c) and the rules of construction supplied by D. Conn. L. Civ. R. 26(d), as incorporated by D. Conn. Bankr. L.R. 7026-1, shall apply to the Requests.   In addition, the following terms used in these Requests shall have the following meanings:

17.     "You," "Your," and "Yourself," mean and refer to ACA Capital Group Ltd., together with all of its affiliates, divisions, agencies, instrumentalities, departments, offices, officers, directors, agents, managers, attorneys, representatives, employees, professionals, and/or anyone acting for or on its behalf.

18.     "Alter Ego Entities" means and refers to Ace Decade Holdings Limited ("Ace Decade"), HK International Funds Investments (USA) Limited ("HK USA"), Golden Spring (New York) Ltd. ("Golden Spring"), Greenwich Land LLC ("Greenwich Land"), Lamp Capital LLC ("Lamp Capital"), Hudson Diamond NY LLC ("Hudson Diamond NY"), Leading Shine NY Ltd. ("Leading Shine NY"), HCHK Technologies Inc. ("HCHK Technologies"), HCHK Property Management, Inc. ("HCHK Property"), Lexington Property and Staffing, Inc. ("Lexington Property"),Whitecroft Shore Limited ("Whitecroft"), Taurus Fund, LLC ("Taurus Fund"), K Legacy Ltd. ("K Legacy"), Bouillor Holdings Limited ("Bouillor"), New Dynamic Development Limited ("New Dynamic"), Allied Capital Global Limited, Crystal Breeze Investments Limited, Creative Apex Investments Limited, Rosy Acme Ventures Limited, Elite Well Global Limited,

9

Globalist International Limited, Infinite Increase Limited, Infinitum Developments Limited, and Noble Fame Global Limited.

19. "Answer" means and refers to Your operative answer and affirmative defenses in the above-captioned adversary proceeding

20. "Assets" means any item that can be used to produce positive economic value, including, but not limited to any resource with economic value that is owned, controlled or is for the benefit of an entity, that is expected to provide a future benefit, including, but not limited to, all real and personal property, intangible property, investments, rights to invest or to future revenue, cash, bank accounts, commodities, securities, claims, total or partial control of an entity, and prospective economic opportunities.

21. "Associated Individuals and Entities" means and refers to individuals and entities listed in **Schedule A**, and as to any such entity or individual, this term shall include, as applicable, any agents, representatives, employees, directors, officers, managers, members, attorneys or other persons acting on its behalf.

22. "Bankruptcy Code" shall mean the provisions of title 11 of the United States Code.

23. "Communications" means, in the broadest possible sense, and without limitation, any transmittal of information or knowledge (in the form of facts, ideas, inquiries, or otherwise). Communication(s) further refers to all conversations, agreements, inquiries, or replies, whether in person, by telephone, in writing, or by means of electronic transmittal devices, and includes, but is not limited to, all correspondence, emails, recordings, transmittal slips, memoranda, telephone communications, voice messages, telegrams, telefaxes, telecopies, telexes, instant messages, chats, text messages, telephonic notes, or notes transmitted internally or with third parties, including but not limited to through WhatsApp, Signal, and Telegram.

10

24.     "Debtor" means Ho Wan Kwok (a/k/a Miles Kwok, Miles Guo, Guo Wengui, Guo Haoyun, 郭文贵, or any other alias You believe was used by the Debtor), together with his employees, agents, counsel, advisors, or anyone acting on his behalf.

25.     "Debtor's Family" means Mei Guo (a/k/a Mei Guo, 郭美, Debtor's Daughter, or any other alias), Hing Chi Ngok (Ngok (a/k/a Hing Chi Ng, Yue Qingzhi, 岳庆芝, or any other alias), Mileson Guo (a/k/a Qiang Guo, 郭强, Debtor's Son, or any other alias), together with employees, agents, counsel, advisors, or anyone acting on the behalf of each above-listed individuals.

26.     "Documents" is synonymous in meaning and equal in scope to the usage of this term "documents or electronically stored information" in Fed. R. Civ. P. 34(a), and includes, without limitation, each and every written, recorded, or graphic matter of any kind, type, nature, or description that is or has been in Your Possession, Custody or Control, including all printed and electronic copies of electronic mail, computer files maintained in electronic form, electronic communication, text message, social media post, tweet, meta-data, correspondence, memoranda, tapes, stenographic or handwritten notes, written forms of any kind, charts, blueprints, drawings, sketches, graphs, plans, articles, specifications, diaries, letters, telegrams, photographs, minutes, contracts, agreements, surveys, computer printouts, data   compilations of any kind, telexes, facsimiles, voice messages, invoices, order forms, checks, drafts, statements, credit memos, reports, position reports, summaries, indices, books, ledgers, notebooks, schedules, transparencies, recordings, catalogs, advertisements, promotional materials, films, video tapes, audio tapes, CDs, computer disks, brochures, pamphlets, punch-cards, time-slips, Tweets, social media posts, or any written or recorded materials of any other kind, and all meta-data thereof, however stored (whether in tangible or electronic form), recorded, produced, or reproduced, and also including but not

11

limited to, drafts or copies of any of the foregoing that contain any notes, comments, or markings of any kind not found on the original documents or that are otherwise not identical to the original documents. A draft or nonidentical copy is a separate document within the meaning of this term.

27. "Haoran He" means Haoran He (a/k/a Ryan He, 何浩然, or other alias), together with his employees, agents, counsel, advisors, or anyone acting on his behalf.

28. "Including" means "including, but not limited to" and "including, without limitation."

29. "Omnibus Alter Ego Defendants" means and refers to G Club International Limited, G Club Operations LLC, Hamilton Opportunity Fund SPC, Hamilton Capital Holding Limited, Hamilton Investment Management Limited, Himalaya International Clearing Limited, Himalaya International Financial Group Limited, Himalaya International Payments Limited, Himalaya International Reserves Limited, Himalaya Currency Clearing Pty Ltd, G Fashion (CA), GF IP, LLC, GF Italy, LLC, GFashion Media Group Inc, GFNY, Inc., G Fashion Hold Co A Limited, G Fashion Hold Co B Limited, G Fashion International Limited, Rule of Law Foundation III, Inc., Rule of Law Society IV, Inc., Celestial Tide Limited, Major Lead International Limited, Bravo Luck Limited, Saraca Media Group Inc., Alfa Global Ventures Limited, Alfonso Global Limited, Anton Development Limited, China Golden Spring Group (Hong Kong) Ltd, Eastern Profit Corporation Limited, Freedom Media Ventures Limited, G Music LLC, Leading Shine Limited, Wise Creation International Limited, AA Global Ventures Limited, AAGV Limited, Alzarro Enterprises Ltd., Ampleforth Capital Limited, Assets Sino Limited, Auspicious Coast Limited, BSA Strategic Fund I, Canadian Agri-product Monetary Investments Limited, Crane Advisory Group LLC, Delta Konsult Limited, Eagle Eye Investments Limited, Fiesta Investment Ltd., Glory Asia (H.K.) Limited, Gold Perfect Limited, Group Dynasty Limited, GS Security Solutions Inc.,

Guang Hong Limited, H Reserve Management Limited, Head Win Group Limited, HGA Property Operation LLC, Holy City Hong Kong Ventures Limited, Hong Kong International Funds Investments Limited, Hudson Diamond Holdings, Inc., Infinity Treasury Management Inc., Insight Phoenix Fund, Joincorp International Limited, Joy Chance Holdings Limited, Kingdom Rich Limited, Long Gate Limited, New Miracle Limited, Pacific King Investment Limited, Rich Group Development Limited, Rising Sun Capital Ltd, River Valley Operations LLC, Sail Victory Limited, Strong Country Holdings Group Limited, and Thousand Stars Company Limited.  As to any such entity, this term shall include any agents, representatives, employees, directors, officers, managers, members, attorneys or other persons acting on its behalf.

30.    "Transfer(s)" shall have the meaning given to it by section 101(54) of the Bankruptcy Code.

31.    "Regarding" means concerning, describing, comprising, referring to, related to, supporting, favoring, opposing, bolstering, detracting from, located in, considered in connection with, bearing on, evidencing, indicating, reporting on, recording, alluding to, responding to, connected with, commenting on, in respect of, about, in relation to, discussing, showing, describing, reflecting, analyzing constituting, and being.

32.    "Relating to," "relate(s) to" or "related to," when referring to any given subject matter, means, without limitation, any document that constitutes, comprises, involves, contains, embodies, reflects, identifies, states, refers directly or indirectly to, or is in any way relevant to the particular subject matter identified.

33.    "William Je" means William Je (a/k/a Kin Ming Je, 余建明, Jianming Yu, William Yu, or any other alias), together with his employees, agents, counsel, advisors, or anyone acting on his behalf.

34.    "Yvette Wang" means Yanping Wang (a/k/a 王雁平, or any other alias), together with her employees, agents, counsel, advisors, or anyone acting on her behalf.

35.    Capitalized terms not defined herein have the meanings ascribed to them in the Trustee's amended complaint in the above-captioned adversary proceeding [Adv. Proc. Docket No. 106] (the "Amended Complaint").

## DOCUMENTS TO BE PRODUCED

**REQUEST FOR PRODUCTION NO. 1.**

All Documents and Communications relating to the corporate governance and organization of You, including but not limited to all of Your board minutes or materials, by-laws, and certificates of incorporation, and all Documents stating, discussing, or otherwise addressing Your corporate actions, governance decisions, corporate structure, business purpose, formation, or relationship to the Debtor, the Debtor's Family, Yvette Wang, William Je, or any other associate, affiliate, business partner, or employee of the Debtor.

**REQUEST FOR PRODUCTION NO. 2.**

All Documents and Communications relating to the formation and creation of You.

**REQUEST FOR PRODUCTION NO. 3.**

Documents sufficient to identify Your places of business, including but not limited to any offices, addresses, or P.O. boxes that You have used since formation, including without limitation copies of any leases or deeds to real property.

**REQUEST FOR PRODUCTION NO. 4.**

Documents sufficient to identify any individual or entity that was at any time affiliated with, employed by, or otherwise involved in any capacity with the operations of You, including but not limited to the past and present members of Your board, Your past and present employees,

14

and any other individuals and entities that were involved in Your management, oversight, and governance or had the ability or authority to direct litigation on Your behalf, including, without limitation, any litigation relating to the Debtor's chapter 11 case, related adversary proceedings, and court orders.

**REQUEST FOR PRODUCTION NO. 5.**

All Documents and Communications regarding ownership of You, including without limitation Documents sufficient to identify all holders of ownership or membership interests in You and all Documents regarding any transfers of such interests, stock, or corporate control, whether nominal, beneficial, or de facto.

**REQUEST FOR PRODUCTION NO. 6.**

All Documents and Communications with Celestial Tide Limited and William Je regarding Your operations, management, or decision-making.

**REQUEST FOR PRODUCTION NO. 7.**

All Documents and Communications regarding corporate decision-making and control over You, including without limitation with respect to hiring and firing managers and major employees, strategic operational decisions, major financial decisions (such as borrowing money or making investments), and Transfers of Assets.

**REQUEST FOR PRODUCTION NO. 8.**

All financial statements, including but not limited to all balance sheets, income statements, statements of cash flows, general ledgers, and all other Documents necessary to identify all of Your Assets and Liabilities.

**REQUEST FOR PRODUCTION NO. 9.**

All tax returns filed in any jurisdiction.

15

**REQUEST FOR PRODUCTION NO. 10.**

Documents sufficient to identify all purported client(s) of You.

**REQUEST FOR PRODUCTION NO. 11.**

Documents and Communications relating to any services you purportedly provided to the clients identified in Request No. 10, including without limitation, all engagement letters, service agreements, statements of work, amendments, billing records, invoices, payment records, and Documents sufficient to show the scope of services provided, the dates such services were performed, and the compensation agreed upon and/or received.

**REQUEST FOR PRODUCTION NO. 12.**

Documents sufficient to identify all Assets, investment funds, and/or managed accounts for which You purport to act as manager, investment manager, advisor, and/or similar role.

**REQUEST FOR PRODUCTION NO. 13.**

All Documents and Communications relating to Your capitalization and financial condition, including but not limited to any Documents containing, incorporating, analyzing, or otherwise discussing Your tax returns, balance sheets, account statements, auditing reports, financial statements, statements of account, loan agreements, certificates of deposit, certificates of holdings, investment portfolio summaries, or similar Documents relating to You.

**REQUEST FOR PRODUCTION NO. 14.**

Documents sufficient to identify all accounts at financial institutions such as bank accounts, investment accounts, and accounts with electronic payment platforms (including such accounts located in foreign jurisdictions) currently and/or previously within Your possession, custody, or control, including, without limitation, all account statements and any Documents discussing the balances of such accounts and/or identifying the entities or individuals with the authority to access

or authorize transfers to such accounts. This includes, without limitation, such accounts at First Abu Dhabi Bank.

**REQUEST FOR PRODUCTION NO. 15.**

All Documents and Communications related to any Transfers of Assets having a value of $50,000.00 or more made by You or on Your behalf, including without limitation, Documents and Communications sufficient to show the amounts of any such Transfer, the purposes or business justification for any such Transfer, any value or consideration provided in connection such Transfer, when the Transfer was made, to whom the Transfer was made, Your relationship with such recipient, any return or repayment of any portion of the Transfer, the source of funds for any Transfer, and any documentation relating to such Transfers. This includes, without limitation, Transfers to Greenwich Land, Lamp Capital, Golden Spring., Lexington Property, Himalaya International Clearing Limited, Hamilton Opportunity Fund SPC, Gettr USA, Inc., Saraca Media Group, Inc., Leading Shine NY, Hudson Diamond NY, and Eastern Profit Corporation Limited. This also includes, without limitation, Transfers to ACASS Canada Ltd., The Sherry Netherland Inc., Nigel Burgess Limited, Flying Colours Corp., Hodgson Russ LLP, New Mulberry PTE Ltd., Ziba Limited, and Mercedes-Benz Manhattan Inc.

**REQUEST FOR PRODUCTION NO. 16.**

All Documents and Communications related to any Transfers of Assets having a value of $50,000.00 or more received by You or on Your behalf, including without limitation, Documents and Communications sufficient to show the amounts of any such Transfer, the purposes or business justification for any such Transfer, any value or consideration provided in connection such Transfer, when the Transfer was received, from whom the Transfer was received, Your relationship with such transferor, the location, status, disposition, or subsequent transfer of any funds or

17

property received as part of any Transfer, rights and obligations with respect to the use, disposition, or application of the funds or property received in any Transfer, the source of funds for any Transfer. This includes, without limitation, Roscalitar 2, Leading Shine NY, G Club, G Club One, G Club Two, G Club Three, G Fashion, and Hamilton Opportunity Fund SPC.

**REQUEST FOR PRODUCTION NO. 17.**

All Documents and Communications related to any Transfers of Assets to or from the Debtor, the Debtor's Family, the Alter Ego Entities, the Omnibus Alter Ego Defendants, or any Associated Entities and Individuals.

**REQUEST FOR PRODUCTION NO. 18.**

All Documents and Communications regarding any gifts, benefits, or loans to, from, or on behalf of the Debtor, the Debtor's Family, Alter Ego Entities, Omnibus Alter Ego Defendants, or the Associated Entities and Individuals, including without limitation, Documents sufficient to show the amounts of such gifts, benefits, or loans; the purposes for which such gifts, benefits, or loans were used; the date that such gifts, benefits, or loans were provided; any value or consideration provided in connection with such gifts, benefits, or loans; the terms of any loans, including all representations and warranties and the interest rate of such loans; and all evidence of repayments of any loans.

**REQUEST FOR PRODUCTION NO. 19.**

All Documents and Communications related to any agreements, contracts, arrangements, understandings (written or oral), side letters, amendments, addenda, modifications, extensions, renewals, and term sheets that You entered into, executed, negotiated (whether or not executed), been a party to, assumed, assigned, amended, modified, terminated, or allowed to expire at any time with the Debtor, the Debtor's Family, Alter Ego Entities, Omnibus Alter Ego Defendants, or

18

other Associated Entities and Individuals, including without limitation all drafts and redlined versions, all exhibits, schedules, statements of work, and attachments thereto, all ancillary or related agreements, any written confirmation or memorialization of oral agreements or understandings, any agreements proposed but not finalized, and all Documents and Communications relating to the negotiation, interpretation, performance, amendment, breach, termination, assignment, or enforcement of such agreements. This includes, without limitation, any Documents sufficient to identify and describe Your relationship with the Debtor, the Debtor's Family, Alter Ego Entities, Omnibus Alter Ego Defendants, or other Associated Entities and Individuals.

**REQUEST FOR PRODUCTION NO. 20.**

All Documents and Communications related to the UK Administration Proceeding of Hamilton Capital Holding Ltd., including without limitation, Documents sufficient to identify and state the basis of Your purported claim against Hamilton Capital Holding Ltd. for more than £13.3 million.

**REQUEST FOR PRODUCTION NO. 21.**

All Documents and Communications related to the Debtor, Yvette Wang, William Je, the Debtor's Family, or the Associated Entities and Individuals.

**REQUEST FOR PRODUCTION NO. 22.**

All Documents and Communications related to the Alter Ego Entities.

**REQUEST FOR PRODUCTION NO. 23.**

All Documents and Communications related to Omnibus Alter Ego Defendants.

**REQUEST FOR PRODUCTION NO. 24.**

All Documents and Communications relating to the "A10" or "A15" investment scheme.

19

**REQUEST FOR PRODUCTION NO. 25.**

Documents sufficient to describe and identify Your relationship with, or connection to, the G|FASHION or G|FOREVER scheme.

**REQUEST FOR PRODUCTION NO. 26.**

Documents sufficient to describe and identify Your relationship with, or connection to, the Himalaya Exchange scheme.

**REQUEST FOR PRODUCTION NO. 27.**

Documents sufficient to describe and identify Your relationship with, or connection to, the G|CLUB scheme.

**REQUEST FOR PRODUCTION NO. 28.**

All Documents and Communications relating to any trust or nominee arrangement or proposed trust or nominee arrangement regarding You.

**REQUEST FOR PRODUCTION NO. 29.**

All Documents and Communications relating to the criminal case styled as *United States v. Guo, et al.*, 23-cr-118 (AT), currently pending in the United States District Court for the Southern District of New York.

**REQUEST FOR PRODUCTION NO. 30.**

All Documents and Communications related to any claim, allegation, argument, statement or judicial finding that You are the *alter ego* of, beneficially or equitably owned by, and/or are responsible for the obligations of any other person or entity, other than in this Adversary Proceeding.

**REQUEST FOR PRODUCTION NO. 31.**

20

Documents sufficient to identify all legal counsel You have retained for any purpose, including copies of engagement letters with such counsel.

**REQUEST FOR PRODUCTION NO. 32.**

All Documents and Communications related to any costs, fees, charges, expenses, obligations, or undertakings You have paid on behalf of the Debtor, the Debtor's Family, the Alter Ego Entities, the Omnibus Alter Ego Defendants, or other Associated Entities and Individuals.

**REQUEST FOR PRODUCTION NO. 33.**

All Documents and Communications related to any costs, fees, charges, expenses, obligations, or undertakings the Debtor, the Debtor's Family, the Alter Ego Entities, the Omnibus Alter Ego Defendants, or other Associated Entities and Individuals have paid on Your behalf.

**REQUEST FOR PRODUCTION NO. 34.**

All Documents and Communications related to any automobiles, vehicles, aircraft, vessels, or real property owned by You, or purchased, sold, leased, rented, financed, loaned, financially supported, financially facilitated, or otherwise obtained by You.

**REQUEST FOR PRODUCTION NO. 35.**

All Documents related to Communications with the United States Department of Justice, the Securities and Exchange Commission, the Federal Bureau of Investigation, or any other governmental agency or body, including copies of any subpoenas and responses thereto.

**REQUEST FOR PRODUCTION NO. 36.**

All Documents and Communications related to the purported loan arrangements:

- between You and HK USA Limited, LLC, including without limitation Documents and Communications relating to the adversary proceeding between the Trustee and HK USA in the Chapter 11 Case, *i.e.*, Adversary Proceeding No. 22-05003; any Communications between You and HK USA or Mei Guo;
- between You and Eastern Profit Corporation Limited;
- between You and Greenwich Land;

21

- between You and Hudson Diamond NY; and
- between You and any other Alter Ego Entities, or Omnibus Alter Ego Defendants, or Associated Entities and Individuals.

**REQUEST FOR PRODUCTION NO. 37.**

All Documents and Communications related to the "ACA Fund."

**REQUEST FOR PRODUCTION NO. 38.**

All Documents and Communications related to Your employment of Yvette Wang.

**REQUEST FOR PRODUCTION NO. 39.**

All Documents and Communications related to the appointment of Karin Maistrello as director of You.

**REQUEST FOR PRODUCTION NO. 40.**

All Documents and Communications related to the Transfer(s) of funds made by You for the payment of expenses related to the Lady May yacht and Bombardier Global XRS private jet with serial number 9189, the Debtor's expenses at the Sherry Netherland Apartment, as well as the Debtor's legal expenses in connection with the litigation between the Debtor and Pacific Alliance Asia Opportunity Fund L.P..

**REQUEST FOR PRODUCTION NO. 41.**

All Documents and Communications related to the Transfer of funds from You for the potential funding of the Debtor-in-possession financing in 2022 in connection with the Debtor's Chapter 11 Case.

**REQUEST FOR PRODUCTION NO. 42.**

All Documents and Communications related to the Transfer of funds from Roscalitar2 to You and the subsequent disposition of such funds.

**REQUEST FOR PRODUCTION NO. 43.**

All Documents and Communications related to the Transfer and requested Transfer of funds from the Himalaya Exchange to You, other Alter Ego Entities, or Omnibus Alter Ego Defendants, including without limitation, the Transfer of no less than $46 million  requested by Your nominal owner William Je on or around September 22, 2022.

**REQUEST FOR PRODUCTION NO. 44.**

All Documents concerning the Himalaya Farm Loan Program, as described in the superseding indictment at *United States v. Guo*, 23-cr-118, Docket No. 307 (S.D.N.Y. Apr. 24, 2024).

**REQUEST FOR PRODUCTION NO. 45.**

All Documents concerning or providing evidentiary support for the factual allegations, admissions or denials, legal conclusions and defenses set forth in the Answer.

**REQUEST FOR PRODUCTION NO. 46.**

All Documents that You intend to use at trial or to support any motion for summary judgment You intend to file or is considering filing.  This includes, without limitation, any Documents that an expert hired by You intend to use at trial.

**REQUEST FOR PRODUCTION NO. 47.**

All Documents and Communications identified or relied upon by You in answering any interrogatory or request for admission propounded by the Trustee.

**REQUEST FOR PRODUCTION NO. 48.**

Documents sufficient to identify any witnesses You intend to call at trial.

Dated: February 24, 2026
     New York, New York

By: */s/ Douglass Barron*
    Douglass Barron (admitted *pro hac vice*)
    PAUL HASTINGS LLP
    200 Park Avenue
    New York, New York 10166
    (212) 318-6000
    douglassbarron@paulhastings.com

      *and*

    Nicholas A. Bassett (admitted *pro hac vice*)
    PAUL HASTINGS LLP
    2050 M Street NW
    Washington, D.C., 20036
    (202) 551-1902
    nicholasbassett@paulhastings.com

      *and*

    Douglas S. Skalka (ct00616)
    Patrick R. Linsey (ct29437)
    NEUBERT, PEPE & MONTEITH, P.C.
    195 Church Street, 13th Floor
    New Haven, Connecticut 06510
    (203) 781-2847
    dskalka@npmlaw.com
    plinsey@npmlaw.com

    *Counsel for the Chapter 11 Trustee*

**SCHEDULE A**

7000R Corp.,

Aaron Mitchell,

AI Group Holdings Inc.,

Alex Hadjicharalambous,

Ana C. Izquierdo-Henn,

Anthony DiBattista,

Arethusa Forsyth,

Bidvestor Trading Limited,

Birchstone Capital AG,

Bulktrade Limited,

Cécile Civiale Vuillier;

Chunguang Han a/k/a Han Chunguang,

David Fallon

Daniel Podhaskie,

Defeng Cao,

Deities Digital LLC,

Doaa Dashoush,

Fiona Yu

Foudre Finance AG,

GETTR USA, Inc.,

Gladys Chow,

GM 27 LLC,

GTV Media Group, Inc.,

Gypsy Mei Food Services LLC,

Himalaya Alliance,

Himalaya Farms,

Haitham Khaled,

Haoran He, a/k/a Ryan He,

Headwater Services LLC,

Jesse Brown,

Jessica Mastrogiovanni,

Jisen Hu, a/k/a Jason Hu,

Karin Maistrello,

Kevin Ma, a/k/a Kun Ma,

Lawall & Mitchell, LLC,

Le Qiao, a/k/a Ingrid Qiao

Leanne Li, a/k/a Nan Li,

Limarie Reyes Molinaris,

Manuel Martinez Anzaldua,

Max Krasner,

Natasha Qu, a/k/a Guojiao Qu,

New Federal State of China a/k/a NFSC,

Nicholas Savio,

Priya Patel,

Qidong Xia,

Ravinder Shokar a/k/a Rav Shokar,

Rui Hao,

Sabina Nüesch,

Savio Law LLC,

Scott Barnett,

Stichting Duurzame,

Stichting Gewelf,

Taurus Management LLC,

Tian Hao,

The Lost Draft LLC,

TrustConsult Group,

Victor Cerda,

X49 FZ LLC,

Xinfang Zhang,

Yongbing Zhang,

Yumei Hao, and

Zhang Wei.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 24, 2026, I caused to be served a copy of the foregoing

via electronic email upon the following counsel for ACA Capital Group Ltd.:

**Michael T. Conway, Esq.**
LAZARE POTTER GIACOVAS & MOYLE LLP
747 Third Avenue, 16th Floor
New York, NY 10017
Telephone: (917) 242-1597
mconway@lpgmlaw.com

Dated: February 24, 2026
New York, New York

By: */s/ Douglass Barron*
Douglass Barron (admitted *pro hac vice*)
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000
douglassbarron@paulhastings.com

*Counsel for the Chapter 11 Trustee*