**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HO WAN KWOK, *et al.*,[1] | Case No. 22-50073 (JAM) |
| Debtors. | (Jointly Administered) |
| LUC A. DESPINS, CHAPTER 11 TRUSTEE, | |
| Plaintiff, | Adv. Pro. No. 24-05249 |
| v. | |
| ACA CAPITAL GROUP LTD., HIMALAYA INTERNATIONAL CLEARING LTD., HIMALAYA INTERNATIONAL FINANCIAL GROUP LTD., HIMALAYA INTERNATIONAL RESERVES LTD., HIMALAYA INTERNATIONAL PAYMENTS LTD., AND HIMALAYA CURRENCY CLEARING PTY LTD., *et al.*, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF CHAPTER 11 TRUSTEE FOR ESTATE OF HO WAN KWOK FOR SUMMARY JUDGMENT WITH RESPECT TO ACA CAPITAL GROUP LIMITED AND HIMALAYA ENTITIES**

[1] The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

**TABLE OF CONTENTS**


I. Criminal Court Judgment and Findings Are Admissible in This Adversary Proceeding and Have Preclusive Effect on Key Issues ....................................................4

II. Defendants' Discovery Violations Support Summary Judgment....................................9

III. Undisputed Facts in Record Establish ACA and Its Assets Were at All Relevant Times Beneficially Owned by Debtor..........................................................................10

A. ACA Nominally Owned by Debtor's Agent, Je ................................................11

B. Witness Testimony Establishes that Debtor Controlled ACA ............................21

C. ACA Staffed by Debtor's Agents.....................................................................22

D. ACA Shared Office Address with Debtor and Debtor-Controlled Entities .........25

E. Debtor Used ACA as His Piggybank for His Purposes......................................25

F. Debtor Invoked Fifth Amendment When Asked About ACA............................35

IV. Undisputed Facts Establish Himalaya Entities and Their Assets Were at All Relevant Times Beneficially Owned by Debtor ..........................................................36

A. Debtor Controlled Je, Nominal Owner of Himalaya Entities .............................37

B. This Court Found that Debtor Was Leader of Himalaya Exchange....................37

C. Himalaya Entities Comprised Debtor's Himalaya Exchange Scheme ................38

D. Debtor Controlled Himalaya Exchange and Made Clear That He Was Boss......38

E. Debtor Controlled Himalaya Exchange Through His Agents ............................42

F. "Himalaya Exchange Ecosystem" Consisted of Debtor's Shell Entities.............44

G. Himalaya Exchange Scheme Originated with Debtor.......................................49

H. Debtor Was Responsible for Funding Himalaya Entities..................................55

I. Debtor Used Funds of Himalaya Entities for His and His Family's Benefit .......56

J. Debtor Invoked the Fifth Amendment When Asked Whether He Controlled and Owned Himalaya Entities........................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ACS Recovery Servs., Inc. v. Figueiredo*,
No. 07CIV7359CLBLMS, 2008 WL 11517824 (S.D.N.Y. Jan. 15, 2008)....7

*Atticus Ltd. Liab. Co. v. Dramatic Publ'g Co.*,
No. 22 CV 10147 (DLC), 2023 WL 3135745 (S.D.N.Y. Apr. 27, 2023), *aff'd,* 145 F.4th 257 (2d Cir. 2025)....8

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*,
No. 93 Civ. 6874, 2001 WL 99506 (S.D.N.Y. Feb. 6, 2001)....4

*Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*,
No. 09 CIV 6148(VM)(MHD), 2012 WL 12932049 (S.D.N.Y. July 17, 2012)....5, 8

*Cayuga Nation v. Tanner*,
6 F.4th 361 (2d Cir. 2021)....5

*Cook Cnty. v. MidCon Corp.*,
773 F.2d 892 (7th Cir. 1985)....7

*Despins v. Taurus Fund LLC, et al.*
[Adv. Proc. No. 23-05017, ECF No. 172....11

*Eeastern Profit Corp. v. Strategic Vision US LLC*,
Case No. 18-cv-2185 (LJL), 2021 U.S. Dist. LEXIS 116334 (S.D.N.Y. June 22, 2021)....24, 30

*Evans v. Ottimo*,
469 F.3d 278 (2d Cir. 2006)....7

*In re Abeyta*,
387 B.R. 846 (Bankr. D.N.M. 2008)....7

*In re Gottheiner*,
703 F.2d 1136 (9th Cir. 1983)....9

*In re Norton*,
No. 8-17-70855-AST, 2020 WL 717411 (Bankr. E.D.N.Y. Jan. 15, 2020)....7

*JSC v Ablyazov*,
[2014] EWHC 2564 (Comm)....3

*Martino v. McDonald's System, Inc.*,
598 F.2d 1079 (7th Cir. 1979)....................................................................................8

*New York City Dist. Council of Carpenters Pension Fund v. Forde*,
No. 11 CIV 5474 (LAP)(GWG), 2018 WL 2455437 (S.D.N.Y. June 1, 2018).......................8

*NRC Holding Ltd v Danilitskiy*
[2017] EWHC 1431 (Ch)..........................................................................................3

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
803 F. Supp. 2d 409 (E.D. Va 2011) ..........................................................................2

*Pleshakov v. Sky Stream Corporation*
[2021] UKPC 15] ...................................................................................................2

*Prest v. Petrodel Resources Limited*,
[2013] UKSC 34] ...............................................................................................2, 3

*Proctor v. LeClaire*,
715 F.3d 402 (2d Cir. 2013)......................................................................................5

*Purba v. Purba*
[2000] 1 FLR 444 (EWCA) (Eng.)..............................................................................2

*S.E.C. v. Haligiannis*,
470 F. Supp. 2d 373 (S.D.N.Y. 2007)..........................................................................7

*S.E.C. v. Monarch Funding Corp.*,
192 F.3d 295 (2d Cir. 1999)......................................................................................5

*Sacerdote v. Cammack Larhette Advisors, LLC*,
939 F.3d 498 (2d Cir. 2019)......................................................................................8

*Sloutsker v Sloutsker*
[2025] EWFC 369 ...............................................................................................3, 4

*Tang v. Revenue and Customs Commissioners*
[2019] UKFTT 81 (TC)............................................................................................2

*Taylor v. Sturgell*,
553 U.S. 880 (2008) ............................................................................................4, 8

*Twin City Pipe Trades Serv. Ass'n, Inc. v. Wenner Quality Servs., Inc.*,
869 F.3d 672 (8th Cir. 2017)......................................................................................8

*U.S. ex rel. Lamberts v. Stokes*,
640 F. Supp. 2d 927 (W.D. Mich. 2009).......................................................................5

*United States v. Weiss*,
467 F.3d 1300 (11th Cir. 2006)....8

*Westdeutsche Landesbank Girozentrale v Islington LBC*
[1996] A.C. 669 at 708-709 ....2

**RULES**

Fed. R. Bankr. Proc. § 7056....1

Fed. R. Civ. P. § 37....9

Fed. R. Civ Proc. § 56....1

Fed. R. Evid. § 803(22)....4

Pursuant to Federal Rule of Bankruptcy Procedure 7056 and Rule 7056-1 of the Local Bankruptcy Rules for the District of Connecticut, Luc A. Despins, as chapter 11 trustee (the "Trustee") for the estate of Ho Wan Kwok (the "Debtor" or "Kwok"), respectfully submits this memorandum of law in support of his motion for summary judgment (the "Motion").[2]

## PRELIMINARY STATEMENT[3]

1. William Je ("Je")—the debtor's agent, money launderer, co-conspirator, and co-defendant—nominally owned each of the Entity Defendants at issue in this Motion.[4] But the evidentiary record in this adversary proceeding, along with preclusive findings made by Judge Torres in the Debtor's Criminal Case, confirm that Je acted at the Debtor's direction and that the Debtor dominated and controlled the Entity Defendants and their assets. Accordingly, the Trustee is entitled to summary judgment on his claim that the Entity Defendants and their assets were at all relevant times beneficially owned by the Debtor, and thus they are property of the estate.

## ARGUMENT[5]

2. The Entity Defendants are all organized in jurisdictions that follow or find persuasive English common law.[6] As this Court has explained, "English common law recognizes that a legal owner may be a 'bare trustee', holding an asset for the benefit of and at the discretion

---

[2] In further support of the Motion, the Trustee relies on the (i) *Declaration of Douglass E. Barron in Support of Memorandum of Law in Support of Motion of Chapter 11 Trustee for Estate of Ho Wan Kwok for Summary Judgment* (the "Declaration") and (ii) *Local Rule 56(a)(1) Statement of Undisputed Material Facts* ("SUF"), both filed concurrently herewith.

[3] Capitalized terms not defined in the Preliminary Statement have the meanings given to such terms in the Trustee's adversary complaint (the "Complaint") or in the sections that follow. "Docket No. __" means and refers to items filed on the docket of the above-captioned adversary proceeding.

[4] The "Entity Defendants" are Himalaya International Clearing Ltd. ("HIC"), Himalaya International Financial Group Ltd. ("HIFG"), Himalaya International Reserves Ltd. ("HIR"), Himalaya International Payments Ltd. ("HIP"), and Himalaya Currency Clearing Pty Ltd. ("HCCP," and together with HIC, HIFG, HIP, the "Himalaya Entities"), and ACA Capital Group Ltd. ("ACA"). The Entity Defendants and Je are, together, the "Defendants".

[5] Per the Court's instruction, the Trustee omits any discussion of the legal standard under Fed. R. Civ P. 56.

[6] *See* Mem. of Decision and Order Granting in Part Mot. for Summary Judgment (the "Bombardier Decision"), at 30, AP No. 23-05008, Docket No. 126 (Court & Date of Filing) ("English common law and equity applies in the BVI."); Mem. of Decision and Order Denying Mot. to Dismiss, at 15, Index No., Docket No. 133 (Court & Date of Filing) (UK, BVI, Hong Kong, and Australia jurisdictions where "English law is either persuasive or binding").

of a beneficial owner who has complete control over the asset."[7] The "term 'beneficial owner' has similar meanings in both English and American law."[8] As under U.S. law, a claim for beneficial ownership under English law is based on the true, or equitable, owner's domination and control over the asset and/or entity in question such that this true owner "gathers the benefits of an asset, business, or agreement without necessarily holding legal title,"[9] and the "relationship between bare trustee and beneficial owner need not be formalized in writing and may be determined based on the facts and circumstances of the case."[10]

3. One of those facts and circumstances can even be the absence of information. As the Supreme Court of the United Kingdom explained in *Prest v. Petrodel Resources Limited*, where lack of information is the result of a defendant's non-cooperation with judicial proceedings, it is a "fair inference" that the "main, if not the only, reason, for the companies' failure to co-operate [was] to protect" the underlying assets.[11] "That, in turn, suggests that proper disclosure of the facts would reveal [the assets] to have been held beneficially" by the alleged true owner.[12]

4. English courts also consider the source of the funds and how the underlying asset or entity was obtained or formed. If the underlying asset or entity was obtained with funds from, or controlled by, the alleged beneficial owner, English law presumes that the alleged beneficial owner does not intend to simply give away his assets and, therefore, the legal owner is no more than a nominal owner, holding the asset (or entity) in trust for the true, beneficial, owner.[13]

---

7 Bombardier Decision at 30.

8 *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 803 F. Supp. 2d 409, 425 (E.D. Va 2011) (noting "the court has undertaken a review of English law").

9 *Id.*

10 Bombardier Decision at 30 (citing *Pleshakov v. Sky Stream Corporation* [2021] UKPC 15 [¶¶ 47–48]; *Tang v. Revenue and Customs Commissioners* [2019] UKFTT 81 (TC); *Purba v. Purba* [2000] 1 FLR 444 (EWCA) (Eng.)).

11 *Prest v. Petrodel Resources Limited* , [2013] UKSC 34 [¶ 47].

12 *Id.*

13 *See Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] A.C. 669 at 708-709 ("[W]here A makes a voluntary payment to B or pays (wholly or in part) for the purchase of property which is vested in B alone or in

Accordingly, in *Prest* the Supreme Court inferred that, in the absence of evidence from the husband, the funds to purchase two properties were provided by him and, in the absence of evidence that he had provided said funds in return for valuable consideration, the husband was inferred to be the beneficial owner of the properties.[14]

5. Based on this law, multiple courts have found beneficial ownership under facts similar to those here. For example, in *JSC v Ablyazov*,[15] the court agreed with a bank that alleged that a "Mr. Z" held the beneficial interest in a property in London because the funding came from Mr. Z, giving rise to the presumption that the nominal owner held the property on trust for Mr. Z. While the documentary evidence was incomplete, the court relied on evidence that Mr. Z had chosen the property, negotiated the purchase, organized funding, and gave instructions to the conveyancing solicitor. And in *NRC Holding Ltd v Danilitskiy*, a judgment creditor contended that the defendant beneficially owned certain London real estate nominally held by Opal Stem. The court agreed, and pointed to the following facts: (i) Opal Stem appeared to have no other assets, no operations, and no bank account, and had only recently been incorporated for the purposes of holding title to the property; (ii) purchase of the property was arranged by and occurred on the instructions of the defendant; (iii) the defendant paid the purchase price; (iv) there was evidence the property was purchased to be used by the defendant's family; and (v) there was no evidence that the defendant ever paid any rent for the use of the property.[16]

the joint names of A and B, there is a presumption that A did not intend to make a gift to B: the money or property is held on trust for A (if he is the sole provider of the money) or in the case of joint purchase by A and B in shares proportionate to their contributions.").

14 *Prest v. Petrodel Resources Limited* , [2013] UKSC 34 [¶ 50].

15 [2014] EWHC 2564 (Comm).

16 [2017] EWHC 1431 (Ch). In another illustrative case, *Sloutsker v Sloutsker*, a husband sought to argue that his matrimonial home was not a matrimonial asset to be shared with his wife in divorce proceedings on the basis that the home was owned by a company, Roosevelt & Partners (NZ) Ltd, and held on trust for separate beneficiaries. [2025] EWFC 369. The judge held that the money used to pay for the home was derived from profits made on the sale by the husband of a hotel in Sochi which the husband transferred to a limited company which were then transferred to Roosevelt which used it to purchase the matrimonial home. *Id.* The separate

6. In accordance with these cases, and English law more generally, the undisputed facts establish that the Debtor dominated and controlled the Entity Defendants and their assets to such an extent that the Trustee is entitled to summary judgment on his claims that these companies and their assets were beneficially owned by the Debtor.

## I. Criminal Court Judgment and Findings Are Admissible in This Adversary Proceeding and Have Preclusive Effect on Key Issues

7. The judgment of the court in the Debtor's and Je's criminal case (the "Criminal Case"), and the findings of the court and the jury therein, are admissible in this adversary proceeding under Federal Rule of Evidence 803(22), which provides an exception to the rule against hearsay for "evidence of a final judgment of conviction" in a criminal case—even "against a party who was not the subject of that judgment."[17] Here, the Debtor's conviction is admissible against Je and the other Defendants.

8. More than being admissible, the Debtor's conviction, and the findings of the criminal court and the jury incident to that conviction, have collateral estoppel effect against the Defendants in this adversary proceeding. Under federal common law,[18] the doctrine of collateral estoppel (otherwise known as issue preclusion) precludes a party from relitigating in a subsequent proceeding an issue of fact or law if: (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support

beneficiaries were dummies, and the reality was that the matrimonial home was held on a resulting trust for husband. *Id.* In reaching those findings, the judge relied on the incomplete and inconsistent documentary evidence provided by the husband and others, in breach of court orders for disclosure, as demonstrating the absence of a legitimate trust structure for the purported separate beneficiaries. *Id.*

17 *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, No. 93 Civ. 6874, 2001 WL 99506, at *3 (S.D.N.Y. Feb. 6, 2001).

18 *See Taylor v. Sturgell*, 553 U.S. 880, 891 (2008) ("The preclusive effect of a federal-court judgment is determined by federal common law.").

a valid and final judgment on the merits.[19] The burden of showing that the issues are identical and were necessarily decided in the prior action rests with the party seeking to apply issue preclusion, but the burden of showing that the prior action did not afford a full and fair opportunity to litigate the issue rests with the party opposing issue preclusion.[20]

9. The Trustee easily meets his burden regarding the first, second, and fourth factors of the collateral estoppel analysis. In the Criminal Case, the Government alleged, and proved, that Kwok "created and maintained several interrelated and overlapping entities—*i.e.*, the G Enterprise"[21] to perpetuate his fraud.[22] That the Debtor created dozens of shell entities (including the G Enterprise), controlled those entities, solicited and obtained funds for those entities, laundered such funds, spent those funds for the benefit of himself and his family, used those funds to promote, operate, and manage the G Enterprise is all part of the charges brought, and proven, in

---

19 *See Cayuga Nation v. Tanner*, 6 F.4th 361, 374 (2d Cir. 2021). Notably, there is no difference between federal and New York law concerning collateral estoppel, and cases drawing on either body of law can be relied on when determining the preclusive effect of a federal-court judgment *See Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*, No. 09 CIV 6148(VM)(MHD), 2012 WL 12932049, at *38 (S.D.N.Y. July 17, 2012), *report and recommendation adopted sub nom. Cardell Fin. Corp. v. Suchodolksi Assocs., Inc.*, 896 F. Supp. 2d 320 (S.D.N.Y. 2012).

20 *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013).

21 ACA and the Himalaya Entities (other than Himalaya International Payments Limited) as well as the Himalaya Exchange are parts of the "G Enterprise" as defined in the Government's indictment. *Superseding Indictment*, 23-cr-00118, ECF 307, ¶ 3.a (S.D.N.Y., Apr. 24, 2024). Hereinafter citations to the Criminal Case refer to "Criminal Case ECF __." The Criminal Court included with the list of entities comprising the "G Enterprise" certain entities as to which the Trustee is not seeking, and does not intend to seek, an alter ego or beneficial ownership ruling. These entities include GTV Media Group, Inc. and GETTR USA, Inc. Because the Trustee is not seeking an alter ego or beneficial ownership ruling with respect to these two entities, the Criminal Court's findings with respect to such entities have no legal effect in these chapter 11 cases, and references by the Trustee to the "G Enterprise" shall therefore exclude these two entities.

22 The Second Circuit has explained that findings made at a sentencing hearing should be given preclusive effect only if it is efficient to do so (and if the other requirements are satisfied). *See S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999). The Criminal Case spanned eight weeks and included hundreds of exhibits and testimony by dozens of witnesses, a substantial portion of which was directly relevant to the G Enterprise. And, at sentencing, Judge Torres thoroughly and carefully explained what had been proven at trial and made extensive findings about (among other things) the G Enterprise, all based on the extensive trial record. Repeating that process here would be costly and time-consuming and would be the very definition of ***in***efficiency. *See* generally *U.S. ex rel. Lamberts v. Stokes*, 640 F. Supp. 2d 927, 933 (W.D. Mich. 2009) (sentencing findings had preclusive effect under *Monarch* where findings aligned with findings established at trial and four requirements for issue preclusion were established).

the Criminal Case. These issues were extensively litigated in the Criminal Case,[23] culminating in the jury convicting Kwok on numerous charges.[24]

10. Judge Torres recounted the Government's proof at trial during the Debtor's and Wang's sentencing hearings, noting in particular the evidence establishing the Debtor's role as the "Boss" who was "in control of the G Enterprise entities."[25] Judge Torres further highlighted evidence establishing the Debtor's *modus operandi* of conspiring with Yvette Wang ("Wang"), William Je, and others to conceal the Debtor's funds by moving them regularly, disguising them as "loans" or "investments," and installing figurehead executives at the entities involved in these transactions (such as Jesse Brown ("Brown"), CEO of the Himalaya Exchange), as well as evidence showing that the Debtor "single-mindedly dedicated himself to increasing his own wealth" via these various fraudulent schemes and conspired with Wang, Je, and others to use the funds obtained through these schemes "to line their pockets, as well as those of [the Debtor's] family" and to "further [the Debtor's] extravagant lifestyle."[26]

11. Regarding the third factor, each of the relevant Defendants had a full and fair opportunity to litigate the issue of Kwok's control of the Entity Defendants and should be precluded from relitigating the issue in this adversary proceeding. As a co-defendant who was charged with participating in the Debtor's fraud, the Entity Defendants' nominal owner, William Je, was highly motivated to dispute the facts on which those charges were built—including the Debtor's control of the G Enterprise. He also had every opportunity to do so. Although Je was not apprehended and did not attend the trial (he is a fugitive from justice believed to be overseas

---

[23] *See, e.g.*, Criminal Trial Tr. at pages 421, 1376, 1677 to 1678, 1941, 1995 to 1996, 2978, 2980, and 3162.
[24] *Jury Verdict*, Criminal Case ECF 395.
[25] *Tr. of Guo Sentencing Hr'g*, Criminal Case ECF 864, at 82:15-16.
[26] *Id.* at 82:11-14, 85:1-3.

in an unknown jurisdiction), he was and is clearly aware of the charges brought against him—indeed, he appeared in the Criminal Case through counsel.[27]

12. In any event, actual participation in, or attendance at, a prior proceeding is not what the test requires, and courts routinely apply collateral estoppel to parties who could have, but chose not to, participate in a prior litigation.[28] Here, to withhold collateral estoppel effect against Je would have the perverse effect of rewarding his attempts to evade justice.[29]

13. Although the Entity Defendants were not parties in the Criminal Case, the findings from that case are binding against them as well. The Supreme Court has identified various exceptions to the rule against nonparty preclusion when the nonparty was in privity with the party to the prior litigation, including when (i) there is a preexisting substantive legal relationship

---

27 *Notice of Appearance*, Criminal Case ECF 771 (Jeremy W. Schulman appearing as counsel for Je); *Notice of Appearance*, Criminal Case ECF 772 (Jeffrey S. Gavenman appearing as counsel for Je).

28 *See Cook Cnty. v. MidCon Corp.*, 773 F.2d 892, 903, 904 (7th Cir. 1985) ("[P]laintiffs' strategic decision not to participate fully in litigating these issues . . . does not mean they had no full and fair ***opportunity*** to do so.") (emphasis in original); *ACS Recovery Servs., Inc. v. Figueiredo*, No. 07CIV7359CLBLMS, 2008 WL 11517824, at *6 (S.D.N.Y. Jan. 15, 2008) ("[T]he [New York] Appellate Division, First Department has afforded issue preclusive effect to a default in subsequent litigation where . . . a party 'appears in the prior action, yet willfully and deliberately refuses to participate in those litigation proceedings, or abandons them, despite a full and fair opportunity to do so.'") (emphasis added) (internal citations omitted). *See also Evans v. Ottimo*, 469 F.3d 278, 282-83 (2d Cir. 2006) (upholding the use of collateral estoppel in a bankruptcy proceeding for a previously rendered New York state court default decision in which a finding that fraud had been committed was made, where the defaulting party had been properly served in the prior litigation and nonetheless chose not to answer complaint or participate in litigation); *In re Norton*, No. 8-17-70855-AST, 2020 WL 717411, at *5 (Bankr. E.D.N.Y. Jan. 15, 2020) (permitting application of collateral estoppel in connection with default judgment where debtor, in prior litigation, answered complaint but failed to comply during discovery, leading court to strike answer); *In re Abeyta*, 387 B.R. 846, 853 (Bankr. D.N.M. 2008) ("Defendant argues that he did not have a full and fair opportunity to participate meaningfully in the District Court Action because he invoked his Fifth Amendment privilege against self-incrimination . . . . [But] even when a party invokes his Fifth Amendment privilege in [a] prior suit, the 'actually litigated' requirement for purposes of collateral estoppel may nevertheless be satisfied").

29 *See S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373, 382 (S.D.N.Y. 2007) ("Despite [the defendant] not having been sentenced, the Court finds the factual determinations essential to his plea to be sufficiently firm to be accorded collateral estoppel effect. . . . [The defendant] would have been sentenced . . . had he not chosen to become a fugitive, and there is no telling when, if ever, he will now be sentenced. This Court should not sanction such behavior by denying the application of collateral estoppel.").

between the nonparty and a party to the prior proceeding judgment, or (ii) the nonparty was "adequately represented by someone with the same interests who [wa]s a party."[30]

14. A party's representation of a nonparty is considered adequate for preclusion purposes if (i) the interests of the nonparty and her representative are aligned; and (ii) either the party in the first suit understood itself to be acting in a representative capacity of the nonparty or the original court took care to protect the interests of the nonparty.[31]

15. Here, the Entity Defendants each have a preexisting substantive legal relationship with parties to the Criminal Case: both Willam Je, the nominal owner and nominal sole shareholder of the Entity Defendants, and the Debtor, who led, controlled and beneficially owned them. That alone establishes that the Entity Defendants are in privity with a party to the Criminal Case and are, therefore, precluded from raising arguments those parties cannot raise.[32]

16. Additionally, the Entity Defendants were adequately represented in the Criminal Case by parties with the same interest as them, as both the Debtor and Je had an interest in showing (and as the Debtor tried, but failed, to show[33]) that the Debtor did not control the entities, but rather Je did.[34]

---

30 *Taylor v. Sturgell,* 553 U.S. 880, 894 (2008); *Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 506 (2d Cir. 2019); *see also New York City Dist. Council of Carpenters Pension Fund v. Forde*, No. 11 CIV 5474 (LAP)(GWG), 2018 WL 2455437, at *16 (S.D.N.Y. June 1, 2018) (discussing and applying the *Taylor* exceptions in an issue preclusion analysis).

31 *See Atticus Ltd. Liab. Co. v. Dramatic Publ'g Co.*, No. 22 CV 10147 (DLC), 2023 WL 3135745, at *11 (S.D.N.Y. Apr. 27, 2023), *aff'd,* 145 F.4th 257 (2d Cir. 2025) (citing *Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 510 (2d Cir. 2019)).

32 *See Martino v. McDonald's System, Inc.*, 598 F.2d 1079, 1083 n. 7 (7th Cir. 1979) (nonparty corporation found to be in privity, for purposes of res judicata, where owner was a defendant in a prior action); *Twin City Pipe Trades Serv. Ass'n, Inc. v. Wenner Quality Servs., Inc.*, 869 F.3d 672, 676 (8th Cir. 2017) ("A closely held corporation is in privity with its shareholder.").

33 For instance, in opposition to the Government's application seeking certain co-conspirator statements be admitted in evidence, the Debtor argued that "there is a commercial and social relationship between Mr. Je and [the Debtor]." *Letter Opposition*, Criminal Case ECF 383, at 10. He also argued in his sentencing submission that he had no ownership or control over the Himalaya Exchange or ACA and that Je acted independently from him. *Sentencing Mem. of Miles Guo*, Criminal Case ECF 826 at 1, and 826-1, at 89-91, 94, 95, and 98.

34 *See Cardell Fin. Corp.*, 2012 WL 12932049, at *38 (finding privity between a corporation and its shareholder and that the interests of the nonparty were adequately represented where the individual was the corporation's sole shareholder); *United States v. Weiss*, 467 F.3d 1300 (11th Cir. 2006) (finding wholly owned corporation of

17. Thus, the Entity Defendants are in sufficient privity with parties to the Criminal Case to preclude them from litigating the issue of the Debtor's control of such entities.

## II. Defendants' Discovery Violations Support Summary Judgment

18. The discovery process in this adversary proceeding involved numerous failures by the Defendants to provide the Trustee with proper disclosure of documents and information. These failures forced the Trustee to file a motion to compel discovery on May 14, 2026 [Docket No. 216], and after multiple subsequent hearings, filings and orders, on June 24, 2026, the Court entered a discovery order requiring the production of several categories of documents and information. However, the Defendants did not comply with this order, either and, on July 2, 2026, the Trustee filed the *Chapter 11 Trustee's Motion for Rule 37 Sanctions* [Docket No. 290] (the "Sanctions Motion"). As the Trustee explained in the Sanctions Motion, the Defendants failed to identify and produce documents and failed to prevent the spoliation of relevant documents.

19. Following a hearing on July 14, 2026, the Court on August 7, 2026, issued its *Order Granting in Part Motion for Rule 37 Sanctions* [Docket No. 330] (the "Sanctions Order"). In the Sanctions Order, the Court found that the objection filed by the Defendants to the Sanctions Motion was without merit and that sanctions should be imposed against them for not obeying discovery orders.[35] The Court also found that sanctions should be imposed against the Defendants "because they have not taken reasonable steps to preserve electronically stored information, have not restored or replaced such information through additional discovery, and, as established by the

individual that had previously contested criminal forfeiture was bound by collateral estoppel effect of district court's prior determination that corporation was mere nominee of criminal offender whose conduct had led to forfeiture proceedings, including as corporation's sole shareholder adequately represented its interests in earlier proceeding); *In re Gottheiner*, 703 F.2d 1136, 1140 (9th Cir. 1983) ("Privity exists when there is 'substantial identity' between parties, that is, when there is sufficient commonality of interest. When a person owns most or all of the shares in a corporation and controls the affairs of the corporation, it is presumed that in any litigation involving that corporation the individual has sufficient commonality of interest."

[35] Sanctions Order, at 3.

Trustee by a preponderance of the evidence, ***acted with the intent to deprive the Trustee from using such information in litigation which is prejudicial to the Trustee***."[36] The Court then ruled, among other things, that the Defendants were precluded from introducing evidence they had failed to produce in opposition to the Trustee's claims,[37] and that "any and all such evidence lost by the Defendants conduct discussed in the Motion and during the July 14th hearing is presumed to have been unfavorable to the Defendants."[38]

## III. Undisputed Facts in Record Establish ACA and Its Assets Were at All Relevant Times Beneficially Owned by Debtor

20. Notwithstanding the Defendants' efforts to deprive the Trustee of discovery related to their relationship with the Debtor, there is voluminous and uncontroverted evidence in the record establishing that ACA and its assets were at all times beneficially owned by the Debtor. The Debtor's domination and control over ACA is demonstrated by, among other things: (a) ACA's nominal ownership by Je, the Debtor's agent; (b) the Debtor's agents serving as ACA's directors, officers, and/or employees; (c) ACA sharing an address with numerous other Debtor-controlled entities; (d) witnesses who testified that the Debtor controlled ACA; and (e) the Debtor's funding of ACA and use of ACA's funds for his and his family's benefit. Regarding the last item, the Declaration of Adam Lomas and exhibits attached thereto, which summarize in detail ACA's bank account and transfer activity, are particularly instructive in establishing the extent of ACA's integration with the Debtor's other shell companies and the use of transfers from ACA's accounts to pay for the Debtor and his family's extravagant expenses.[39] ACA's failure to produce any tax

36 *Id.* (emphasis added).

37 *Id.* at 4-5.

38 *Id.* at 5.

39 The Lomas Declaration relies on all bank account statements and other evidence of transfers that the Trustee was able to obtain in discovery from the defendants and third parties. To the extent the defendants were to contend that other bank account activity demonstrates ACA's independence from the Debtor, they have produced no such evidence, which for purposes of the Motion means there is none.

returns or financial statements (with the exception of one consolidated ACA financial statement for the year 2017) also suggests that ACA is not a bona fide separate entity. [40]

**A. ACA Nominally Owned by Debtor's Agent, Je**

21. Despite Je's patently false assertion in sworn interrogatory responses that he has "no relationship" with the Debtor, the uncontroverted evidence establishes that Je was at all relevant times the Debtor's agent. Je's role in this regard has already been established by prior findings of the Criminal Court and this Court. The Debtor described himself as Je's boss and Je as his representative, and Je's own statements and witness testimony demonstrate that he acted for the Debtor and on the Debtor's behalf. The record also demonstrates that Je advanced the Debtor's interests in connection with a wide variety of the Debtor's affairs, worked at the Debtor's offices, and served as nominal owner of other companies beneficially owned by the Debtor.

*i. Court Findings Establish that Je Worked for Debtor*

22. The evidence adduced during the Debtor's criminal trial resulted in findings by the Criminal Court that the Debtor was the "Boss" and "***in control of***" of G Enterprise entities of which Je was the nominal owner, including the Entity Defendants and Hamilton Opportunity Fund SPC ("Hamilton"), and that, "[a]lthough [Wang] and [Je] also played a significant role in the conspiracy, [the Debtor] was ***ultimately the boss and had the final say***." [41] As discussed above, these findings have preclusive effect, conclusively establishing that Je worked for the Debtor.

23. In addition, this Court has previously found that Je worked for the debtor.[42] This Court described Je, based on the testimony of Kwok's former assistant Karin Maistrello

[40] *See* Trustee Ex. 71, Declaration of Adam Lomas in Support of Motion of Chapter 11 Trustee for Summary Judgment.
[41] *See* SUF ¶ 5 (emphasis added).
[42] See *Despins v. Taurus Fund LLC, et al.* [Adv. Proc. No. 23-05017, ECF No. 172] (the "Taurus Decision").

("Maistrello"), as "the [Debtor's] 'finance person' who 'would handle the investments and financing for' [Kwok]."[43]

*ii. Debtor Described Je as His Agent*

24. The Debtor himself has confirmed that Je was his agent multiple times. For example, as this Court recognized, "in the Criminal Action, the [Debtor], through his counsel, stated '[Je] was the finance guy. He's a well-regarded investment banker who had managed the fortune not just of the Guo family fund but he had managed the fortunes of many other companies.'"[44]; and "[i]n voice recordings introduced into evidence during the trial in the Criminal Action, [Je], when referencing the [Debtor], called him the 'principal.'"[45] In addition, Journalist Sasha Gong testified at her deposition that in 2018 Kwok, through his assistant, Wang, invited Gong to a lunch at his residence in the Sherry Netherland hotel, where Kwok introduced her to Je, stating "[t]his is William Je, my money man," which Je affirmed by nodding.[46] Further, in a recording of a July 2022 meeting of Kwok with the "Iron Blood Group," comprised of Kwok's top lieutenants and loyal followers, at the highest level of Kwok's Himalaya Alliance/New Federal State of China organization (the "Iron Blood Group"), Kwok derided the notion that Je was the real owner of the Himalaya Exchange: "William with his own company? You're joking. ***William is only representing me***."[47] Any suggestion that Je might own the Himalaya Exchange was ridiculed by the Debtor as "absurd" and those making such a suggestion were scoffed at by Kwok as "hav[ing] something wrong with your brain . . . [who] should slap yourself after saying that."[48]

---

[43] *See* SUF ¶ 9; Taurus Decision at 16, 44.
[44] *See* SUF ¶ 9; Taurus Decision at 44.
[45] *See* SUF ¶ 9; Taurus Decision at 44.
[46] *See* SUF ¶ 10.
[47] *See* SUF ¶ 11 (emphasis added).
[48] *See id*.

*iii. Je's Own Statements Identified Him as Debtor's Subordinate*

25. Je's own statements repeatedly identify him as a subordinate of Kwok, whom he referred to as the "boss," "principal," or "big brother." For example:

a) On July 13, 2018, when Je communicated with Daniel Podhaskie, general counsel of Golden Spring (New York) Ltd. ("Golden Spring"), the Debtor's adjudged alter ego, regarding instructions from "the Principal" related to an arbitration concerning the Debtor's Airbus aircraft handled by the Debtor's attorney Laurent Chassot.[49]

b) On May 4, 2021, when Je texted the Debtor's employee Haitham Khaled asking if he had time for a call because "the principal would like to finalize things today."[50]

c) On May 6, 2021, when Je spoke on a recorded phone call with the Debtor and Khaled, Je explained the Debtor's instructions to Khaled as "what the principal said," and Khaled later said to Je, "I know the boss is upset but you have to explain to him …"[51] Je then attempted to speak further to the Debtor in Chinese, referring to him as "big brother," a term indicating Je's subordination to the Debtor.[52]

d) On May 15, 2021, when Je texted Khaled, relaying an inquiry from "the principal" regarding the use of Medici Bank "for crypto business for retail clients."[53]

*iv. Numerous Witnesses Testified that Je Worked as Debtor's Agent in Connection with Management of Debtor's Finances and Assets*

26. Witness testimony is uncontroverted that Je was the Debtor's agent and a subordinate who acted on the Debtor's behalf and at the Debtor's instruction.

**27.** Maistrello, the Debtor's assistant and translator in 2018-2020, testified at her deposition that Je was the Debtor's "friend and finance person," who "would handle investments and financing for boss."[54] Maistrello further testified that Je "reported to" the Debtor, explaining that: "[The Debtor] has money, and he asks [Je] to manage that money." Thus, though Je "is not [the Debtor's] employee . . . . He's managing [the Debtor's] money. So [Je], after managing [the

---

[49] *See* SUF ¶ 12.
[50] *See id.*
[51] *See id.*
[52] *See id.*
[53] *See* SUF ¶ 12.
[54] *See* SUF ¶ 13.

Debtor's] money is going to report back to [the Debtor]."[55] Referring to the Debtor's offices where Je and the Debtor's employees worked, Maistrello emphasized that "everything that happened in the office by [Je]" was done for the Debtor, and after Je did something, "he would go back to [the Debtor] to report whatever it was."[56] Maistrello also testified that Je reported to the Debtor about real estate the Debtor was contemplating purchasing.[57] Per Maistrello, based on her experience and observations witnessing "hundreds" of interactions between the Debtor and Je, she understood Je "was subservient" to the Debtor, and when the Debtor spoke to Je about financial matters, the Debtor "wasn't asking for advice, he was telling [Je] to do things."[58] Maistrello further testified that one of the tasks undertaken by her and others, including Je, was to write emails on the Debtor's behalf because the Debtor would never communicate by email himself.[59]

28. Valerie Stevens of the law firm of Hodgson Russ LLP, which represented the Debtor in various corporate and litigation matters in 2018-2020, testified at her deposition that "she came to understand that Mr. Je worked for [the Debtor]," and that "entities Mr. Je asked me to create were, in fact, being asked to be created at the direction of [the Debtor]."[60] Stevens testified that she "understood Mr. Je to be an agent or representative of [the Debtor]."[61]

29. Ya Li, a former member of the Debtor's Iron Blood Group comprised of his top supporters, testified at her deposition that she understood Je to "work for Miles Guo to manag[e] his money."[62] Li testified that when she participated in the Debtor's investment projects, the Debtor would direct her and other supporters to "contact William for the details," and supply him

---

55 *See id.*
56 *See id.*
57 *See* SUF ¶ 14.
58 *See id.*
59 *See id.*
60 *See* SUF ¶ 15.
61 *See id.*
62 *See* SUF ¶ 16. *See* Trustee Ex. [], Li Dep. Tr. at 17:4-21.

with details to facilitate transfers of funds.[63] She also testified that Je worked for the Debtor by setting up the Himalaya Exchange platform and helping to transfer funds to the "Hamilton Fund."[64]

*v. Documentary Record Shows Je Handled Debtor's Affairs on His Behalf*

30. Documents obtained by the Trustee demonstrate that Je handled numerous of the Debtor's affairs on his behalf, consistent with his role as the Debtor's agent.

31. Je communicated with Debtor's counsel regarding formation of shell companies on the Debtor's behalf. In 2017, the Debtor personally retained the law firm Foley Hoag LLP ("Foley Hoag") to represent him in various matters, including [redacted] [redacted] Documents produced by Foley Hoag demonstrate that Je communicated with Foley Hoag on the Debtor's behalf in connection with this representation. For example, Foley Hoag's time records from its representation of the Debtor [redacted] [redacted]

32. In June 2018, Je communicated on the Debtor's behalf with the Debtor's counsel at Hodgson Russ regarding Saraca. On June 17, 2018, Valerie Stevens emailed Je with formation

---

63 *See* SUF ¶ 16.
64 *See id.*
65 *See* SUF ¶ 17 (citing Trustee Ex. 433 (FOLEYHOAG-0000208) (Foley Hoag Engagement Letter)).
66 *See id.*

documents for Saraca.[67] At her deposition, when asked why she worked with Je to form Saraca, Stevens responded: "I generally understood [Je] to be an agent or representative of [the Debtor]."[68]

33. During the period of at least March through June 2018, Je communicated with the Debtor's real estate agent, Kathy Sloane ("Sloane"), on the Debtor's behalf. For example, Sloane emailed Je: (i) on March 29 and 31, 2018, about marketing the Sherry Netherland Apartment for sale[69]; (ii) on April 23, 2018, with an agenda for meeting that day with "our friend" regarding "[t]he DC purchase," "[t]he Palm Beach rental," and "[t]he listing agreement for the Sherry," to which "Miles [*i.e.*, the Debtor] agreed . . . 2 weeks ago."[70] Later, in emails dated June 9 and June 10, 2018, Sloane asked Je to sign an "NDA agreement" in connection with the contemplated sale of the Sherry Netherland Apartment. Je, using his Gmail address, responded "OK. Pls print out the copy for signature."[71]

34. Je also handled other real estate matters on behalf of the Debtor. For instance, he communicated with Valerie Stevens of Hodgson Russ, the Debtor's counsel, regarding a contemplated real estate purchase where the purported buyer was Mei Guo. On March 16, 2018, Stevens emailed Je stating that she "understand[s] the purchase is moving forward" and asking "who the client should be."[72] Je responded, using his ACA email account (notably, an email account from which Je has produced no emails), stating: "The client will be the new BVI Company to be set up by you. ACA will pay for the legal fees before the BVI Company is established."[73] Je followed up the next day with an email in which he wrote: "I was just been informed by Mei Guo (the purchaser) that she wants to put the purchase on hold. I will let you know if she decides

---

67 *See* SUF ¶ 18.
68 *See id.*
69 *See* SUF ¶ 19.
70 *See id.*
71 *See id.*
72 *See* SUF ¶ 20.
73 *See id.*

to go ahead again… We are in constant search of properties in NYC and will definitely work together."[74] At her deposition when asked why Je would have been assisting Mei Guo, the Debtor's daughter, with this purchase, Stevens responded: "[b]ecause he generally assisted the family with business matters."[75] This is consistent with Maistrello's testimony that when the Debtor "wanted to purchase property, a new property, he would tell William to go see it, go speak with the . . . owner" and "William would do it," and then report back to the Debtor regarding how things went.[76]

35. As another example, in June 2020, Je communicated on the Debtor's behalf with the Debtor's associate, Steve Bannon, regarding the Debtor's purchase for Bannon's use of a house located at 354 Nod Hill Rd, Wilton, CT 06897 (the "Nod Hill Property On June 7, 2020, Bannon emailed Je about funding, noting that the property was "close to [M]iles" and asking if he could "connect [Je] to [his] real estate agent who will handle everything."[77] In response, Je wrote "Sir, Yes, please. I am copying Yvette who could provide evidence of funding for Golden Spring. Thanks."[78] Later, as the Court found "[o]n July 30, 2020, Leading Shine NY Ltd transferred $1,475,000.00", which "funds were used to purchase [the Nod Hill Property]. On August 3, 2020, Rule of Law Society transferred $1,475,909.25 to Leading Shine NY Ltd . . . ."[79] Leading Shine NY Ltd and Rule of Law Society are both adjudged alter egos of the Debtor.

36. Je was also intimately involved in the Debtor's "GTV Private Placement" scheme in 2020. Under that scheme, the Debtor instructed his followers to send funds to accounts held under the name of Saraca to purchase shares in Saraca's subsidiary, GTV Media Group Inc.

---

74 *See* SUF ¶ 20.
75 *See id.*
76 *See id.* ¶ 21.
77 *See* SUF ¶ 22.
78 *See id.*
79 *See id.*; *Mem. of Decision and Order Granting Motion for Summary Judgment* (AP No. 23-05023, Docket No. 136) ¶ 27.

("GTV").[80] For example, on April 1, 2020, the Debtor's counsel Aaron Mitchell sent an email to lawyers at the firm of Wachtel Missry LLP ("WM"), counsel to GTV and Saraca, saying "I want to introduce you to William Je and Yvette Wang. Yvette and William are the representatives for Saraca Media and Guo Media."[81] On April 5, 2020, Je sent WM attorneys an email with "a brief presentation of the GTV," and asked about "ways to do the deal[.]"[82] Then, on April 7, 2020, Je emailed the WM attorneys, updating them that: "We . . . have decided to do the private placement without any general solicitation. Instead, Mr. Miles Guo, being the sponsor and the main host of the GTV programmes, will contact his friends in his personal WhatsApp Directory."[83] [redacted]

37. In May and June of 2020, Je acted on the Debtor's behalf, through Saraca, to facilitate the Debtor's $100 million investment in Hayman Opportunity Fund Hong Kong L.P. ("Hayman"). In email correspondence with Steele Schottenheimer, managing director of investor relations at Hayman Capital Management, Je (using his ACA email address) received Hayman's investment solicitation materials and responded that "we are reviewing the documents," and that Saraca was the "onshore investment vehicle" that would invest $100 million.[85] Je sent Saraca's KYC documents (signed by Wang), noting that "we will arrange the remittance."[86] Later, on August 22, 2020, following the SEC's investigation into the transaction, Kyle Bass of Hayman emailed Je at his ACA email address, stating, among other things, that "Hayman needs to receive a representation from you and Saraca's lawyers regarding the specific source of this money,"

---

80 *See* SUF ¶ 23.
81 *See id.*
82 *See id.* ¶ 24.
83 *See* SUF ¶ 24.
84 *See* SUF ¶ 25.
85 *See* SUF ¶ 26.
86 *See id.*

specifically "that it is ***a bona fide investment made by Saraca and Mile*****s** [i.e., the Debtor]."[87] Bass also asked Je to "[p]lease ***discuss this with Miles*** [i.e., the Debtor] and respond as soon as possible."[88] Bass attached a letter agreement for Je to sign for Saraca providing, among other things, for the withdrawal of $70 million of the $100 million Saraca invested with Hayman.[89]

38. In December 2021, Je, in his role as nominal owner of Hamilton Opportunity Fund, the Debtor-controlled company[90] that was also indirect parent company of the Debtor's adjudged alter ego Taurus Fund LLC, assisted the Debtor in connection with the purchase and renovation of the Mahwah Mansion, which this Court ruled was beneficially owned by the Debtor.[91] This Court found in the Taurus Decision that "Hamilton Opportunity Fund paid the deposit and closing costs for the purchase of the Mahwah Mansion" and "transferred additional funds used to pay, among other things, invoices relating to the renovation of Mahwah Mansion."[92] In addition, the Debtor directed Ya Li to transcribe and translate his WhatsApp voicemail to "Anron" (whom Li believed to be the Debtor's counsel Aaron Mitchell) containing a detailed offer from the Debtor to purchase the Mahwah Mansion, including the instruction to "***Please contact William***, and use that fund to buy this."[93] The Court also found that Li "testified she understood the [Debtor's] reference to 'William' was a reference to Mr. William Je."[94]

39. In April 2022, Je assisted the Debtor in arranging the transfer of $37 million into an escrow account pursuant to the stipulation related to the *Lady May* (the yacht adjudged to be beneficially owned by the Debtor) under which the Debtor had the *Lady May* returned to the

---

87 *See* SUF ¶ 27 (emphasis added).
88 *See id.* (emphasis added).
89 *See id.*
90 The Trustee has alleged that Hamilton Opportunity Fund and its assets are beneficially owned by the Debtor, and summary judgment pleadings with respect to this issue are being filed concurrently herewith.
91 *See* SUF ¶ 28.
92 *See id.* (emphasis added).
93 *See* SUF ¶ 29.
94 *See id.*

jurisdiction of the United States. Je's role here is established by, among other things, the January 2023 deposition testimony of Mei Guo, the Debtor's daughter and nominal owner of the Debtor's adjudged alter ego (and titleholder to the *Lady May*) HK International Funds Investments (USA) Ltd. ("HK USA").[95] Mei Guo testified that, on April 13, 2022, she was called by the Debtor's counsel, Aaron Mitchell, regarding the potential need to post a $37 million bond, after which she immediately called Je, whom she described as "Uncle William . . . a family friend we've known for many, many years."[96] According to Mei Guo, during this phone call she requested from Je a loan of $37 million and Je "agreed very quickly."[97]

*vi. Je Worked Out of Debtor's Offices*

40. Je's role as the Debtor's agent is also highlighted by the fact he had a desk and worked from the Debtor's offices in New York, first at 800 Fifth Avenue and then at 162 East 64th Street.[98] And contrary to Je's claim that "he visited the United States offices at 162 E. 64th Street, NY and the Sherry Netherland Apartment on a few occasions," the time he spent working in the Debtor's offices was by no means fleeting, as Maistrello testified that she witnessed "hundreds" of interactions between the Debtor and Je at the Debtor's offices while working for the Debtor in 2018-2020.[99] Je himself referred to 162 East 64th Street as the address of "my office" and "my NY office" in correspondence with the Debtor's counsel.[100]

*vii. Debtor Invoked Fifth Amendment When Asked About Je*

41. At the Debtor's deposition in March 2023, the Debtor was asked, among other things, whether: (i) Je was the Debtor's agent in connection with his business dealings; (ii) any

[95] *See id.* ¶ 30.
[96] *See id.*.
[97] *See id.* Notably, initial drafts of the loan agreement shows that ACA was originally the contemplated lender.
[98] *See* SUF ¶ 31.
[99] *See id.*
[100] *See id.* This law firm is also Je's counsel in the Criminal Case

actions taken by Je in connection with business dealings were taken at the Debtor's direction or under the Debtor's control and (iii) any assets or entities purportedly under the control of Je were actually under the Debtor's control. In response to each question, the Debtor asserted the Fifth Amendment.[101]

42. The Debtor repeated this refusal to answer in his *Declaration in Response to the Written Deposition Questions of the Trustee*, dated July 8, 2026, wherein the Debtor asserted his Fifth Amendment rights and declined to answer the questions posed to him regarding Je.[102]

**B. Witness Testimony Establishes that Debtor Controlled ACA**

**43.** Multiple witnesses with knowledge of the Debtor's affairs have testified that ACA was controlled by the Debtor. Ya Li testified that she came to understand in her dealings with the Debtor that he controlled a number of companies she and other followers of the Debtor referred to as "headquarter companies,"[103] which she understood to be "Guo's entities."[104] She stated that ACA was one of these entities, explaining that the Debtor asked Li and other Iron Blood Group members to send to ACA money they had collected from the Debtor's supporters.[105] Similarly, Valerie Stevens of Hodgson Russ testified that she "viewed ACA as similar to the other entities that were formed on behalf of [the Debtor]."[106] Stevens explained that her understanding was based on "the two years of work we did with Yvette and [Je]. Over time it became more clearer in meetings and phone calls and emails that Mr. Je was acting as an advisor to Mr. Guo."[107]

[101] *See* SUF ¶ 32.
[102] *See id*.
[103] *See id.* ¶ 34.
[104] *See id.*
[105] *See id.*
[106] *See id.* ¶ 35.
[107] *See id.*

### C. ACA Staffed by Debtor's Agents

44. Je was not the Debtor's only agent working at ACA. In addition to Je serving as the nominal owner of ACA, other agents of the Debtor, including Yvette Wang, Fiona Yu, Laurent Chassot, and Maistrello, staffed ACA in different capacities, whether as directors, officers, or employees.

45. Wang was purportedly employed by ACA as its director of business operations, as demonstrated by her ACA business card and a January 2017 letter from ACA to DBS Bank certifying her employment details including her employment by ACA beginning in January 2016 (the "Wang Letter"), each of which were recovered in the FBI's search of Wang's apartment.[108] Wang's role as the Debtor's agent is well known. This Court has already found, for example, among other things, that: (i) "[t]he Debtor has control over Ms. Wang," "has employed [her] for several years, and has directed her to take actions on his behalf"[109]; (ii) Wang was "a top manager for the [Debtor] who, among other things, oversaw management and operations of many of the [Debtor's] shell companies at the [Debtor's] offices at 162 East 64th Street, New York, New York"[110]; and (iii) the Debtor's adjudged alter egos Golden Spring, Lamp Capital, HCHK Technologies, Inc. ("HCHK Tech"), HCHK Property Management, Inc. ("HCHK Property"), and Lexington Property and Staffing Inc. ("Lexington") were "entities which employed the [Debtor's] personal assistants and staff under the direction of Ms. Wang."[111] Indeed, as early as 2016, the same time period for which the Wang Letter confirms Wang was employed by ACA, Wang

---

108 *See* SUF ¶ 36. Surprisingly, ACA denied any relationship with Yvette Wang, and when asked to produce documents related to ACA's employment of Wang, ACA responded "None." *See* C*hapter 11 Trustee's Mot. to Compel Discovery*, Docket No. 216-1, at 27.

109 *See* SUF ¶ 37; *Order Granting Mot. to Hold Debtor in Contempt of Corporate Governance Order* [Main Case Docket No. 1372] ¶ 4.

110 *See* SUF ¶ 37.

111 *See id.*

referred to the Debtor as "my boss" in email correspondence.[112] Witnesses testified that Wang was the Debtor's "right hand", "close advisor" and "agent", and "assistant".[113] As with Je, the Debtor invoked the Fifth Amendment when asked whether Wang was his employee and agent.[114]

46. Fiona Yu served as company secretary of ACA between 2016 and 2018, and was employed as ACA's director of legal and compliance, according to her business card.[115] Yu was also an agent and employee of the Debtor, referring to the Debtor as "my principle [*sic*]" and communicating on the Debtor's behalf with the Debtor's counsel, Boies Schiller.[116] Yu also worked for the Debtor in connection with (i) arbitration proceedings against Leading Shine Limited ("Leading Shine BVI", the company that held title to the Debtor's Hong Kong mansion),[117] and (ii) corporate matters related to Leading Shine BVI, Whitecroft Shore Limited ("Whitecroft", the company that held title to the Debtor's Bombardier jet),[118] and Kingdom Rich Limited ("Kingdom Rich", the company that held title to the Debtor's *Lady May II* vessel),[119] as evidenced by correspondence addressed to Yu at the Hong Kong address used by ACA and other of the Debtor's companies (as discussed further below). In addition, Yu submitted an affidavit to the New York state court in the PAX litigation in support of the Debtor's motion to dismiss PAX's complaint in which she referred to herself as the [redacted][120] The Debtor also invoked the Fifth Amendment when asked whether Yu was his employee and agent.[121]

---

112 *See* SUF ¶ 38.
113 *See id*.
114 *See id*.
115 *Joint Statement of Undisputed Facts*, Docket No. 282, ¶¶ 5, 6. *See* SUF ¶ 39.
116 *See* SUF ¶ 39.
117 *See id.* ¶ 39; Amended Default Judgment ¶ 17 (AP 24-05318, Docket No. 140).
118 *See* SUF ¶ 39.
119 *See id.*; Default Judgment ¶ 24 (AP 24-05322, Docket No. 106); Summary Judgment Decision (AP No. 22-05003, Docket No. 183) (finding that Lady May II is property of the Debtor's estate); Default Judgment ¶ 24 (AP 24-05322, Docket No. 106).
120 *See* SUF ¶ 39.
121 *See id*.

47. Laurent Chassot served as a director of ACA for most of 2018.[122] Chassot, an attorney based in Switzerland, was also an agent of the Debtor, serving as the Debtor's Swiss counsel in connection with disputes related to the Airbus jet aircraft once held by the Debtor through Well Origin Limited, a company of which the Debtor was the sole shareholder.[123] Chassot, like the Debtor's other agents, referred to him as "the Principal" in correspondence.[124]

48. Maistrello served as a director of ACA between January and July, 2019.[125] She testified that she worked for the Debtor from the beginning of 2018 to mid-2020, that she referred to him as "Boss," and that the Debtor installed her as the president and treasurer of the Rule of Law Society ("ROLS"), his adjudged alter ego, of which she testified he was in charge.[126] Maistrello also testified that, during the period in which she served as director of ACA, she simultaneously worked for Golden Spring, performed tasks for other entities, such as Saraca, and served as a director, president, and treasurer at ROLS.[127] She characterized her role as being a "good puppet" of the Debtor, while at all times understanding he was her ultimate "boss".[128] Maistrello also explained in her testimony that, although she was officially appointed as a director of ACA, she "didn't do anything" at ACA and had no experience as a corporate director.[129] In 2019, when Maistrello received a subpoena to be deposed in connection with the *Eastern Profit v. Strategic Vision* litigation as a director of ACA, she gave the subpoena to Daniel Podhaskie, counsel to the Debtor and Golden Spring, and informed Wang about the subpoena.[130] Wang then

---

[122] *Joint Statement of Undisputed Facts*, Docket No. 282, ¶¶ 7, 8.
[123] *See* SUF ¶ 40.
[124] *See id*.
[125] *Joint Statement of Undisputed Facts*, Docket No. 282, ¶¶ 9, 10.
[126] *Id*. ¶ 11. *See* SUF ¶ 41.
[127] *See id*.
[128] *See id*.
[129] *See id*.
[130] *See* SUF ¶ 41.

arranged for lawyers to represent Maistrello in connection the deposition.[131] Afterward, Maistrello discussed the deposition with Wang and the Debtor, ***not Je (ACA's nominal owner).***

**D. ACA Shared Office Address with Debtor and Debtor-Controlled Entities**

49. ACA's lack of separation from the Debtor is underscored by the fact that ACA's official address at 49/F, Bank of China Tower, No. 1 Garden Road, Hong Kong (the "Hong Kong Address") was used by the Debtor and numerous of the Debtor's other companies. While ACA claimed the Hong Kong address "had nothing to do with the Debtor," evidence shows that the Hong Kong Address was used by the Debtor, on the register of directors and register of members of Genever Holdings Corporation,[132] and by various entities this Court has ruled are alter egos of and/or beneficially owned by the Debtor, including China Golden Spring Group (Hong Kong) Limited ("China Golden Spring"),[133] Whitecroft,[134] Eastern Profit Corporation Limited ("Eastern"),[135] Leading Shine BVI,[136] Anton Development Limited ("Anton"),[137] Bravo Luck Limited ("Bravo Luck"),[138] and Kingdom Rich.[139]

**E. Debtor Used ACA as His Piggybank for His Purposes**

50. In contradiction to ACA's blanket denial claiming that "[a]ny operational functions associated with [ACA's financial] transactions are conducted on behalf of the company and do not relate to the Debtor," the evidentiary record, as summarized in the Lomas Declaration, shows that

---

[131] *See id.*
[132] *See* SUF ¶ 42; HR0144130 (Exhibit 21 to Valerie Stevens Deposition).
[133] *See* SUF ¶ 42.
[134] *See id.*
[135] *See id.*; Amended Default Judgment ¶ 19 (AP 24-05318, Docket No. 140).
[136] *See* SUF ¶ 42; Amended Default Judgment ¶ 17 (AP 24-05318, Docket No. 140).
[137] *See* SUF ¶ 42; Amended Default Judgment ¶ 18(AP No. 24-05318, Docket No. 140).
[138] *See* SUF ¶ 42; Amended Default Judgment ¶ 16 (AP No. 24-05318, Docket No. 140).
[139] *See* SUF ¶ 42.

the Debtor was responsible for funding ACA and that ACA in turn transferred hundreds of millions of dollars to fund the Debtor's expenses and his other alter ego shell companies.[140]

*i. Debtor Was Responsible for Funding ACA*

51. ACA received funding from the Debtor's shell companies, his agents, his supporters at the Debtor's direction (individually or through companies these supporters operated on the Debtor's behalf), and entities that received consideration from the Debtor.

52. According to available records, between May 2015 and October 2023, ACA received transfers of approximately $447 million.[141] Of this amount, approximately $70 million was transferred to ACA by entities with respect to which the Trustee has obtained Alter Ego Judgments[142] or asserts pending Alter Ego Claims,[143] namely Hamilton[144] (transferred $63,232,732.00), G Fashion[145] (transferred $4 million); Golden Spring[146] (transferred $2 million); and Leading Shine NY[147] (transferred $625,000.00).[148]

53. Another approximately $161 million was transferred to ACA by followers of the Debtor, organized as part of the Debtor's worldwide network of "Himalaya Farm" organizations (the "Farms"), in connection with the Farm Loan Program, which is one of the fraudulent schemes that the Debtor promoted and for which he was later convicted.[149] These transfers to ACA came

140 *See* SUF ¶¶ 43-44.
141 *See* SUF ¶ 44.
142 Alter Ego Judgments refer to rulings in the Trustee's favor with respect to the Trustee's Alter Ego Claims (as defined below).
143 Alter Ego Claims refer to the Trustee's claims alleging numerous shell entities are the Debtor's alter egos and/or that such shell entities and their assets are beneficially owned by the Debtor, or similar claims under applicable law.
144 Hamilton is a defendant is this adversary proceeding.
145 G Fashion is a defendant in this adversary proceeding.
146 Joint Statement of Undisputed Facts, Docket No. 282, ¶ 50. *See Order Granting Mot. of Ch. 11 Trustee for Estate of Ho Wan Kwok for Entry of Default Judgment Against Golden Spring and China Golden Spring*, AP No. 23-05018, Docket No. 35 (Golden Spring alter ego decision).
147 Docket No. 282, ¶ 51. *See Mem. of Decision and Order Granting Motion for Summary Judgment,* AP No. 23-05023, Docket No. 136 (finding Leading Shine NY was Debtor's alter ego at all times)
148 *See* SUF ¶ 43.
149 *See* SUF ¶ 44; *see also* Docket No. 282 ¶ 53.

either from followers' personal bank accounts or the bank accounts of companies owned by certain of these followers (in many cases, these companies were "Farm Companies," created with the purpose of gathering and bundling funds from individual followers prior to transferring them to ACA), in all cases at the instruction and behest of the Debtor.[150]

54. Ya Li, who was the leader of a Farm in Australia, testified that the Debtor "told us to send money to" ACA and other "headquarter companies."[151] Describing in detail the operation of the Farm Loan Program, Li testified, among other things, that:

a) The Farms were "created' by the Debtor,[152] and the Debtor asked that each Farm set up a Farm Company to be used for the Farm Loan Program.[153] To join a Farm, members had to donate to the Rule of Law Foundation (an adjudged alter ego of the Debtor) and show their support for the Debtor.[154]

b) Li was the leader of a farm in Australia called G Translators, in which "G" stood for "Guo," and set up a Farm Company called G Translators Pty Ltd.[155] The Debtor picked the leader for each Farm.[156]

c) In addition to acting as leader of the G Translators Farm, Li also assisted other Farms in transmitting funds for the Farm Loan Program in which "every farm collected supporters' money, and then sen[t] it to [the Debtor's] entity"[157] in order "to get GTV shares,"[158] using a loan agreement between the Farm member and his or her Farm that "was not a real loan."[159] When another Farm had collected sufficient funds from its members to participate in the Farm Loan Program, Li would inform the Debtor, and the Debtor would instruct Li where to send the money.[160]

d) Li transferred funds in this manner multiple times to ACA based on instructions she received directly from the Debtor, and she also saw in her group chat with the Debtor and other Farm leaders that the Debtor instructed other Farm leaders to send

150 *See* SUF ¶ 44.
151 *See* SUF ¶ 45.
152 *See id.*
153 *See id.*
154 *See id.*
155 *See* SUF ¶ 49.
156 *See id.*
157 *See id.*
158 *See id.*
159 *See id.*
160 *See* SUF ¶ 49.

> funds to ACA "on many occasions."[161] As Ms. Li put it, "for the farm loan program, we send the money to ACA Capital." [162]

55. In addition to directing the transfer of funds to ACA from his followers and from his other shell companies, the Debtor also funded ACA via transfers from his agents, such as Wang and Je, who transferred $5 million, in the aggregate, to ACA.[163]

56. ACA also received $181 million between May of 2015 and January of 2019, from Roscalitar2. Roscalitar2, an entity reportedly linked to the Abu Dhabi sovereign wealth fund, [redacted] in particular Alfonso Global Limited ("Alfonso") and Alfa Global Ventures Limited ("Alfa")—companies that this Court has ruled were beneficially owned, together with their assets, by the Debtor.[164] Roscalitar2 was also at one time the holder of a pledge to the shares of Genever Holdings Corporation, the BVI company through which the Debtor held Genever Holdings LLC, titleholder to the Debtor's Sherry Netherland Apartment.[165] The Debtor's connection to the United Arab Emirates ("UAE") is well-known, including that he had a UAE passport.[166] As discussed below, the Debtor discussed in his sentencing submission his efforts to obtain financing from UAE sovereign fund. *See* ___ *infra*.

*ii. Debtor Used Funds of ACA for His and His Family's Benefit*

57. The evidence demonstrates that the Debtor used ACA, like several of his other alter egos, such as Golden Spring, as a piggybank to fund his other shell companies and pay his and his family's personal expenses. According to available records, between June 2015 and October 2023,

---

161 *See id.*
162 *See id.*
163 *See* SUF ¶ 44.
164 *See* Amended Default Judgment (AP 24-05318, ECF 140) ¶ 21 ("[T]he ownership interests in Alfonso Global held under the name of Next Tycoon, and Alfonso Global's Assets, are and were at all relevant times property of the Debtor or the Estate, as applicable"); ¶ 20 ("[T]he ownership interests in Alfa Global held under the name of Karin Maistrello, and Alfa Global's Assets, are and were at all relevant times property of the Debtor or the Estate, as applicable").
165 *See* SUF ¶ 46.
166 *Letter Supplementing Application for Release on Bail Pending Trial,* Ex. B, Criminal Case ECF 50-2, at 5.

ACA made outgoing transfers of approximately $422 million.[167] Of this amount, approximately $313 million was transferred to companies with respect to which the Trustee has obtained Alter Ego Judgments or asserts pending Alter Ego Claims.

58. Recipients of transfers from ACA as to which the Trustee has obtained Alter Ego Judgments include: (a) Anton (received transfers totaling approximately $102 million)[168]; (b) Lexington (received transfers totaling approximately $33 million)[169]; (c) Saraca (received direct transfers from ACA totaling approximately $7.5 million along with a transfer of $32 million from ACA to Savio Law LLC, acting as Saraca's escrow agent)[170]; (d) Lamp Capital (received transfers totaling approximately $18 million)[171]; (e) Hudson Diamond NY (received transfers totaling approximately $18 million, [redacted][172]; (f) Golden Spring (received transfers totaling approximately $10.4 million)[173]; (g) River Valley Operations LLC (received transfers totaling about $8 million)[174]; (h) Leading Shine NY (received transfers totaling approximately $6 million)[175]; (i) Greenwich Land LLC (received transfers totaling approximately $5 million)[176];

---

[167] *See* SUF ¶ 47.

[168] *Joint Statement of Undisputed Facts*, Docket No. 282, ¶¶ 28-32. *See Amended Default Judgment,* AP No. 23-05318, Docket No. 140 (finding Anton's Assets are and were property of Debtor of Estate at all relevant times).

[169] Joint Statement, Docket No. 282, ¶ 41. *See Amended Default Judgment and Permanent Injunction*, AP No. 23-05013, Docket No. 297 (Lexington alter ego decision).

[170] Docket No. 282, ¶ 27. *See Amended Default Judgment,* AP No. 23-05318, Docket No. 140 (Saraca alter ego decision)

[171] Docket No. 282, ¶¶ 37-40. *See Mem. of Decision and Order Granting Motion for Summary Judgment,* AP No. 23-05023, Docket No. 136 (Leading Shine NY alter ego decision)

[172] Docket No. 282, ¶ 42. *See Mem. of Decision and Order Granting Motion for Summary Judgment,* AP No. 23-05023, Docket No. 136 (Hudson Diamond NY alter ego decision).

[173] *Joint Statement of Undisputed Facts*, Docket No. 282, ¶ 24. *See Order Granting Mot. of Ch. 11 Trustee for Estate of Ho Wan Kwok for Entry of Default Judgment Against Golden Spring and China Golden Spring*, AP No. 23-05018, Docket No. 35 (Golden Spring alter ego decision).

[174] *See* SUF ¶ 48.

[175] *Joint Statement,* Docket No. 282, ¶ 26. *See Mem. of Decision and Order Granting Motion for Summary Judgment,* AP No. 23-05023, Docket No. 136 (finding Leading Shine NY was Debtor's alter ego at all times)

[176] Docket No. 282, ¶ 36. *See Mem. of Decision and Order Granting Mot. for Summary Judgment,* AP No. 23-05005, Docket No. 133 (Greenwich Land LLC alter ego decision) (the "Greenwich Land Decision").

(j) Fiesta Investment Limited (received transfers totaling approximately $573,000);[177] (k) Rule of Law Foundation III, Inc. (received transfer of approximately $500,000)[178]; (l) Rule of Law Society IV, Inc. (received transfer of approximately $500,000)[179]; and (m) China Golden Spring (received transfers totaling approximately $146,000).[180]

59. Recipients of transfers from ACA with respect to which the Trustee asserts pending Alter Ego Claims include: HIC[181] (received transfers totaling approximately $22 million, $5.5 million of which was used to purchase a McLaren Vehicle for Mileson); and Hamilton[182] (received transfers totaling approximately $9 million, $5 million of which was then transferred to Amy Buck's escrow account to pay for furnishing of the Debtor's Mahwah Mansion).[183]

60. The Debtor also used ACA to pay numerous of his expenses, for example:

a) [redacted]

b) The $1 million fee paid to Strategic Vision US LLC ("Strategic Vision") pursuant to the contract between Strategic Vision and Eastern.[185] Though the $1 million was paid by ACA pursuant to purported loan agreement between ACA and Eastern, these funds were found by Judge Liman to be "a gift on behalf of Eastern (and [the Debtor]) and not provided out of any obligation."[186]

c) Expenses related to the management of the Debtor's yacht, the *Lady May*, paid to Nigel Burgess.[187]

---

177 *See* SUF ¶ 48; *Default Judgment,* AP No. 24-05322, Docket No. 106 (Fiesta's assets are and were at all relevant times property of Debtor of Estate).

178 Docket No. 282, ¶ 43. *See* Docket No. 177 (ROLF alter ego decision).

179 Docket No. 282, ¶ 44. *See Order Granting Mot. of Ch. 11 Trustee for Entry of Default Judgment Against Defendants Rule of Law Foundation III, Inc. and Rule of Law Society IV, Inc., Docket No. 177* (ROLS alter ego decision).

180 *See* SUF ¶ 48; *Amended Default Judgment,* AP No. 23-05318, Docket No. 140 (China Golden Spring's assets are and were at all relevant times property of Debtor of Estate).

181 *See* SUF ¶ 49. Himalaya International Clearing is a defendant in this adversary proceeding.

182 *See* SUF ¶ 49. Hamilton is a defendant in this adversary proceeding.

183 *See* SUF ¶ 49.

184 *Joint Statement of Undisputed Facts*, Docket No. 282, ¶ 13.

185 *See* SUF ¶ 50.

186 *Id.*

187 *Joint Statement* Docket No. 282, ¶¶14. *See* SUF ¶ 50.

d) Expenses related to the management of the Debtor's Bombardier Jet, paid to Flying Colours Corp. and ACASS Canada.[188]

e) Expenses related to the Debtor's travel paid to ACASS Canada.[189]

f) Amounts owed to the Sherry Netherland Inc., related to the Debtor's residence.[190]

g) [redacted]

h) Legal fees of the Debtor's adjudged alter ego, Saraca, paid to Kelman PLLC.[192]

i) Legal fees of Ace Decade Limited, which this Court has ruled was beneficially owned by the Debtor, paid to the Hong Kong law firm of Michael Li & Co.[193]

j) Legal fees of Bravo Luck paid to Bravo Luck's BVI law firm, O'Neal Webster.[194] Notably, O'Neal Webster's fees were subsequently paid for by Hamilton Investment Management Limited, another entity nominally owned by Je with respect to which the Trustee has asserted Alter Ego Claims.[195]

k) Payroll services expenses of the Debtor's adjudged alter ego, Golden Spring, paid to GTM Payroll Services Inc.[196]

l) Amounts invoiced by UBS AG to Well Origin Limited, a company of which the Debtor was the sole shareholder.[197]

m) Fees for security services for the Debtor.[198]

61. ACA was also the source of $9 million transferred to the escrow account of Golden Spring's counsel, Cohn & Birnbaum P.C., in April 2022, in connection with the Debtor's proposal early in the Chapter 11 Case that Golden Spring act as his DIP Lender.[199] In addition, ACA was

188 Docket No. 282, ¶¶ 15, 16. *See* SUF ¶ 50.
189 Docket No. 282, ¶ 16. *See* SUF ¶ 50.
190 Docket No. 282, ¶ 17. *See* SUF ¶ 50.
191 Docket No. 282, ¶¶ 18 – 22. *See* SUF ¶ 50.
192 *See* SUF ¶ 50.
193 Docket No. 282, ¶ 23. *See* SUF ¶ 50.
194 Docket No. 282, ¶¶ 45-49. *See* SUF ¶ 50.
195 *See* SUF ¶ 50.
196 Docket No. 282, ¶ 25; SUF ¶ 50.
197 Docket No. 282, ¶ 34. *See* SUF ¶ 50; *Global Notes and Statements of Limitations, Methodology, and Disclaimers Regarding the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs* (Main Case Docket No. 77) ("SOFA"), at 6 ("The Debtor was the sole shareholder of . . . Well Origin Ltd.").
198 Docket No. 282, ¶ 35. *See* SUF ¶ 50.
199 Docket No. 282, ¶ 5. *See* SUF ¶ 51.

[redacted]

62. Moreover, for the period between at least 2020 and 2021, the Debtor used ACA to pay for expenses related to the Himalaya Exchange, [redacted]

*iii. Purported Agreements Do Not Show ACA's Independence from Debtor*

63. The Defendants may argue that the transfers made or received by ACA described above occurred pursuant to purported arm's length commercial arrangements documented by certain agreements between ACA and Alfa (*i.e.*, Alfa Global Ventures Ltd). These agreements, however, only further demonstrate Debtor's over ACA at all relevant times.

64. The agreements at issue include [redacted]

65. These documents do not in any way demonstrate ACA's independence from the Debtor or generate a material disputed fact in connection therewith, because the evidentiary record shows that they were not bona fide commercial agreements, but rather created to distance ACA (a company holding the Debtor's assets) from the Debtor (and therefore his creditors), and to "paper over" transfers made for the Debtor's benefit.

---

[200] *See* SUF ¶ 51.
[201] *See* SUF ¶ 51.

66. As an initial matter, it cannot be disputed that Alfa is and was controlled by the Debtor. According to documentation in the record, Alfa's purported sole member was Maistrello, the Debtor's assistant and translator.[202] Following the Trustee's assertion of Alter Ego Claims with respect to Alfa in 2024, the Trustee entered into a stipulated judgment with Maistrello which documented her ignorance of any nominal ownership interest held by her in Alfa and stipulated that such ownership interest was property of the Debtor or the Estate.[203] She similarly stated at her deposition that she was unaware she had been named a member of Alfa.[204] This Court subsequently entered a default judgment that Alfa is the Trustee's alter ego.[205]

67. The record demonstrates that the agreements between Alfa and ACA were, at most, designed to create the appearance of an arms' length business relationship between the Debtor and ACA. The agreements had no impact on the parties' conduct. Before entering into the agreements, ACA regularly made transfers directly to Debtor shell companies to pay his and those companies' expenses. There was no suggestion at the time of these transfers that ACA was acting as a "fund manager" for Alfa or for any other entity. After the execution of the FAA, these same types of transfers continued uninterrupted. Thus, ACA served as a slush fund entity for the Debtor both before and after the FAA purportedly came into existence in July 1, 2020, as is demonstrated simply by comparing the amounts of funds transferred by ACA to the Debtor's shell companies (or for his or his family's expenses) prior to July 1, 2020 (approximately $127 million in the aggregate), and afterwards (approximately $184 million in the aggregate).[206]

---

[202] *See* SUF ¶ 56.
[203] *See id.* ¶ 53.
[204] *See id.*
[205] *See id*.
[206] *See* SUF ¶ 54.

68. Further demonstrating that the agreements lacked economic meaning or substance, the parties did not even adhere to their terms. For example:

a) Although the FAA contemplates that Alfa will deposit a "Sum" of investment money with ACA that ACA would administer, this "Sum" never existed, as the record shows that Alfa never provided any funding to ACA as contemplated.[207]

b) Although the FAA required that Alfa pay management fees to ACA, and such fees were purportedly invoiced, there is no evidence in the record that management fees were ever paid by Alfa to ACA.[208]

c) Although ACA routinely executed "loan" documents for transfers it ostensibly made as lender to other Debtor entities on Alfa's behalf, it never received any payments of interest or repayments of principal in connection with such loans.[209]

d) Similarly, ACA never made any payments of interest or repayments of principal in connection with the loan agreements it purportedly entered into, as borrower, on Alfa's behalf.[210]

e) The Facility Agreement contemplates a $50 million loan from Alfa to ACA. However, there is no record of Alfa providing any funding to ACA. [211] There is also no record of ACA ever repaying principal or interest in connection with such loan.

69. Moreover, there is evidence that the FAA and related documents were never validly executed and, therefore, are ineffective. The original FAA, dated July 1, 2020, was signed for Alfa by the Debtor's daughter, Mei Guo, and its supplement and subsequent documents were signed for Alfa by an individual named Wei Kailun, purportedly appointed the authorized representative of Alfa by Mei Guo, as "sole member" of Alfa, on July 30, 2020.[212] However, according to the Alfa register of members, Mei Guo was not the sole member of Alfa in July 2020; rather, Maistrello was, as the register shows Maistrello as the sole member since December 2018

---

[207] *See* SUF ¶ 55.
[208] *See id.*
[209] *See id.*
[210] *See id.*
[211] *See id.*
[212] *See id.* ¶ 56.

and is dated November 5, 2020.[213] As such, Mei Guo had no authority to execute to the original FAA or to appoint Wei Kailun to execute the supplement thereto.

70. Finally, these purportedly "exonerating" documents do not appear in a vacuum, but rather form part of a well-established pattern and practice of the Debtor and his associates seeking to "paper over" transactions using purported loan agreements, declarations of trust, and other such instruments to attempt to isolate the Debtor and his assets from the claims of creditors. Examples of these documents include, among others: (i) the purported declaration of trust under which the Debtor's Sherry Netherland Apartment was supposedly held in trust for the benefit of Bravo Luck; (ii) the loan agreement between HK USA and HIFG that was used to paper over the transfer of $37 million into escrow for the benefit of HK USA; (iii) the loan agreement between ACA and Eastern used to justify ACA's payment of $1 million that Judge Liman found to be a gift on behalf of Eastern and the Debtor; and (iv) the numerous litigation funding agreements under which Golden Spring funded the Debtor's litigation and was entitled to the proceeds thereof.

71. As Judge Torres found in the criminal case, "[Wang] and her co-conspirators concealed Guo's [*i.e.*, the Debtor's] funds by moving them regularly, disguising them as 'loans' or 'investments' and installing figurehead executives at the entities involved in these transactions."[214] Je is one such co-conspirator, and ACA is one of the entities he and others used to move the Debtor's funds.

**F. Debtor Invoked Fifth Amendment When Asked About ACA**

72. The Debtor has asserted the Fifth Amendment when asked: (i) whether he was familiar with ACA; (ii) to describe his relationship with ACA; (iii) whether he controlled ACA; and (iv) whether he beneficially owned ACA. In the summary judgment context, this Court has

[213] *Joint Statement of Undisputed Facts*, Docket No. 282, ¶ 12.
[214] *Tr. of Wang Sentencing Hr'g*, Criminal Case ECF 491, at 10:14-18.

ruled that such invocations of the Fifth Amendment are relevant insofar as they establish that the Debtor does not dispute the testimony of other testifying witnesses.[215]

## IV. Undisputed Facts Establish Himalaya Entities and Their Assets Were at All Relevant Times Beneficially Owned by Debtor

73. Notwithstanding the Himalaya Entities' airy assertion that they have "no relationship with the Debtor or his family," undisputed evidence in the record demonstrates that the Debtor also beneficially owned the Himalaya Entities and their assets. The facts establishing Debtor's domination and control over the Himalaya Entities closely mirror those that entitle the Trustee to summary judgment on his claims with respect to ACA. The Debtor's domination and control over the Himalaya Entities is demonstrated by, among other things: (a) the Debtor's control over Je, who served as the nominal owner of the Himalaya Entities, just as he did ACA; (b) this Court's finding that the Debtor was the leader of the Himalaya Exchange; (c) that the Himalaya Entities comprised the Himalaya Exchange, the Debtor's fraudulent cryptocurrency scheme; (d) that the Debtor controlled Himalaya Exchange and made clear he was the "boss"; (e) the Debtor's control over the Himalaya Exchange through his agents; (f) that the "Himalaya Exchange Ecosystem" consisted of the Debtor' shell companies; (g) that the Himalaya Exchange scheme originated with the Debtor; (h) that the Debtor was responsible for funding the Himalaya Entities; (i) that the Debtor used the Himalaya Entities' funds for his or his family's benefit; and (j) that the Debtor invoked the Fifth Amendment when asked whether he controlled and owned the Himalaya Entities. The Himalaya Entities' failure to produce any tax returns or financial statements (with the exception of a purported consolidated income statement and balance sheet for the year 2021 of

[215] Greenwich Land Decision, at 18-19.

an undefined "Himalaya Group") also suggests that the Himalaya Entities are not bona fide separate entities. [216]

**A. Debtor Controlled Je, Nominal Owner of Himalaya Entities**

74. As discussed above, there is extensive evidence in the record establishing beyond any genuine dispute that Je, the nominal owner of the Himalaya Entities, served as the Debtor's agent and carried out his instructions. *See* section III.A. *supra*.

**B. This Court Found that Debtor Was Leader of Himalaya Exchange**

75. This Court previously found, in its January 13, 2023, *Corrected Memorandum of Decision Granting in Part Motion for Preliminary Injunction* (the "PI Decision"),[217] that the Debtor was the leader of the Himalaya Exchange. More specifically, the PI Decision addressed protest activities organized by the Debtor against the Trustee and Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), requiring that the Court assess in an extensive evidentiary record and witness testimony regarding the networks of individuals and entities linked to the Debtor. In the PI Decision, the Court found that certain Debtor-affiliated organizations and entities were involved in these protests, in particular the Whistleblower Movement, New Federal State of China ("NFSC"), Rule of Law Foundation ("ROLF"), and "Himalaya," defined by the Court as the Himalaya Global Alliance "together with affiliated Himalaya entities, ***such as Himalaya Exchange*** and Himalaya Farms."[218] The Court then found that "[t]he Debtor is the leader of The Whistleblower Movement, NFSC, ROLF, and Himalaya. The Whistleblower Movement, NFSC, ROLF, GSeries, and Himalaya ***serve the purposes of the Debtor, serve as business vehicles for the Debtor, and their members are personally loyal to the Debtor***."[219]

[216] Lomas Declaration ¶ 3.
[217] *PI Decision*, AP No. 22-05032, Docket No. 133.
[218] *Id.* ¶ 4 (emphasis added), 6 (emphasis added).
[219] *Id.* ¶ 7 (emphasis added).

### C. Himalaya Entities Comprised Debtor's Himalaya Exchange Scheme

76. The Himalaya Entities comprised one of the Debtor's most important fraud schemes, the Himalaya Exchange. The Himalaya Exchange was a purported online cryptocurrency "ecosystem," that the Debtor used to defraud his supporters out of hundreds of millions of dollars of "investments" in the purported cryptocurrencies "Himalaya Coin" (a/k/a "H Coin"), and "Himalaya Dollar" (a/k/a "H Dollar").[220] The Criminal Court found H Coin and H Dollar to be "phony cryptocurrency," the Debtor's invention of which was one of the aspects of the Debtor's crime that supported an enhancement to his sentence.[221]

77. The Himalaya Entities together comprised a single scheme, the Himalaya Exchange. According to the Himalaya Entities' documents:

a) HIC indicated that its "DBA" (doing business as) name is Himalaya Exchange.[222]

b) HIFG "issue[s] and manage[s]" Himalaya Coin.[223]

c) HIR "issue[s] and manage[s]" Himalaya Dollar.[224]

d) HIP is part of the "ecosystem of the Himalaya Exchange" and "serve[s] as payment process."[225]

e) HCCP "provide[s] customer service for" HIC, which is its "only customer."[226]

### D. Debtor Controlled Himalaya Exchange and Made Clear That He Was Boss

78. The Debtor's ownership of and control over the Himalaya Exchange is best said by the Debtor himself. In the same recording of the July 2022 meeting discussed above (which meeting Ya Li also attended online), in response to a follower's comment about William Je purportedly applying for licenses related to the Himalaya Exchange, the Debtor said, "***William***

---

220 *See* SUF ¶ 61.
221 *See id.*
222 *See id.*
223 *See id.*
224 *See id.*
225 *See id.*
226 *See id.*

***with his own company? You're joking. William is only representing me***. What they're looking at is the Himalaya Exchange. ***From day one, that was my design***, right? The prince knows ***I am supposed to be the boss*** . . ." The Debtor dismissed this follower's comment, "[w]hen you speak, like what you just said about whether it might belong to William—you should slap yourself after saying that. People would think you have something wrong with your brain, right?"[227]

79. Even the Debtor's arrest did not hinder him from continuing to exercise control over Himalaya Exchange's affairs. As the Debtor said in his sentencing submission, after he was arrested and while in federal custody, he had a meeting with representatives from the UAE sovereign fund to "finalize an investment by the UAE into the Himalaya Exchange and the issuance of government licenses to the Himalaya Exchange,"[228] and "[c]hats between [Je] and [Wang] confirm the scheduling and coordination of this meeting."[229] The Debtor further asserted that he "encouraged continuation of efforts to partner and negotiate with the UAE as well as applications for UAE banking licenses post-arrest is lawful and proper." In other words, it is the Debtor's position that it is lawful and proper that he, as the boss of the Himalaya Exchange, handled negotiation on behalf of the Himalaya Exchange, while his assistants Je and Wang assisted him with administrative tasks such as scheduling and coordinating the meeting. To suggest otherwise is, in the Debtor's own words, "absurd."[230]

*i. Debtor Designed Himalaya Exchange and Decided on Its Launch Date*

80. As discussed further in paragraphs 99 to 110 herein, uncontroverted evidence shows that the Himalaya Exchange scheme (including H Coin/H Dollar) was designed by and originated with the Debtor. In the Debtor's own words, the Himalaya Exchange, "[f]rom day one,

---

227 *See id.* ¶ 62 (emphasis added).
228 *See id.*
229 *See id.*
230 *See id.* ¶ 11.

that was my design." Ya Li also testified that the term "Himalaya" was chosen by the Debtor,[231] and that "[the Debtor] designed H-Coin, H-Dollar, Himalaya Exchange from Day 1."[232]

81. The Debtor also decided on the launch date of the Himalaya Exchange. Himalaya Exchange was launched on November 1, 2021, which, per the testimony of then-Himalaya Exchange CEO Brown, was a "drop dead day issued by [the Debtor]."[233] Ya Li similarly testified that in WhatsApp chat discussions that included the Debtor, Je, and Iron Blood Group members, the Debtor demanded the Himalaya Exchange be launched on November 1, 2021 "no matter what happened." Even this date was inextricably tied to the Debtor. According to an article posted on GNews in 2021, the launch of H Coin is set for November 1, at 11:11 am GMT (7:11 am EDT), because "[t]here are 7 '1s' (11/01, 11:11) in the offering date and time." To the Debtor's followers, the number "7" is symbolic of the Debtor, as it is widely known that the Debtor goes by Brother Seven and his followers call him Brother Seven.[234]

*ii. Debtor Established H Coin Quota*

82. As Ya Li testified, the Debtor designed the "H Coin quota"[235] allowing supporters to subscribe to a certain amount of H Coin at a discount prior to the November 1, 2021 launch date.[236] The H Coin Quota established the amount of H Coin a Farm member could purchase at a 10% discount rate, based on the total amount of H Coin the supporter subscribed to, as well as the supporter's donations of money and time, in the form of volunteer work, to the Debtor's cause.[237] The H Coin Quota was set forth in a form agreement (the "Quota Agreement"), nominally between

---

231 *See id.* ¶ 62.
232 *See id.*
233 *See id.* ¶ 63.
234 *See id.*
235 *See id.* ¶ 64.
236 *See id.*
237 *See id.*

the Farm member and the Farm Company.[238] As shown in Li's Quota Agreement dated October 21, 2021,[239] Li was allowed, "in recognition of the contributions" she had made, to purchase 66,781 H Coin at a discount rate of ten cents per H Coin.[240] The agreement contained undertakings that the Farm member would not take or support any actions "against the core values and ideals of" the Farm, which meant, as Li explained, that a Farm member who "criticized Miles Guo" could lose his or her H Coin as a result.[241]

*iii. Debtor Was Fully Responsible For Any Documents Provided by Himalaya Exchange and Personally Guaranteed Against Any Loss in Purchasing H Coin*

83. Li testified about a live broadcast of the Debtor in December 2021 that she watched, where the Debtor, referring to himself as Brother 7, stated that "for any single coin you lost, Brother 7 will be responsible. For any documents given to you by the Himalaya Exchange and the alliance, Brother 7 will be fully responsible."[242] Subsequently on January 10, 2022, the Debtor (again referring to himself as "Brother 7"[243]) stated: "No one will take your personal information away, and I will always be responsible if anyone does so . . . once you have purchased the coins, if you have any financial losses, Qige [Brother 7] will be responsible. You will only make money, without experiencing any losses . . . This is guaranteed by Qige [Brother 7]."[244]

*iv. Debtor Made Decisions for Himalaya Exchange*

84. The Debtor also made decisions for the Himalaya Exchange. For instance, according to the recording of the July 2022 meeting, the Debtor instructed his Iron Blood Group members to find a CFO (*i.e.*, Chief Financial Officer) and an in-house lawyer for Himalaya

---

238 *See id.*
239 *See id.* In Ya Li's case, because she was a farm leader.
240 *See id.*
241 *See id.*
242 *See id.*
243 *See id.*
244 *See id.* ¶ 65.

Exchange based in the UK. He said, "[a]s quickly as possible, we need to find a qualified CFO, and the Himalaya Exchange will directly send someone over. He must obey unconditionally. Then after the CFO goes in, the in-house lawyer needs to go in. After that, we need to find a deputy CTO to work alongside the CTO."[245]

85. In addition, Ya Li testified that around June and July 2022, a discussion took place about moving the Himalaya Exchange from the UK to Abu Dhabi, and it was the Debtor's idea to do so.[246] In the July 2022 meeting, the Debtor gave further instructions to his Iron Blood Group members regarding the move. The Debtor demanded a "BVI structure" be set up for the Himalaya Exchange in the UAE, because "using a BVI structure allows many people who do not wish to appear publicly to participate as investors through BVI."[247] Regarding Himalaya Exchange's UAE licenses, which Je allegedly applied for, the Debtor instructed his followers that "[o]f course he [*i.e.*, Je] must hand it over to you. You will manage it there. How could it be William? William will also be involved. But those four licenses must be managed by you there."[248]

**E. Debtor Controlled Himalaya Exchange Through His Agents**

86. The Debtor's agents such as Mileson and Wang were closely involved with the Himalaya Exchange. For example, the evidentiary record includes emails between Mileson and Ferrari personnel regarding a proposed Himalaya Exchange sponsorship of Ferrari events. In several of these emails from May 2022, Je was not even copied, and Mileson, among other things, stated that he "***instructed our Exchange*** to concentrate on a proposal for Ferrari" and sent Himalaya Exchange proposals to Ferrari.[249] In June 2022, Ferrari emailed a draft MOI to Mileson

---

[245] *See id.* ¶ 66.
[246] *See id.* ¶ 67.
[247] *See id.*
[248] *See id.*
[249] *See id.* ¶ 68 (emphasis added).

and Je and asked whether Mileson would sign the contract on behalf of Himalaya.[250] Other emails from June 2022 show that Mileson and Je met with Ferrari personnel in person in London, and that Ferrari inquired regarding Mileson's "ties to ownership" of an unspecified Australian company that would be signing the MOU with Ferrari.[251] Je responded that Mileson "is an investor in [Hamilton] and is also responsible for the Ferrari project for Himalaya Exchange."[252]

87. As to Wang, among other things, she discussed the Debtor's plan for a cryptocurrency exchange with Je and Jessica Mastrogiovanni, interviewed Brown in connection with his hiring, and signed documents for Saraca to establish Himalaya Coin and Himalaya Dollar as assumed names of Saraca.[253] Moreover, per the testimony of Ya Li, some of the Debtor's Iron Blood Group members have been employed at the Himalaya Exchange.

88. Brown, nominal CEO of the Himalaya Exchange, testified that, despite his title as CEO, he in fact exercised no control over the Himalaya Exchange and felt like a "strawman" who "didn't really have any say in anything that went on"[254] and was "just kind of the face of [the company without] really hav[ing] any input into the decisions."[255] Brown was originally hired by GTV and paid by Guo Media and GTV; he subsequently transferred to the payroll of Hamilton, but "[n]othing changed" about Mr. Brown's work when this transfer occurred.[256] Brown further testified that he interviewed with Wang and Je, that he took instruction from Je, and that Je appointed him to his position as CEO of Himalaya Exchange during a meeting without telling Brown about it in advance.[257] The appointment surprised Brown, who said he did not consider

---

[250] *See id.*
[251] *See id.*
[252] *See id.*
[253] *See id.* ¶ 69.
[254] *See id.* ¶ 70.
[255] *See id.*
[256] *See id.*
[257] *See id.*

himself "CEO material," was "a terrible public speaker," did not "understand all the dynamics that go with being a chief executive," and had never been a CEO or lead an organization before.[258]

89. Brown's role as a "strawman CEO" who was merely "the face" of the company, is supported by the work he did (and did not do). After he became CEO, Brown said all that changed was he became more involved in marketing, "doing some video sessions and doing some interviews that were given to me by the marketing team," which "decide[d] who I would talk to and when [and] set the agendas."[259] When Brown was later named President of the Himalaya Exchange and replaced as titular CEO by an individual named "Kevin" selected for the CEO role by the Debtor, again "nothing changed" in Brown's role.[260] Despite his lofty titles, Brown said he was not allowed access to the Himalaya Exchange's technology and internal database.[261]

**F. "Himalaya Exchange Ecosystem" Consisted of Debtor's Shell Entities**

90. The Himalaya Exchange had no business with anyone outside the network of the Debtor's shell companies, supporters, and related entities. [redacted]

---

[258] *See id.*
[259] *See id.* ¶ 70.
[260] *See id.*
[261] *See id.*
[262] *See id.* ¶ 71.
[263] *See id.*

[redacted]

91. Brown also testified that "besides the Miles Guo companies," there were no other companies that were part of the so-called Himalaya Exchange ecosystem.[266] Per Brown, G Club was a client of the Himalaya Exchange that would use the Himalaya Exchange "for the money transfer for the purchase of the G/Club memberships."[267] Similarly, HIM, with respect to which the Trustee has asserted pending beneficial ownership claims,[268] was a fund that "was going to work with the exchange . . . people in the fund were allowed access to the … coins.[269]

92. Ya Li also gave testimony illuminating the nature of the relationships between the Himalaya Exchange and the Debtor's other shell companies. For example, she testified that:

a) She transferred money to GFNY, Inc., an alleged alter ego of the Debtor, with an address at the Debtor's offices at Columbus Circle in New York,[270] to purchase H Dollar, and that following the arrest of the Debtor and Wang in March 2023, GFNY, Inc. refunded this money to Ya Li, who then sent it the account in Abu Dhabi of another Debtor-controlled company, G Club ME.[271]

b) The Debtor installed her as director of Holy City Hong Kong BVI ("<u>HCHK BVI</u>"), the parent of the HCHK Entities nominally owned by Wang, with the rationale that

---

[264] *See id.*
[265] *See id.* ¶ 71.
[266] *See id.* ¶ 72.
[267] *See id.*
[268] *See id.*
[269] *See id.*
[270] *See id.* ¶ 73.
[271] *See id.*

HCHK BVI would act as a new Rule of Law Foundation in BVI, where it would be able to accept H Dollar donations.[272]

c) She received, using a company she had established in Australia for this purpose, approximately $5 million from Himalaya Farms in New York and Japan that she sent to "Hamilton Fund," an "institutional investor to Himalaya Exchange" (which other documents confirm to be Hamilton Opportunity Fund[273]) because "[t]hey were going to buy H coin for us."[274]

93. As the Criminal Court found, the Himalaya Exchange was not a real cryptocurrency business and, H Coin and H Dollar were "phony" cryptocurrencies. This is also supported by witness testimony. Brown testified that customers could never purchase H Coin or H Dollar on a blockchain; the Himalaya Exchange simply kept a database.[275] He also testified that the supposedly high market valuation of H Coin was maintained through a "humming bot" automated program that simulated trading activity, and not through real trades.[276] According to Brown, participants in the Himalaya Exchange never purchased H Coin or H Dollar, but merely credits to H Coin or H Dollar, which credits were not cryptocurrency.[277] Indeed, Brown found it "amusing" when Je described the credits "as if they were like an amusement park credits where you pay for tickets and cash them out when you left the park" which "flies in the face of a cryptocurrency," which is "about a public chain where transactions are viewed to for everyone. And everything that goes on, on that chain people have access to. This wasn't anything like that."[278]

94. Under the disguise of a phony cryptocurrency exchange, the Debtor used the Himalaya Exchange to fund the purchase of at least two historic luxury Formula One ("F1")

---

[272] *See id.*
[273] *See id.*
[274] *See id.*
[275] *See id.* ¶ 74.
[276] *See id.*
[277] *See id.*
[278] *See id.*

vehicles for the benefit of his son, Mileson. Though Himalaya Exchange misleadingly marketed these transactions as being paid for by H Dollar, they were actually paid for in cash.

95. The first of these F1 vehicle transactions involved the purchase of a historic McLaren MP4/5A-06 F1 racing car (the "McLaren Vehicle"), paid for by HIC in 2022. The evidence shows that the McLaren Vehicle was purchased for Mileson: (i) according to the import instructions,[279] delivery of the McLaren Vehicle was to be taken at 1053 Great West Road, Brentford TW8 9BW, London, the United Kingdom—*i.e.*, an address Mileson referred to as his "man cave"[280]; (ii) Andrew Law—known as "Mileson's friend"[281]—signed the purchase contract on behalf of the purported buyer, a Bahamas entity Harmony Estate Holding Limited ("Harmony"); and (iii) the email contact for Harmony was ravshokar@protonmail.com—*i.e.*, Ravinder Shokar, who is Mileson's assistant.[282] Indeed, in an email dated April 2023, Mileson sent a picture of himself and another person standing next to a McLaren F1 vehicle that appears identical to the McLaren Vehicle.

96. A press release by Himalaya Exchange dated March 10, 2022 said this transaction was "facilitated" by the "Himalaya Exchange's newly launched Payment Application, Himalaya Pay," and the vehicle was "privately purchased by means of a Himalaya Pay member-to-member transfer of Himalaya Dollar."[283] But this was untrue. The McLaren Vehicle was paid for in cash, with HIC transferring a total of approximately $5.2 million from its account at Mercantile Bank to the seller, GCP Investment Advisors SL.[284] That this was effectively a cash transaction is also clear from the purchase contract itself, which states that the title in the McLaren Vehicle would be

[279] *See id.* ¶ 75.
[280] *See id.*
[281] *See id.*
[282] *See id.*
[283] *See id.* ¶ 76.
[284] *See id.* ¶ 75.

transferred to the buyer "on receipt of the Final Payment in cleared funds into the Seller's bank account," a reference to the deposit of cash into a bank account, not the receipt of a cryptocurrency (even if such cryptocurrency was real, which in this case it was not).[285] Further, while the contract states that the first installment (GBP £3,000,000) of the sale price (GBP £3,950,000) would "be paid through the cryptocurrency exchange known as the Himalaya Exchange," it also states that the "Buyer guarantees that First Deposit shall have a minimum value of GBP £3,000,000."[286] This "minimum value" clause means that, even if this were a transaction involving a real cryptocurrency (which it was not), the amount of cryptocurrency would simply be whatever amount equaled £3,000,000. There was no risk to the seller of receiving cryptocurrency whose value had previously fallen, and therefore the entire payment structure of this transaction was just an elaborate ruse to lead victims to believe that the crypto was a stable currency.

97. The second F1 vehicle transaction involved a $4 million historic Ferrari F1 vehicle (the "Ferrari Vehicle") paid for by HIC in 2022. That Ferrari Vehicle was purchase for Mileson is obvious from the bill of sale, which clearly identified the buyer as Mileson.[287] The Himalaya Exchange again issued a press release, claiming that this "iconic 1989 Ferrari 640 . . . has been sold using Himalaya Dollar."[288] It even referenced the McLaren purchase as a "similar transaction."[289] Again, however, this was a cash transaction involving the wire of funds from HIC's bank account at Mercantile Bank to RM Auctions Deutschland GmbH, as bank records confirm.[290]

---

[285] *See id.* ¶ 76.
[286] *See id.*
[287] *See id.* ¶ 77.
[288] *See id.*
[289] *See id.*
[290] *See id*. Upon receiving the withdrawal request from HIC, Mercantile Bank personnel emailed Ehsan Masud of the Himalaya Exchange, writing "[w]e have received your request to wire out $3,847,155.00" and requested more information about the recipient "[g]iven auction house face a high risk of money laundering."

98. As yet another example, within days of the first seizures by the U.S. Government of bank accounts held in the name of the Himalaya Entities, on or about September 23, 2022, Je contacted Bo Collins, CEO of Mercantile Bank which held these accounts, and sought to effectuate a wire transfer of no less than $46 million as a purported redemption to an unnamed VIP client of the Himalaya Exchange, which Je later revealed was ACA. Twice Je emphasized to Mercantile that the transfer needed to happen "today or it is meaningless." According to a purported redemption form dated September 23, 2022, the ACA account to receive the $46 million transfer was held at First Abu Dhabi Bank in the UAE.[291] However, when the Trustee asked ACA to produce documents sufficient to describe and identify its relationship with the Himalaya Exchange scheme, ACA responded, "None."[292]

**G. Himalaya Exchange Scheme Originated with Debtor**

99. In addition to the Criminal Court's preclusive finding that the Debtor was responsible for the "invention a phony cryptocurrency," (i.e., H Coin/H Dollar)[293] the evidence shows that the Himalaya Exchange scheme (including H Coin/H Dollar) originated with the Debtor.

*i. Himalaya Exchange Scheme a Continuation of Debtor's G Coin/G Dollar Scheme*

100. The origin of the Himalaya Exchange can be traced to the Debtor's first scheme promoting a fake cryptocurrency: his effort to use Saraca and its subsidiary, GTV, to sell "G Coin" and "G Dollar," purportedly issued by a "Himalaya Reserve." The Debtor promoted G Coin/G Dollar to his followers in mid-2020, but this effort was brought to a halt by the United States Securities and Exchange Commission ("SEC"). Subsequently, G Coin/G Dollar was rebranded H

---

[291] *See id.* ¶ 92.
[292] *See Chapter 11 Trustee's Mot. to Compel Discovery*, Docket No. 216-1, at 24.
[293] Criminal Case ECF 864, at 46:11-16.

Coin/H Dollar, to be traded on the Himalaya Exchange. The sequence of events was summarized in the deposition testimony of Ya Li, who explained: "H-Coin is a -- Miles Guo created this cryptocurrency. So H-Coin's original name is G Coin. It was GTV's together at that time. But because G Coin been seized by SEC, so the new name become H-Coin."[294]

*ii. Debtor Plans Purported Cryptocurrency Scheme*

101. The Debtor was already looking into the creation of purported cryptocurrency in May 2020, prior to the formation of the Himalaya Entities.[295] On May 4, 2020 the Debtor discussed with his counsel Aaron Mitchell regarding "G Coin," and Mitchell's time records show that on numerous subsequent occasions Mitchell performed numerous tasks on "crypto-related" issues, such as research into "crypto attorneys" on May 10, 2020 and a report "to Y re: crypto[] results" (a clear reference to Wang, the Debtor's agent) on May 11, 2020.[296]

102. Even at this early stage, the Debtor was interested in the possibility of "Himalaya" branding for his planned cryptocurrency scheme. On May 12, 2020, Mitchell emailed Valerie Stevens (copying the Debtor's agents Max Krasner and Wang), asking Hodgson Russ to file certain "doing business as" (*i.e.*, d/b/a) names Saraca and its subsidiary, GTV. Mitchell's email included instructions as to what the d/b/a names were to be for Saraca, namely ***"Himalaya Coin" and "Himalaya Dollar***,"[297] and the corporate resolutions and New York state filing forms related to adopting these d/b/a names were completed on May 13 and May 14, 2020.[298]

103. The Debtor's interest in "Himalaya" as well "G" branding for his cryptocurrency scheme is further demonstrated by the Word document, last revised on May 13, 2020, that was

---

294 *See id.* ¶ 78.
295 *See id.* ¶ 79.
296 *See id.*
297 *See id.* ¶ 80 (emphasis added).
298 *See id.*

extracted from one the Debtor's phones found by the FBI at the Debtor's Sherry Netherland residence.[299] This document is titled "Four Currencies Joint Programme" and proposes that there be a "Himalaya Reserve," to be "the independent holding company for all G currencies. It is central to the plans for the Himalaya financial system."[300] The document goes on to discuss plans for the development of a cryptocurrency scheme over multiple stages, or "versions," including, in "Version 2", a "G Dollar," as well as "G Coins" that would (in a hallmark of the Debtor's schemes) be convertible to GTV stock.[301] The final stage, "Version 4," states: "The ultimate objective is the Himalaya Reserve. The Father coin, also called Himalaya Coin, will be publicly tradable and circulatable. It will be a stable coin and be a real tangible currency."[302]

*iii. Debtor Initially Promotes G Coin/G Dollar*

104. Initially, the focus of the Debtor's cryptocurrency scheme was the promotion of G Coin/G Dollar-branded cryptocurrency as an opportunity for his supporters to invest in GTV.

105. Brown testified that he was hired in June 2020 by GTV, that he understood the "G" in GTV to stand for "Miles Guo" and that he understood GTV to be controlled by the Debtor.[303] He further testified that he was hired "to help launch and create cryptocurrency as well as work to build out or develop an exchange," and that the cryptocurrency was "branded G Coin and G Dollar", naming which he believed was "***for Miles Guo***."[304] Brown said he was hired to help with the creation of the coins for ***Guo Media***.[305] Brown's testimony is supported by his offer letter from GTV, dated June 17, 2020, which offers him a position as "Associate Director – Blockchain, reporting to Joe Wang, Chief Tech Officer, and Yvette Wang, Director, ***at our New York City***

[299] *See id.* ¶ 81.
[300] *See id.*
[301] *See id.*
[302] *See id.*
[303] *See id.* ¶ 82.
[304] *See id.* (emphasis added).
[305] *See id.* (emphasis added).

***office at 162 East 64th Street*** [i.e., the Debtor's office]."[306] Notably, Brown further explained that, although he was hired to develop G Coin/G Dollar branded cryptocurrency, he learned about H Coin/H Dollar "pretty much my first day," and that there "***was no difference***" "between G Dollar and G Coin on one hand and H Dollar and H Coin on the other hand."[307]

106. Between May and September 2020, the Debtor vigorously promoted G Coin/G Dollar. The Debtor's messages to his supporters promoting G Coin/G Dollar also repeatedly made references to "Himalaya": the Debtor described G Coin/G Dollar as being issued by the "Himalaya Reserve" and made references to H Coin/H Dollar. For example:

a) The Debtor's May 13, 2020 video broadcast, in which he told his supporters: "There is no place to go, ***you can only come to the Himalaya Reserve to*** buy Dollar, buy G coins."[308]

b) The Debtor's June 2, 2020 video broadcast, in which he told his supporters: "At the same time, as our fellow fighters know, our GDOLLAR, and GCOIN, this pre-sale of the whole system will also start immediately, and will be fully online and start running in three and a half months from now. Then, the Stable Coin ***issued by our Himalayan Federal Reserve***, the HiFed, and the GCOIN jointly used by our online, our GFASHION and GNEWS, GTV will all be fully online."[309]

c) The Debtor's July 22, 2020 video broadcast, in which he told his supporters: "Next, our G-Club, G-Fashion, G-Coin, G-Dollar, ***and the H-Coin and H-Dollar***, will become the greatest currencies in the world, please remember this."[310]

d) The Debtor's September 20, 2020 video broadcast, in which he told his supporters, "G Dollar is pegged to the US dollar and other currencies" and "you can put your money here for a long time, even forever. You can take it away in minutes, from your G Dollar account, ***which is also our Himalaya-coin***, directly to the virtual currency G Coin . . . ."[311]

---

[306] *See id.* (emphasis added).
[307] *See id.* (emphasis added).
[308] *See* SUF ¶ 83 (emphasis added).
[309] *See id.* (emphasis added).
[310] *See id.* (emphasis added).
[311] *See id.* (emphasis added).

*iv. SEC Investigation Prompts Rebrand of G Coin/G Dollar as H Coin/H Dollar*

107. By July 2020, the Debtor and his associates knew that the SEC had begun an investigation of the Debtor's G Coin/G Dollar solicitation and related GTV private placement scheme. This is evident from the July 2020 invoice of the Debtor's counsel, Aaron Mitchell, which references an SEC subpoena, calls with the SEC, and correspondence regarding G Dollar.[312] It is also evident from the letter dated July 15, 2020, sent via email to Saraca (attention to Je, Max Krasner, Wang, and Mitchell), by Hayman, which inquired about the source of the money used by Saraca to invest in Hayman.[313] The letter explained: "We have been contacted by the [SEC] related to an investigation of a securities offering by [GTV] entitled "In the matter of G Coins (NY-10256)."[314] Eventually, the SEC's investigation would lead to the issuance, on September 13, 2021, of a Cease and Desist Order which stated, among other things, that Saraca and GTV had offered and sold G Coin/G Dollar in violation of the Securities Act, and that they had undertaken to "[n]ot participate, directly or indirectly, in any offering of a digital asset security[.]"[315]

108. The Debtor and his agents, while the SEC investigation was still ongoing, worked on the rebranding of G Coin/G Dollar to H Coin/H Dollar and the movement of the cryptocurrency scheme's operations to another jurisdiction. Jessica Mastrogiovanni, Saraca's General Counsel from August 2020 to March 2021, testified in a declaration that she attended a video conference with the Debtor, Wang, the Debtor's counsel Victor Cerda,[316] and Je where they discussed cryptocurrency opportunities.[317]

[312] *See id.* ¶ 84.
[313] *See id.*
[314] *See id.*
[315] *See id.*
[316] *See* SUF ¶ 85. Ms. Mastrogiovanni understood Victor Cerda to "oversee legal work for the Debtor and his family office," and that he reported directly to the Debtor and Yvette Wang. *See id.*
[317] *See id.*

109. In November 2020, most of the Himalaya Exchange Entities were formed in the BVI, along with a BVI entity called Freedom Media Ventures Limited ("FMV"), an entity nominally owned by Haoran He[318] that the Debtor referred to as the "new GTV" and with respect to which this Court has already issued an Alter Ego Ruling in favor of the Trustee.[319] Per the testimony of Ya Li, the Debtor's supporters would eventually be required to transfer a large portion of the H Coin held in their Himalaya Exchange accounts to be "locked up" in the Himalaya Exchange account of FMV, which Li stated was another of the "headquarter" companies controlled by the Debtor.[320] Li also testified that FMV's nominal owner and director, Haoran He, held FMV for the Debtor, and she understood He represented the Debtor's family.[321]

110. In April of 2021, the Debtor began to vigorously promote H Coin and H Dollar himself. For example, the Debtor appeared in video broadcasts on April 27, 2021 ("The White Paper of Himalaya Coin is the best one in the world, and the H-Coin, H-Dollar, H-Reserve will change the financial system."[322]), April 29, 2021 (announcing that the H Dollar going online is "a huge online success" and that "the arrival of Himalaya Coin, the Himalaya Dollar, and the Himalaya Reserve is perfectly timed."[323]), and numerous dates thereafter.[324] And on December 10, 2021, the Debtor released his "HCoin to the Moon" music video, featuring himself on the Lady May and driving a red Lamborghini vehicle.[325]

318 *See id.* ¶ 86.
319 *See id.*
320 *See id.*
321 *See id.*
322 *See id.* ¶ 87.
323 *See id.*
324 *See id.*
325 *See id.*

### H. Debtor Was Responsible for Funding Himalaya Entities

111. As the evidence summarized by the Lomas Declaration explains, the Debtor was responsible for funding each of the Himalaya Entities, both through transfers from companies he controlled as well as through his solicitation of funds from his supporters. The only exception to this was HIP, which had no bank account. For example:

a) HIC received approximately $82 million from Hamilton. [326]

b) HIC received approximately $22 million from ACA. [327]

c) HIC received $50 million from G Club International Limited. [328]

d) HIC received $200,000 from Lexington. [329]

e) HIC also received more than $8.8 million from HAA Group Pty Ltd., a company that Ya Li testified that she owned and set up pursuant to instructions from the Debtor.[330]

f) HCC received approximately $585,000 from ACA.[331]

112. In addition, the Debtor directed transfers between and among the Himalaya Entities. For example:

a) HIC transferred more than $101 million to HIFG;[332]

b) HIC transferred approximately $260 million to HIR;[333]

c) HIC transferred more than $215,000 to HCCP; [334]

d) HIFG transferred more than $56 million to HIR;[335]

e) HIFG transferred approximately $356,000 to HIC;[336] and

---

[326] *See* SUF ¶ 88. The Trustee alleges Hamilton was beneficially owned, together with its assets, by the Debtor.
[327] *See id.* The Trustee alleges was beneficially owned, together with its assets, by the Debtor.
[328] *See id.* The Trustee alleges was beneficially owned, together with its assets, by the Debtor.
[329] *See id.*
[330] *See id.*
[331] *See id.*
[332] *See id.* ¶ 89.
[333] *See id.*
[334] *See id.*
[335] *See id.*
[336] *See id.*

f) HIR transferred $35 million to HIC.[337]

**I. Debtor Used Funds of Himalaya Entities for His and His Family's Benefit**

113. The Debtor used the funds of the Himalaya Entities to transfer money to or for the benefit of companies that he controlled. For example:

a) HIFG transferred $37 million to Zeisler & Zeisler PC, attorneys for HK USA;[338]

b) HIC transferred more than $175 million to Hamilton;[339]

c) HIC transferred more than $50 million to Hamilton Investment Management Ltd.;[340]

d) HIC transferred approximately $47 million to Hamilton Capital;[341]

e) HIC transferred $15 million to G Club International Limited;[342] and

f) HIC transferred more than $3 million to G Fashion International Limited.[343]

114. The Debtor also used the funds of the Himalaya Entities to make transfers for the benefit of Mileson and Mileson's associates, for example:

a) HIC transferred approximately $5.2 million to GCP Investment Advisors SL for the purchase of the McLaren Vehicle for Mileson.[344]

b) HIC transferred approximately $4 million to RM Auctions Deutschland GmbH for the purchase of a Ferrari F1 vehicle for Mileson.[345]

c) HIC transferred approximately $454,000 to Andrew Law, who is described as "Mileson's friend."[346]

d) HIC transferred more than $3.4 million to Scarabaeus Wealth Management AG ("Scarabaeus").[347]

---

337 *See id.*
338 *See id* ¶ 90.
339 *See id.*
340 *See id.*
341 *See id.*
342 *See id.*
343 *See id.*
344 *See id.* ¶ 91.
345 *See id.*
346 *See id.*
347 *See id.* Despite having received transfers from HIC, according to Scarabaeus' initial disclosures, the director of Scarabaeus who would have knowledge of the transfers to Scarabaeus said he did not have information

e) HIC transferred approximately $52,000 to Farrant Group Limited, which is described as "Mileson's PR firm.[348]

f) HIC transferred more than $190,000 to Cameron Smee and Roger Smee, who are described as "Mileson's friend[s]."[349]

115. In short, the Himalaya Entities and the related fraudulent schemes are just another example of how the Debtor, in Judge Torres's words, (i) "single-mindedly dedicated himself to increasing his own wealth," (ii) conspired with William Je and others to conceal the Debtor's funds by "moving them regularly, disguising them as 'loans' or 'investments,'" and (iii) used the funds obtained through those schemes to "further [the Debtor's] extravagant lifestyle."[350]

### J. Debtor Invoked the Fifth Amendment When Asked Whether He Controlled and Owned Himalaya Entities

116. The Debtor has asserted the Fifth Amendment when asked: (i) whether he was familiar with each of the Himalaya Entities; (ii) to describe his relationship with the Himalaya Entities; (iii) whether he controlled the Himalaya Entities; and (iv) whether he beneficially owned the Himalaya Entities. In the summary judgment context, this Court has ruled that such invocations of the Fifth Amendment are relevant insofar as they establish that the Debtor does not dispute the testimony of other testifying witnesses.[351]

---

concerning the Himalaya Entities. Instead, the director claimed he had information solely about Scarabaeus' relationship with G Club International Limited. *See* Trustee Ex. 108. The Court will recall that in the attachment proceedings in Switzerland, Mileson claimed that the multimillion-dollar mansion in Weggis, Switzerland that he bought (the "Weggis Property") was encumbered by "bearer mortgage notes" held by Scarabaeus (which is now known as Prime Funds). *See Chapter 11 Trustee's Notice of Filing of Presentation for March 3, 2026 Status Conference* (Main Case Docket No. 5106), at 33.

[348] *See* SUF ¶ 91.

[349] *See id.*

[350] Criminal Case ECF 864 at 82:11-14, 85:1-3.

[351] Greenwich Land Decision, at 18-19.

WHEREFORE, the Trustee respectfully requests that the Motion be granted and the Court enter judgment against the Defendants.

Dated: August 7, 2026
New York, New York

LUC A. DESPINS, CHAPTER 11 TRUSTEE

By: /s/ *Nicholas A. Bassett*
Nicholas A. Bassett (admitted *pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C., 20036
(202) 551-1902
nicholasbassett@paulhastings.com

*and*

Douglass E. Barron (admitted *pro hac vice*)
G. Alexander Bongartz (admitted *pro hac vice*)
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6079
douglassbarron@paulhastings.com
alexbongartz@paulhastings.com

*and*

Douglas S. Skalka (ct00616)
Patrick R. Linsey (ct29437)
NEUBERT, PEPE & MONTEITH, P.C.
195 Church Street, 13th Floor
New Haven, Connecticut 06510
(203) 781-2847
dskalka@npmlaw.com
plinsey@npmlaw.com

*Counsel for the Chapter 11 Trustee*